RECEIVED
Mail Room

JUN -- 3 2013

United States Court of Appeals
District of Columbia Circuit

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED
JUN -- 3 2013

CLERK

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| OTIS ELEVATOR COMPANY, | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| SECRETARY OF LABOR, | )  Civil No. **13-1194** |
| U.S. DEPARTMENT OF LABOR, | ) |
| and | ) |
| OCCUPATIONAL SAFETY AND HEALTH | ) |
| REVIEW COMMISSION | ) |
| Respondents. | ) |

_____/

## PETITION FOR REVIEW

Otis Elevator Company hereby petitions the Court under 29 U.S.C. 660(a) and

*Fed.R.App.P.* 15 to review the final order issued by the U.S. Occupational Safety and Health

Review Commission on April 8, 2013, in *Otis Elevator Company*, OSHRC Docket No. 09-

1278, a copy of which is included as Attachment A, which affirmed citation items issued by

the Secretary of Labor and which assessed civil penalties.

A certificate of compliance with *Fed.R.App.P.* 15(c)(1)-(3), including a list of persons

to be served by the clerk of the Court, is attached.

Respectfully submitted,

**WATERS LAW GROUP, LLC**
1465 S. Fort Harrison Avenue, Ste. 205
Clearwater, FL 33756
Phone: (727) 474-4736 x1
Email: pwaters@oshattorney.com

By:_____
Paul J. Waters, Esq.

USES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUN -3 2013

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUN -3 2013

CLERK

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| OTIS ELEVATOR COMPANY, | ) |
| Petitioner, | ) |
| v. | ) Civil No. **13-1194** |
| SECRETARY OF LABOR,<br>U.S. DEPARTMENT OF LABOR, | ) |
| and | ) |
| OCCUPATIONAL SAFETY AND HEALTH<br>REVIEW COMMISSION | ) |
| Respondents. | ) |

## CORPORATE DISCLOSURE STATEMENT

In accordance with *Fed.R.App.P.* 26.1 and Circuit Rule 26.1, Otis Elevator Company files this Corporate Disclosure Statement as follows:

Otis Elevator Company, a New Jersey corporation, is a wholly-owned subsidiary of United Technologies Corporation, a publicly traded company on the New York Stock Exchange.

Respectfully submitted,

**WATERS LAW GROUP, LLC**
1465 S. Fort Harrison Avenue, Ste. 205
Clearwater, FL 33756
Phone: (727) 474-4736 x1
Email: pwaters@oshattorney.com

By: _____
Paul J. Waters, Esq.

### INSTRUCTIONS FOR SERVICE
### AND
### CERTIFICATE OF SERVICE

Pursuant to *Fed.R.App.P.* 15(c), the Clerk must serve a copy of the Petition for

Review on the persons listed below:

Hon. Ray H. Darling, Jr., Executive Secretary
Occupational Safety and Health Review Commission
One Lafayette Centre
1120 20th Street, N.W., Room 980
Washington, D.C.  20036-3419
rdarling@oshrc.gov

Joseph M. Woodward
Associate Solicitor for Occupational Safety and Health
Office of the Solicitor of Labor
Room S-4004
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210
woodward.joseph@dol.gov

This also certifies that the foregoing Petition for Review and Corporate Disclosure Statement were served by U.S. mail, first class, postage prepaid, and by electronic mail, upon the above persons on May 31, 2013.

Paul J. Waters

ATTACHMENT A

COPY OF REVIEW COMMISSION FINAL ORDER



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1120 20th Street, N.W., Ninth Floor
Washington, DC 20036-3457

---

SECRETARY OF LABOR,

             Complainant,

         v.

OTIS ELEVATOR COMPANY,

             Respondent.

OSHRC Docket No. 09-1278

---

ON BRIEFS:

     Sarah Kay Marcus, Attorney; Charles F. James, Counsel for Appellate Litigation; Joseph M. Woodward, Associate Solicitor; M. Patricia Smith, Solicitor; U.S. Department of Labor, Washington, DC
         For the Complainant

     Paul J. Waters, Esq.; Akerman Senterfitt, Tampa, FL
         For the Respondent

## DECISION

Before: ROGERS, Chairman; ATTWOOD, Commissioner.

BY THE COMMISSION:

On June 16, 2009, a service mechanic employed by Otis Elevator Company ("Otis") injured his hand while unjamming the gate of a freight elevator at Boston Store, a department store in Brookfield, Wisconsin. Following an investigation of this accident, the Occupational Safety and Health Administration ("OSHA") issued a serious citation to Otis under the Occupational Safety and Health Act of 1970 ("Act"), 29 U.S.C. §§ 651-678.[1] The citation item at issue alleges that Otis violated 29 C.F.R. § 1910.147(f)(2)(i), a provision in the lockout/tagout ("LOTO") standard that requires an "outside employer" and an "on-site" employer to inform each other of their respective LOTO procedures.

---

[1] The citation included two items, one of which the Secretary withdrew prior to the hearing.

Administrative Law Judge Dennis J. Phillips vacated the item, concluding that the LOTO standard was not applicable and that, in any event, the cited provision did not require Otis, the outside employer, to inform Boston Store, the on-site employer, of its LOTO procedures. For the reasons that follow, we reverse the judge and affirm the citation item.

## BACKGROUND

On the day of the accident, Otis assigned a service mechanic to repair a freight elevator at Boston Store. The Otis dispatcher who made the assignment informed the mechanic that the elevator's "car gate was hung up and not functioning." When functioning properly, the elevator's metal gate opened whenever an employee pushed a button in the hallway next to the elevator. The mechanism that controlled the gate included two chain assemblies located on the rooftop of the elevator car—one on each side adjacent to the gate. Each chain assembly included vertical and horizontal chains attached to separate sprockets. The horizontal chains were powered by one of the motor's pulleys which, when operating properly, raised and lowered the gate.

After he arrived at the store, the mechanic talked to "a couple [Boston Store] employees," who confirmed that "the gate was hung up on the [elevator] car." He then walked to the freight elevator and observed that the gate was partially open leaving a three-foot gap between it and the floor. He also observed an out-of-order sign in the hallway by the elevator. He tried to move the gate, yanking on it "[p]retty hard," but it did not budge. After ducking underneath the gate to enter the elevator car, he used a ladder to access the car's escape hatch and climbed on top of the car.

Once on top of the car, the mechanic flipped two switches to prevent anyone from calling the elevator or moving the gate electrically.[2] He then examined one of the gate's chain assemblies and determined that the gate could not move because the assembly's chain "was off the sprocket" and jammed. The mechanic decided that he would attempt to fix the gate by prying the chain back onto the sprocket. He testified that when he did this, the chain started moving as he had anticipated, and he "intentionally" grabbed it with his hand, resulting in his hand being "drug through the sprocket and chain." He explained that he grabbed the chain

---

[2] Otis's LOTO procedures required its mechanic to "block up [the gate] mechanically or with a Bi-Parting Door Tool to prevent unexpected gate movement." Otis does not dispute that the mechanic failed to do this.

2

because he "was worried about . . . the gate slamming and busting" the link that connected a counterweight to the gate. According to the mechanic, if the connecting link had broken, the repair would have taken longer because he would have had to "fish" the counterweight out of the box in which it was housed.

## DISCUSSION

The cited provision of the LOTO standard, § 1910.147(f)(2)(i), states that "[w]henever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures." It is undisputed here that Otis was the "outside employer" and Boston Store was the "on-site employer," and Otis concedes that it did not inform Boston Store of its LOTO procedures.

Before us on review are the following issues: (1) whether the Otis mechanic, as "outside servicing personnel," was "engaged in activities covered by the scope and application" of the LOTO standard; (2) if so, whether the cited provision required Otis to inform Boston Store of its LOTO procedures; (3) whether compliance with the cited provision would have been infeasible; and (4) in the event a violation has been established, whether it is serious.

### Scope and application of LOTO standard

The LOTO standard's scope "covers the servicing and maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." 29 C.F.R. § 1910.147(a)(1)(i) (emphasis in original). Its application section states that the "standard applies to the control of energy during servicing and/or maintenance of machines and equipment." 29 C.F.R. § 1910.147(a)(2)(i). For purposes of the LOTO standard, "[s]ervicing and/or maintenance" includes activities such as "unjamming of machines or equipment . . . where the employee may be exposed to the *unexpected* energization or startup of the equipment or release of hazardous energy." 29 C.F.R. § 1910.147(b) (emphasis in original).

The judge concluded that the Otis mechanic's work did not fall within the scope of the LOTO standard, finding that "there was no potential for an unexpected release of stored [gravitational] energy while [the mechanic] performed his work on the gate chain and sprocket atop of the elevator car." In support of this conclusion, the judge found that the mechanic "expected and fully anticipated that the gate and the chain would begin moving" once the chain

3

was placed back onto the sprocket. The Secretary argues that the judge erred because the mechanic's unjamming work is specifically covered under the standard.

Contrary to the judge's conclusion, applicability of the LOTO standard does not turn on whether or not the unjamming process happened to proceed as the Otis mechanic expected. *See Elliot Constr. Corp.*, 23 BNA OSHC 2110, 2119, 2012 CCH OSHD ¶ 33,231, p. 56,071 (No. 07-1578, 2012) (noting that the " 'purpose of the Act is to prevent the first accident' " (citation omitted)). The standard applies if there was the *potential* for an unexpected release of stored energy that could cause injury to the mechanic. 29 C.F.R. § 1910.147(a)(1)(i); *see Gen'l Motors Corp.*, 22 BNA OSHC 1019, 1023, 2004-09 CCH OSHD ¶ 32,928, p. 53,606 (No. 91-2834E, 2007) (consolidated) ("Energization is 'unexpected' in the absence of some mechanism to provide adequate advance notice of machine activation." (citations omitted)).

We find that this potential was present during the unjamming activity the mechanic performed here. *See, e.g.,* Control of Hazardous Energy Sources (LOTO), 54 Fed. Reg. 36,644, 36,646-47 (Sept. 1, 1989) (final rule) (indicating that effort to unjam wood wedged in energized table-saw blade created potential for unexpected energization). There was stored kinetic energy in the elevator's jammed chain assembly due to the weight of the partially open gate. Although the mechanic testified that the chain was off the sprockets and jammed "tight as could be," and that he "expected" the chain would move once he "unwedged" it, the record does not show that he could predict when the jam would yield. In fact, the mechanic's own testimony shows that the release of energy surprised him: "I *reacted*, and I guess I grabbed [the chain] with my hand" to prevent the gate from slamming and breaking the counterweight link. (Emphasis added.) *See Gen'l Motors Corp.*, 22 BNA OSHC at 1023, 2004-09 CCH OSHD at p. 53,606; *compare Reich v. Gen'l Motors Corp.*, 89 F.3d 313, 315 (6th Cir. 1996) (affirming Commission's holding that LOTO standard did not apply to servicing activities performed on deactivated machines that were "designed and constructed so that [they could not] start up without giving a servicing employee notice of what [was] about to happen"), *aff'g* 17 BNA OSHC 1217, 1993-95 CCH OSHD ¶ 30,793 (No. 91-2973, 1995) (consolidated).

Moreover, we find that the release of stored energy posed a caught-in hazard to the mechanic. Even if he had not reflexively grabbed the chain, his work necessarily placed him in close proximity to it, and a body part or piece of clothing could have been inadvertently caught

in the chain, or between it and the sprocket, when the stored energy released.[3] *See* Control of Hazardous Energy Sources (LOTO), 54 Fed. Reg. at 36,647 (noting that performance of maintenance or servicing activities "expose the employee to the hazard of being pulled into the operating equipment when parts of the employee's body, clothing or the material or tools used for cleaning or servicing become entrapped or entangled in the machine or equipment mechanism"); *Burkes Mech., Inc.*, 21 BNA OSHC 2136, 2139 n.4, 2004-09 CCH OSHD ¶ 32,922, pp. 53,561-62 n.4 (No. 04-0475, 2007) (finding laborers cleaning near conveyor were "positioned in such a way" that conveyor "could have unexpectedly caught hold of their tools, clothing, or body parts—all types of hazards § 1910.147 was intended to eliminate" (citations omitted)). The Otis mechanic was, therefore, engaged in "service and/or maintenance" within the meaning of the LOTO standard's scope provision. 29 C.F.R. § 1910.147(a)(1)(i), (b).

In support of his contention that the LOTO standard applies here, the Secretary relies on 29 C.F.R. § 1910.147(a)(2)(ii), which generally excludes "[s]ervicing and/or maintenance which takes place during normal production operations" from coverage under the LOTO standard, but includes such work pursuant to paragraph (a)(2)(ii)(B) if, as relevant here, "[a]n employee is required to place any part of his or her body into an area on a machine or piece of equipment . . . where an associated danger zone exists during a machine operating cycle." 29 C.F.R. § 1910.147(a)(2)(ii), (ii)(B). Even if the work here was done during "normal production operations," we find that the LOTO standard applies because the record establishes that this criterion for coverage under the standard has been met.[4]

As we have already found, the Otis mechanic was on top of the elevator car—where an employee using the elevator would not ordinarily be positioned—performing an unjamming activity that placed parts of his body in a "danger zone," i.e., an area where a release of energy

---

[3] Otis asserts that the "movement of the gate," which is designed to be evenly counterweighted so that its weight would be greatly reduced, could not "inflict any serious physical harm or death," or even cause a bruise. But the mechanic testified that when he was servicing the elevator only one counterweight was holding the gate and, therefore, it would have slammed shut once the chain was unjammed. Based on this testimony, we reject Otis's assertion.

[4] We need not reach the issue of whether the Otis mechanic's work was done during "normal production operations," because the record establishes the LOTO standard's applicability in either case. If the work was not done during "normal production operations," the LOTO standard applies pursuant to § 1910.147(a)(2)(i). If the work was done during normal production operations, the LOTO standard applies because the record establishes that the requirements for applicability pursuant to § 1910.147(a)(2)(ii)(B) have been met.

stored in the gate assembly could result in a caught-in hazard.[5]  *See* 29 C.F.R. § 1910.147(b) (defining "[s]ervicing and/or maintenance" as including "unjamming of machines or equipment . . . where the employee may be exposed to the *unexpected* . . . release of hazardous energy" (emphasis in original)); *Burkes Mech.*, 21 BNA OSHC at 2139 n.4, 2004-09 CCH OSHD at pp. 53,561-62 n.4.  Moreover, the mechanic was in this danger zone "during a machine operating cycle," as the record shows that the elevator's gate was in a partially open position as the mechanic worked to unjam the chain, and then closed once he unjammed it.  Under these circumstances, we conclude the LOTO standard covers Otis's unjamming activity.

### Alleged Violation of § 1910.147(f)(2)(i)

In vacating the citation, the judge concluded that there was "no possibility" of Otis and Boston Store employees interacting or creating "misunderstandings," based on his findings that: (1) "[t]he only 'zone of danger' was on the elevator car top near the chain and sprocket" and "[t]he only employee who would ever be on the elevator car top . . . would be an Otis employee," and (2) there was no evidence that Boston Store employees were either "affected" or "authorized" employees under the LOTO standard.[6]  On review, the Secretary argues that the standard presumes the potential for such interaction and/or misunderstandings whenever an outside employee is performing an activity covered by the LOTO standard.

We agree with the Secretary's reading of the standard.  By its terms, § 1910.147(f)(2)(i) applies "*[w]henever* outside servicing personnel are to be engaged in activities covered by the scope and application of [the LOTO] standard . . . ."  (Emphasis added.)  As discussed above, the

---

[5]  In fact, the caught-in hazard to which the Otis mechanic was subjected is the very type of hazard that the LOTO standard is intended to protect against when unjamming activities are performed during normal production operations.  Control of Hazardous Energy Sources (LOTO), 54 Fed. Reg. at 36,646-47 (explaining that "operations such as cleaning *and unjamming machines or equipment* are covered by this standard when the employee is exposed to greater or different hazards than those encountered during normal production operations" (emphasis added)).

[6]  The LOTO standard defines an "[a]uthorized employee" as "[a] person who locks out or tags out machines or equipment in order to perform servicing or maintenance on that machine or equipment."  29 C.F.R. § 1910.147(b).  The standard defines an "[a]ffected employee" as "[a]n employee whose job requires him/her to operate or use a machine or equipment on which servicing or maintenance is being performed under [LOTO], or whose job requires him/her to work in an area in which such servicing or maintenance is being performed."  *Id.*  "An affected employee becomes an authorized employee when that employee's duties include performing servicing or maintenance covered under this section."  *Id.*

Otis mechanic was engaged in such covered activities. The cited provision, which is a specification standard,[7] presumes that in this situation a Boston Store employee may interfere with "the restrictions and prohibitions" of Otis's energy control program.[8]  *See* Control of Hazardous Energy Sources (LOTO), 55 Fed. Reg. 38,677, 38,683 (Sept. 20, 1990) (final rule) (stating that § 1910.147(f)(2)(i) is "a way to prevent misunderstandings by either plant employees or outside service personnel regarding [in part] . . . the restrictions and prohibitions imposed upon each group of employees by the other employer's energy control program"); *Joseph J. Stolar Constr. Co.*, 9 BNA OSHC 2020, 2024 n.9, 1981 CCH OSHD ¶ 25,488, p. 31,783 n.9 (No. 78-2528, 1981) ("The Commission has held that, when a standard prescribes specific means of enhancing employee safety, [a] hazard is presumed to exist if the terms of the

---

[7] On review, Otis claims that the cited provision is a performance standard because, in requiring employers to "inform" each other of their LOTO procedures, the standard fails to specify how that information is to be conveyed. Otis further contends that the word "inform"—which it defines as "impart[ing] information or knowledge"—is ambiguous because "many acts can impart information," making "what is necessary to comply with the [cited provision] . . . unclear." We find nothing unclear about the requirement that Otis "inform" Boston Store of its "lockout or tagout procedures." As Otis itself acknowledges, "inform" means to "impart [the] information." *See Faultless Div., Bliss & Laughlin Indus., Inc. v. Sec'y of Labor*, 674 F.2d 1177, 1186 (7th Cir. 1982) (construing machine guarding requirement as "sufficiently specific . . . to reasonably apprise [the employer] in clear terms" of conduct required by standard). The provision is specific as to the circumstances under which the employers must convey the information and what information must be conveyed.

To the extent Otis is suggesting that the standard is impermissibly vague because it does not specify a particular *method* by which the information must be imparted, we find that the absence of such detail does not render the requirement invalid. And even if, as Otis suggests, the provision is performance-oriented in this respect, a reasonable person in the industry would understand that simply providing a copy of the procedures to Boston Store would have been sufficient, especially in light of the guidance provided in the Secretary's compliance directive, which indicates that the provision is met where the "on-site and outside contractors . . . exchange copies of their respective energy control procedures[.]" OSHA Instruction CPL 02-00-147, ch. 3, ¶ XIII (Feb. 11, 2008); *see Siemens Energy & Automation Inc.*, 20 BNA OSHC 2196, 2198, 2004-09 CCH OSHD ¶ 32,880, p. 53,229 (No. 00-1052, 2005) (stating that " 'general regulations are not constitutionally infirm on due process grounds so long as a reasonableness requirement is read into them' " (citation omitted)); *Western Waterproofing Co.*, 7 BNA OSHC 1625, 1629, 1979 CCH OSHD ¶ 23,785, pp. 28,862-63 (No. 1087, 1979) ("A standard is not invalid merely because an employer must exercise reasoning and judgment to decide how to apply the standard in a particular situation.").

[8] Moreover, as discussed below, the record establishes that Boston Store employees were present at the store and had access to the elevator gate while the Otis mechanic was servicing the elevator.

7

standard are violated."). And unlike other provisions in the LOTO standard that specifically reference "authorized" or "affected" employees, *see, e.g.*, 29 C.F.R. § 1910.147(c)(6), (c)(7), (d)(4), (d)(6), (e), no such reference is contained in the cited provision. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " (citation omitted)).

Otis would have us find that § 1910.147(f)(2)(i) applies only to "situations like a factory floor with machines on which both the employees of the employer controlling the building and another, different contractor are expected to . . . service [equipment]." But such a reading contradicts the plain language of the provision, which (1) defines its scope in terms of the activities of only the outside servicing personnel, not the activities of the on-site employer, and (2) links its applicability to the full breadth of activities covered by the LOTO standard: "[w]henever *outside servicing personnel* are to be engaged in activities *covered by the scope and application of [the LOTO] standard* . . . ." 29 C.F.R. § 1910.147(f)(2)(i) (emphasis added). The scope and application section of the standard, § 1910.147(a), excludes only certain specific industries, equipment, and activities that have no relevance to the instant case. In short, the language in the standard that establishes the cited requirement's applicability precludes the interpretation urged by Otis. *See Arcadian Corp.*, 17 BNA OSHC 1345, 1347, 1995-97 CCH OSHD ¶ 30,856, p. 42,916 (No. 93-3270, 1995) (" 'In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished.' " (citations omitted)), *aff'd*, 110 F.3d 1192 (5th Cir. 1997).

Otis also argues that the cited provision applies only where *both* the outside and on-site employers have LOTO procedures, and thus is inapplicable here because Boston Store lacked its own procedures. Specifically, Otis relies on the provision's use of the word "respective"—"the on-site employer and the outside employer shall inform each other of their *respective* lockout or tagout procedures," 29 C.F.R. § 1910.147(f)(2)(i) (emphasis added)—which Otis defines as "relating to two or more persons or things regarded individually; particular." According to Otis, this shows that the provision's requirement is contingent on both employers having their own LOTO procedures.

8

We disagree. The term "respective," even as defined by Otis, does not establish that the outside employer's duty under the provision is *conditioned* on the on-site employer also having procedures; it simply means that each employer has a duty to provide *its own* procedures to the other employer.   This is also evident from the structure and context of the standard. Section 1910.147(f)(2)(ii), the provision that follows the one cited here, requires the on-site employer to "ensure that his/her employees understand and comply with the restrictions and prohibitions of the outside employer's energy control program."  Even if Boston Store did not have its own procedures, it needed Otis to comply with paragraph (f)(2)(i) so that it could identify what information to provide to its own employees, and Otis needed Boston Store to comply with paragraph (f)(2)(ii) to help protect the Otis mechanic.[9]  Not only would Otis's interpretation defeat the purpose of these provisions, it would lead to the absurd result that the protections afforded by paragraph (f)(2)(ii) to outside contractor employees would be rendered inapplicable where the on-site employer violates a requirement to have its own LOTO procedures. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid . . . unreasonable results whenever possible."); *Unarco Commercial Prods.*, 16 BNA OSHC 1499, 1502, 1993-95 CCH OSHD ¶ 30,294, p. 41,732 (No. 89-1555, 1993) ("It is well established that a statute or, in this case, a standard must be construed so as to avoid an absurd result.").   Therefore, we conclude that the cited provision places a separate

---

[9] We disagree with Otis's assertion that the rule's preamble is inconsistent with the Secretary's interpretation.   To the contrary, OSHA specifically discussed how the safety of contractor employees depends in part on the on-site employees understanding the outside contractor's procedures:

> [Section 1910.147(f)(2)(ii)] requires that each employer inform the other employer of the procedures used by his/her employees and that *each* employer's employees understand and comply with the restrictions and prohibitions *of the other* employer's energy control program.  For example, if there are elements of the contractor's procedures which need to be explained to the facility employees, or if there are other steps needed to assure *the safety of the contractor's employees*, the facility employer must provide his/her employees with the information to provide the necessary protection.

Control of Hazardous Energy Sources (LOTO), 55 Fed. Reg. at 38,683 (emphasis added).

obligation on "each employer" to inform the other employer of its LOTO procedures that is not dependent on the existence of the other employer's procedures.[10]

Having determined that the Secretary's interpretation of § 1910.147(f)(2)(i) is supported by the provision's plain language, we conclude that Otis failed to comply with this provision because (1) Otis's work on the elevator was covered by the LOTO standard; (2) Boston Store and Otis were the on-site and outside employers, respectively; and (3) Otis admits that it did not inform Boston Store of its LOTO procedures.

### *Infeasibility*

Before the judge and again on review, Otis raises the affirmative defense of infeasibility, claiming that (1) it cannot determine in advance of a particular job which of "a potentially 'endless' amount of different energy control procedures" will be applicable; (2) it may have difficulty finding personnel in a building to inform of its LOTO procedures; and (3) compliance with the provision could hinder its ability to respond to an emergency situation, "such as emergency call backs with trapped passengers." To prove infeasibility, Otis must show by a preponderance of the evidence that " '(1) literal compliance with the terms of the cited standard was infeasible *under the existing circumstances* and (2) an alternative protective measure was

---

[10] Otis argues that the cited provision "fails to give any notice whatsoever that an elevator maintenance company like Otis should provide a customer its procedure for wedging open an elevator gate" both as a general matter and, in particular, where only the outside employer has LOTO procedures. We find that Otis had fair notice of the requirement in both respects. As discussed above, the mechanic's work does not fall within any of the standard's scope exclusions, and the cited provision's language, along with the structure and context of the standard, make clear that the duty of the outside employer to provide its LOTO procedures to the on-site employer is independent of the on-site employer's corresponding duty. 29 C.F.R. § 1910.147(a); *see Ohio Cast Prods., Inc.*, 18 BNA OSHC 1912, 1915, 1999 CCH OSHD ¶ 31,926, p. 47,353 (No. 96-0774, 1999) ("[I]n view of our conclusion that [29 C.F.R. § 1910.1000(c)'s] formula operates to regulate silica exposure in only one manner, we find that its plain meaning would be 'ascertainably certain' to an employer who is aware that its operations generate silica dust exposure."), *aff'd*, 246 F.3d 791 (6th Cir. 2001). Even if, as Otis alleges, "industry understanding and practice"—as reflected in testimony from its employee and expert witnesses, and in an industry consensus standard (ANSI Z-244.1)—differs from the OSHA requirement, that does not render insufficient the notice provided by the clear terms of the provision. Moreover, OSHA expressly stated in an interpretation letter that it had "carefully considered the 1982 ANSI standard in developing the agency's LOTO standard, . . . [but] did not adopt the standard by reference, and in some respects the agency deliberately departed from the ANSI standard in order to provide a higher level of employee protection." Interpretation Letter from Director of OSHA Directorate of Enforcement Program, to Chairman of Z244 American Standards Committee (Nov. 10, 2004).

used or there was no feasible alternative measure.' " *Westvaco Corp.*, 16 BNA OSHC 1374, 1380, 1993-95 CCH OSHD ¶ 30,201, p. 41,570 (No. 90-1341, 1993) (emphasis added) (citation omitted).

None of Otis's claims are relevant to the circumstances that existed at Boston Store. First, based on the information the Otis mechanic received from Boston Store employees and his own initial observation, he knew before starting his work on the elevator that the gate was jammed.    Determining what energy control procedure to utilize in that situation was straightforward because, in addition to shutting down the electrical components of the elevator, Otis's LOTO procedures merely required the mechanic to "block up [the gate] mechanically or with a Bi-Parting Door Tool to prevent unexpected gate movement." Second, the Otis mechanic talked to Boston Store personnel about the elevator before servicing it.  He could have provided LOTO procedures to Boston Store at that point or asked them who to inform.  Finally, there was no emergency when the Otis mechanic first arrived on site—the elevator gate was simply jammed.  Otis, therefore, has not shown that it would have been " 'infeasible *under the existing circumstances*' " to inform Boston Store of the applicable LOTO procedures before the mechanic commenced his work.  *Id.* (emphasis added) (citation omitted).  Accordingly, we affirm the citation.

### *Characterization and penalty*

On review, Otis challenges the Secretary's characterization of the violation as serious, claiming that the violation should be classified as *de minimis*.  Section 17(k) of the Act, 29 U.S.C. § 666(k), provides that "a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result" from the violation.  A violation is *de minimis*, however, "when a deviation from the standard has no 'direct or immediate' relationship to employee safety."  *Star Brite Constr. Co.*, 19 BNA OSHC 1687, 1691, 2001 CCH OSHD ¶ 32,511, p. 50,434 (No. 95-0343, 2001) (citation omitted); 29 U.S.C. § 658(a) (noting that *de minimis* violations are those "which have no direct or immediate relationship to safety or health").  *But see Caterpillar, Inc. v. Herman*, 131 F.3d 666, 668 (7th Cir. 1997) ("[W]e accept the Secretary's view that the Commission cannot label a violation *de minimis* and disregard it; that would transfer the Secretary's prosecutorial discretion to the Commission.  If the Secretary issues a citation, the Commission must determine whether the violation occurred and set an appropriate penalty." (citation omitted)).

Absent information from Otis about its LOTO procedures, Boston Store was precluded from evaluating those procedures "and determin[ing] what information need[ed] to be provided to [Boston Store] employees." Control of Hazardous Energy Sources (LOTO), 55 Fed. Reg. at 38,683. Had LOTO procedures been implemented here, Boston Store's inability to provide its employees with proper instruction could have, in turn, made it more likely that a Boston Store employee would interfere with the use of those procedures, exposing the mechanic to serious injury from a release of stored energy. Indeed, a Boston Store employee could have removed a wedge or Otis's Bi-Parting Door Tool, or even pulled on the gate as the Otis mechanic unjammed the chain.[11] *See Flintco, Inc.*, 16 BNA OSHC 1404, 1405-06, 1993-95 CCH OSHD ¶ 30,227, p. 41,611 (No. 92-1396, 1993) (establishing that serious characterization requires Secretary to show " 'an accident is possible and there is a substantial probability that death or serious physical harm could result from the accident' " (citation omitted), and holding that judge erroneously relied upon likelihood of accident occurring to characterize violation as non-serious). We therefore reject Otis's argument and affirm the violation as serious.

However, we find the Secretary's proposed penalty of $5,000 excessive under the circumstances here. The likelihood of an accident resulting from a Boston Store employee interfering with Otis's LOTO procedures (had they been implemented) was exceptionally low: an out-of-order sign had been placed by the elevator before the Otis mechanic arrived at the store; only a limited number of Boston Store employees were present at the time because the servicing activity was being performed before the store opened for business; and the record shows that Boston Store employees, as part of their jobs, were *not* responsible for servicing the freight elevator, at least when the Otis mechanic was assigned to perform the servicing activity. *Siemens Energy*, 20 BNA OSHC at 2201, 2004-09 CCH OSHD at p. 53,231 (noting that principal factor in penalty determination is gravity, which "is based on the number of employees exposed, duration of exposure, likelihood of injury, and precautions taken against injury").

---

[11] The judge concluded that there was "insufficient evidence to show that store employees were in the area of the gate while [the Otis mechanic] serviced the elevator." However, the mechanic admitted at the hearing that he was uncertain whether all of the Boston Store employees were aware that he was fixing the elevator, though some of them knew of his presence based on his interactions with them. And he conceded that they could have come near the elevator gate while he was working on it.

Thus, upon consideration of all of the penalty factors, we find a penalty of $500 to be appropriate.

## ORDER

We affirm Citation 1, Item 2 as serious and assess a penalty of $500.

SO ORDERED.


_Thomasina V. Rogers_
Thomasina V. Rogers
Chairman


_Cynthia L. Attwood_
Cynthia L. Attwood
Commissioner

Dated:  April 8, 2013

***THIS CASE IS NOT A FINAL ORDER OF THE REVIEW COMMISSION AS IT IS
PENDING COMMISSION REVIEW***

| | |
|---|---|
| Secretary of Labor, | ) |
| Complainant, | ) |
| v. | )    OSHRC Docket No. 09-1278 |
| Otis Elevator Company, | ) |
| Respondent. | ) |

APPEARANCES:

For the Complainant:                           For the Respondent:

Bruce Canetti, Esq.                            Paul Waters, Esq.
U. S. Department of Labor                      Akerman Senterfitt
Office of the Solicitor                        Sun Trust Financial Centre, Ste. 1700
Chicago, Illinois 60604                        401 E. Jackson Street
                                               Tampa, Florida 33602-5250

Before:  Dennis L. Phillips
         Administrative Law Judge

## DECISION AND ORDER

### Background

This proceeding is before the Occupational Safety and Health Review Commission (the

Commission) pursuant to Section 10(c) of the Occupational Safety and Health Act of 1970, 29

U.S.C. § 651 *et seq.* (the Act).   Otis Elevator Company (Otis or Respondent) designs,

manufactures, installs and services elevators, escalators, and moving walks for commercial and

residential buildings. (Exh. 10).[1]  On June 16, 2009, Otis employee Ken Nauholz injured himself

with hand lacerations while repairing a gate of a freight elevator at an Otis worksite in Brookfield,

Wisconsin.  (Tr. 48).  Occupational Safety and Health Administration (OSHA) was notified of the

incident by the Brookfield Police Department.  (Tr. 47).  Between June 26 and July 20, 2009,

OSHA conducted its investigation of the incident.  As a result of that investigation, OSHA issued

a Citation and Notification of Penalty to Respondent alleging two serious violations of the Act.

The first item charged Otis with a violation of 29 C.F.R. § 1910.147(d)(3) for Mr. Nauholz'

failure to use an energy isolating device to block the gravity energy in a freight elevator gate while

working.  The second item alleged a violation of 29 C.F.R. § 1910.147(f)(2)(i) (standard) for not

using energy control procedures to secure the gravity energy of the gate and not informing or

obtaining energy control procedures from the customer to be used for the repair.  Respondent

filed a timely Notice of Contest.  Prior to trial, the parties stipulated that Citation 1, Item 1 was

withdrawn.  Therefore, only Citation 1, Item 2 concerning the use and exchange of energy control

procedures remained in dispute at trial.  The proposed penalty is $5,000.  A trial was conducted in

Milwaukee, Wisconsin on April 6 and 7, 2010.  Both parties submitted post-trial, reply and

supplemental briefs in support of their respective positions.

Cited Standard

The cited standard provides:

> 29 C.F.R. § 1910.147(f)(2)(i):  Whenever outside servicing
> personnel are to be engaged in activities covered by the scope and
> application of this standard, the on-site employer and the outside
> employer shall inform each other of their respective lockout or
> tagout procedures.

---

[1] Elisha Graves Otis founded Otis in Yonkers, New York in 1853 after he invented a safety mechanism for a lifting platform.  (Exh. 10, at p. 3).

Complainant alleges in Citation 1, Item 2 that:

> 29 C.F.R. § 1910.147(f)(2)(i):  When outside personnel were engaged in activities covered by the scope and application of the standard, the onsite employer and the outside employer did not inform each other of their respective lockout or tagout procedures:  (a) On or about June 16, 2009, an authorized employee was performing repairs to the freight elevator gate in the storeroom at the customer located at 15875 W. Bluemound Road, Brookfield, Wisconsin 53005.  Energy control procedures to secure the gravity energy of the gate were not utilized.  The company did not inform or obtain the energy control procedures from the customer to be used for this repair.

(Tr. 8-9).

Stipulations

Prior to trial, the parties agreed upon and submitted the following stipulations (Stip.):

1. The Occupational Safety and Health Review Commission has jurisdiction over this matter.

2. Respondent is, and was at all relevant times, a corporation with an office and place of business at 6070 N. Flint Road, Glendale, Wisconsin  53209.

3. Respondent is, and was at all relevant times, engaged in the business of servicing and repairing elevators.

4. Respondent at all relevant times engaged in a business affecting commerce by handling goods or materials which had been moved in commerce.

5. Respondent at all relevant times was an employer employing employees in the business of servicing and repairing elevators, including at the workplace of 15875 W. Bluemound Road, Brookfield, Wisconsin.

6. Boston Store has, and at all relevant times had, a department store at 15875 W.

- 3 -

Bluemound Road, Brookfield, Wisconsin, which had a freight elevator.

7. Respondent serviced and repaired the freight elevator at Boston Store on June 16, 2009.

8. Ken Nauholz was an Otis employee sent by Otis to service and repair the freight elevator at Boston Store on June 16, 2009.

9. Citation 1, Item 1, alleging a violation of 29 C.F.R. § 1910.147(d)(3) is withdrawn. (Joint Prehearing Submission, March 25, 2010).

## Jurisdiction

Based on the parties' pleadings, stipulations and the trial record, I find that Respondent, at all relevant times, was engaged in a business affecting commerce and was an employer within the meaning of Sections 3(3) and 3(5) of the Act.[2]  I also find that jurisdiction of this proceeding is conferred upon the Commission by Section 10(c) of the Act.[3]  I conclude, therefore, that the Commission has jurisdiction over the parties and subject matter in this case.

## Secretary's Burden of Proof

To establish a *prima facie* violation of the Act, the Secretary must prove by a preponderance of the evidence that:  (1) the cited standard applied to the condition; (2) the terms of the standard were violated; (3) one or more of the employees had access to the cited condition; and (4) the employer knew, or with the exercise of reasonable diligence could have known, of the violative condition.  *Offshore Ship Bldg., Inc.*, 18 BNA OSHC 2169, 2171 (No. 99-257, 2000), *Astra Pharm. Prod.*, 9 BNA OSHC 2126 (No. 78-6247, 1981), *aff'd in pertinent part*, 681 F.2d

---

[2]  In its First Amended Answer, Respondent admitted that it was at all relevant times engaged in a business affecting commerce and an employer employing employees.  (First Amended Answer, at p. 1; Stip. Nos. 3-5).
[3]  In its First Amended Answer, Respondent admitted that jurisdiction of this action was conferred upon the Commission by section 10(c) of the Act.  (First Amended Answer, at p. 1; Stip. No. 1).

- 4 -

69 (1st Cir. 1982).  A violation is serious if there is a substantial probability that death or serious

physical harm could result from the violative condition.  29 U.S.C. § 666(k)(2009).  Complainant

need not show that there is a substantial probability that an accident will occur; she need only

show that if an accident occurred, serious physical harm would result.  If the possible injury

addressed by the regulation is death or serious physical harm, a violation of the regulation is

serious.  *Phelps Dodge Corp. v. OSHRC*, 725 F.2d 1237, 1240 (9th Cir. 1984); *Dec-Tam Corp.*,

15 BNA OSHC 2072 (No. 88-0523, 1993).

Relevant Testimony and Findings of Fact

Four witnesses testified at trial:  Kevin Robertson, OSHA Compliance Safety and Health

Officer (CSHO); Kenneth Nauholz, an elevator service mechanic employed by Respondent; Louis

DeLoreto, Respondent's Senior Manager for Environmental Safety and Health; and George

Karosas, Respondent's expert witness.  (Tr. 44, 105, 173, 199).  Based on their testimony, the

stipulations, and the evidentiary exhibits admitted into the record, the court makes the following

factual findings.

On June 16, 2009, Otis service mechanic Ken Nauholz was assigned to a job by his

supervisor Dean Kleveno to repair a damaged gate and elevator at The Boston Store (The Boston

Store or store) in the Brookfield Square Mall, Brookfield, Wisconsin.[4]  (Tr. 48, 68, 105, 107).

At the time of the incident, Mr. Nauholz had eleven years experience as a mechanic with Otis and

about 29 years overall industry experience.[5]  (Tr. 105, 126; Exh. 9).  He received the call through

Otis dispatch center in Connecticut through his personal digital assistant.  The only information he

---

[4]  The Boston Store is a department store where they sell general merchandise, clothing, and housewares.  (Tr. 47).
The elevator was located on the first floor of the store and was used to move merchandise and personnel between
the first and second floors.  (Tr. 51).
[5]  Mr. Nauholz was an experienced elevator service mechanic who previously worked at Schumacher Elevator

received about the job was that the elevator car gate was "hung up and not functioning." Mr. Nauholz did not know the particular nature of the job and did not have a particular plan to repair the gate prior to arrival at The Boston Store. He did not have any anticipation that he would necessarily employ any energy control procedures at the store that day. (Tr. 108).

The store was not open for business when Mr. Nauholz arrived at about 8:30 a.m. (Tr. 138-39) He signed in with Irene at the store's entrance. Irene expected him and knew he was there to work on the elevator. (Tr. 56, 108-09, 139). On his way to the elevator, Mr. Nauholz encountered a couple of store employees who told him that the gate was "hung up on the car" and they were not sure why. (Tr. 109). Those employees were not working near the freight elevator, but in an area "quite a ways from the [elevator] car," in another room where they take shipments that come in off the trucks.[6] (Tr. 111, 139). Before working on the distressed elevator, he did not provide any store employee with a written copy of any Otis lockout/tagout procedure.[7] (Tr. 156, 188, 254). Mr. Nauholz testified that neither he, nor the elevator service industry, had a practice of informing customers of Otis' or the industry's lockout/tagout procedure when performing an elevator service or repair call. (Tr. 156). Mr. Nauholz testified that no lockout/tagout procedures were needed to perform his work on June 16, 2009 at the store. (Tr. 170).

---

Company and Braun Elevator. The State of Wisconsin issued him an elevator mechanic's license. (Tr. 106-07).

[6] No Boston Store employees were involved in Mr. Nauholz' work on the elevator that day. (Tr. 110). During Mr. Nauholz' three years of servicing The Boston Store, no store employees had ever been involved in his elevator work. (Tr. 110). In Wisconsin, only licensed elevator mechanics, who maintain their licenses with continuing education and training, are allowed to perform service on elevator equipment. (Tr. 106-07; Exh. K).

[7] Lockout is defined as "The placement of a lockout device on an energy isolating device, in accordance with an established procedure, ensuring that the energy isolating device and the equipment being controlled cannot be operated until the lockout device is removed." Tagout is defined as "The placement of a tagout device on an energy isolating device, in accordance with an established procedure, to indicate that the energy isolating device and the equipment being controlled may not be operated until the tagout device is removed." 29 C.F.R. §

Once at the elevator, Mr. Nauholz proceeded to determine the nature of the problem.[8]  To do this, he needed to access the elevator cartop by using a large step-ladder inside the elevator car.  (Tr. 112; Exh. T).  As he approached the gate, Mr. Nauholz observed that the bi-parting outer hoistway doors were completely open and the bottom of the gate was approximately three feet off of the floor.[9]  (Tr. 112-13, 115-18; Exh. T).  He saw that the elevator gate was stuck in the open position.  Despite pulling on the gate "pretty hard," Mr. Nauholz could not move it.[10]  (Tr. 112-13, 119).  There was virtually  "no way" that the gate would move.  Mr. Nauholz testified that "[y]ou could have hung on it with all your weight, and it wasn't moving."   (Tr. 119, 122, 158).

No one could enter the elevator car without stooping to get under the elevator's gate, and, at five feet five inches tall, Mr. Nauholz had to duck to get under the gate.  (Tr. 113-15).  Working alone, Mr. Nauholz positioned an eight-foot red step-ladder  just inside the partially opened gate to access the cartop escape hatch in order to get to the inspection station on top of the car.  (*Id.*, 137, 167; Exh. T at "C" and "G").  At the cartop inspection station, Mr. Nauholz took the elevator "out of service" so no one could call the elevator away from him and flipped the "stop switch" to take total control of the elevator.  (Tr. 61-62, 113, 119, 143-44, 148-50).  He stated that he "can't set foot on that car top without having complete control of it."  (Tr. 149). The mechanism that controlled the movement of the freight elevator gate was also located on the

---

1910.147(b).

[8]  The buttons on the wall in front of the elevator that called the elevator to the floor were covered with a large "Out of Order" sign.  (Tr. 117-18, 170, 198; Exh. T at "E").

[9]  The gate was a gray, metal, grated gate, located in front of the elevator car.  (Exhs. 11, T). The bi-parting doors could not accidentally or unexpectedly close because they were counterweighted evenly together.  (Tr. 119).
[10]  The elevator gate was normally operated manually by pulling or lifting the gate itself.  (Tr. 51).

top of the elevator car on its right side near the front.  (Tr. 120-21; Exhs. P, T at "F").  When Mr. Nauholz examined the door operating mechanism, he saw that the inner gate chain had come off of its sprocket and had become tightly wedged.  This chain was jammed and could not move in any way mechanically.[11]  (Tr. 119, 121-22, 136, 162-63; Exh. P at "A" and "B").  The chain and sprocket were worse than he had ever seen before during his previous visits to the store over the past three years.[12]  (Tr. 56, 73, 157).  The only way for the chain to move was for it to be repaired or "un-wedged."  (Tr. 122).  Mr. Nauholz decided to pry and restore the chain back onto the sprocket.  (Tr. 56, 122-23).

The gate chain could not move unexpectedly while he pried the chain back onto the sprocket.  Mr. Nauholz expected that the chain would move after the chain was placed back onto the sprocket and his hand was safely away from the chain.  (Tr. 122-23).  At that time, he had control of the gravity energy in the elevator's gate.  When the gate chain began to move as expected, Mr. Nauholz then made the deliberate and intentional, ill-timed decision to grab the chain with his hands.[13]  This, unfortunately, caused his injury.[14]  (Tr. 56, 74, 123, 172; Exh. T at "F").  He grabbed the chain because he was worried about its connecting link breaking when the gate closed.  (Tr. 123-24).  Prior to grabbing the chain, Mr. Nauholz had not been in a position where he could have been injured by that chain.  He would not have been injured if he had not intentionally grabbed the chain.  (Tr. 123-25).  Otis issued a NAA Safety Citation Form and

---

[11] There was no possibility that the chain would move unexpectedly prior to being repaired.  (Tr. 112-13, 119, 122, 158, 270).

[12] During his July 1, 2009 interview with CSHO Robertson, Mr. Nauholz stated that he had "not seen a situation this bad before with the chain twisted and hung up."  He also admitted that he "had control of the elevator but did not block the gravity energy which created the incident about one half hour later."  (Tr. 61-62; Exh. 3).

[13] The injury occurred at about 9:35 a.m.  (Exh. 9).

[14] During the course of his inspection, CSHO Robertson was unaware that Mr. Nauholz had grabbed the chain. (Tr. 74).

written warning to Mr. Nauholz regarding the incident.[15]  (Tr. 53-54; Exh. 9).

The elevator car top where Mr. Nauholz repaired the sprocket and chain mechanism was under his exclusive control the entire time he was working on top of the car.  (Tr. 74, 76, 125, 144-45, 180, 241-42, 269, 271-72).  The only way to access the elevator car top was to climb a large stepladder, go through a hatch in the elevator car roof, and climb onto the top of the elevator.  (Tr. 113).  Store employees were not allowed to perform any service or maintenance on any store elevator equipment or to be on top of the elevator car.  (Tr. 74, 76, 110-11, 125-26).  The elevator car top could not be accessed by any Boston Store employee and Mr. Nauholz was unaware of any Boston Store employee having ever been on the elevator car top.[16]  (Tr. 125-26).  No Boston Store employee was exposed to any injury from any movement of the gate, or its chain and sprocket, while Mr. Nauholz serviced the elevator.[17]  (Tr. 90, 125-26, 242-43, 270-72).  Only Mr. Nauholz was exposed to any injury from the chain and sprocket and that was because he intentionally grabbed the chain.  (Tr. 126, 246).

Prior to June 16, 2009, The Boston Store had no energy control procedures that applied to the freight elevator.[18]  (Tr. 81, 213-14).  When Mr. Nauholz was at the worksite, there was no

---

[15]  The NAA Safety Citation Form stated: "Ken did not take into account the Stored Energy present when the Freight Elevator Car Gate became inoperative with slack chain present.  The gate should have been block (sic) up mechanically or with a Bi-Parting Door Tool to prevent unexpected gate movement."  (Exh. 9).  CSHO Robertson determined that Mr. Nauholz failed to mechanically block the gate.  (Tr. 85).  Respondent concedes that Mr. Nauholz failed to utilize an "energy isolating device" that was required by Otis' procedures.  (Respondent's post-hearing brief, at p. 27, n 5; Exh. B).  The fact that Mr. Nauholz was disciplined for failing to follow Otis' energy control procedures does not mean that the potential release of energy was "unexpected."

[16]  With the freight car gate jammed open and the car placed on "inspection mode", the elevator car could not possibly move.  (Tr. 148-50).

[17]  Mr. Nauholz could see the area in front of the gate and no one could approach the gate and enter the car without him seeing them.  (Tr. 113, 121, 125).

[18]  As part of the settlement of the citation issued to it by OSHA after the incident, The Boston Store adopted an energy control procedure that applied to the freight elevator.  (Tr. 82, 213-14; Exh. F).  This procedure dealt with locking and tagging out the power supply to the freight elevator and did not apply to the hazard of gravity energy associated with the chain and sprocket during Mr. Nauholz' work.  (Tr. 217; Exh. F).

Boston Store employee in any responsible position to receive a copy of Otis' energy control procedures.[19] (Tr. 57). Prior to the incident, Otis had developed and implemented policies and procedures to protect its employees from potentially hazardous energy. (Tr. 175). Otis expected its employees to analyze the circumstances they confront in the field and determine the hazardous energy control procedures necessary to perform their work after they arrived at the work site. (Tr. 177, 214-15). Otis developed specific tools and procedures for working on the bi-parting freight door such as the one involved in this case. (*See* Otis Technical Information Publication (TIP) 28.3-2 (REV) *Tools & Procedures for Working on Bi-Parting Freight Doors*, dated March 9, 2000 (TIP 28.3-2)(REV), at Exh. B).[20] This procedure applied to the repair performed by Mr. Nauholz on the freight elevator's bi-parting gate. (Tr. 48-49; Exh. B). TIP 28.3-2(REV) called for the blocking of any stored energy in the elevator door system at the store on June 16, 2009. (Exh. B, at p. 3).

With Otis' cooperation, CSHO Robertson interviewed Messrs. Nauholz and Kleveno, and Otis' area safety representative, Jeff Case, on July 1, 2009.[21] Messrs. Kleveno and Case acknowledged that Mr. Nauholz did not share information regarding Otis' lockout tagout procedure with the Boston Store on June 16, 2009 because there were no Boston Store employees around to actually share that information with. (Tr. 54, 57; Exhs. C-3 through C-4, at p. 2). Mr. Nauholz never told CSHO Robertson that he intended to use lockout tagout or energy control procedures before he began his work on the elevator. (Tr. 87). CSHO Robertson was

---

[19] The store employee, Fred, that Mr. Nauholz normally met with when performing elevator service at the store was on vacation. (Exh. 3, at p. 1).
[20] TIP 28.3-2(REV) stated that "Most repairs to bi-parting doors will be unique to the particular situation, condition, and setup of the equipment." (Exh. B, at p. 2).
[21] CSHO Robertson may have been involved in one other case where a citation was issued for a failure to exchange an energy control program. (Tr. 90-91).

not told by any Otis employee that they expected Mr. Nauholz to need to perform any task that required some sort of energy control at the worksite.[22]  (Tr. 88-90).  CSHO Robertson made no inquiry as to whether any company in the elevator industry would have exchanged any type of energy control program or lockout tagout material with its customer before performing the repair involved in this case.  (Tr. 68-70).

Mr. Nauholz testified that he could not estimate how many different tasks that he performed when servicing elevators called for some sort of energy control procedure because each service call is different with too many variables.   He further testified that he did not know what energy control procedures he was going to use before he arrived at the work site.  He stated that there are times that he performs repairs on elevators without using any energy control procedures.  (Tr. 145-46).  He further stated that when he initially goes atop an elevator he may not use any type of energy control procedure because he has not yet assessed the problem.  (Tr. 148).  He testified that he would have no reason to go near the chain and sprocket atop the elevator unless there was something wrong with either of them.   When working atop elevators, he would ordinarily not be near the chain and sprocket.  (Tr. 168-70; Exh. P).  He stated that it was not feasible for customers to have copies of all of the energy control procedures that he might implement during elevator service calls.  He also testified that he was not always able to make contact with building personnel during service calls because "There's times, a lot of times, where you don't have someone to talk to...."  He also testified that elevator mechanics needed to respond quickly during emergencies when passengers were trapped in elevators.  (Tr. 129-31, 135).  Mr. Nauholz testified that Otis did not give its proprietary elevator maintenance work

---

[22]  CSHO Robertson could not recall any Otis employee telling him during his interviews that the gate door had

procedures to customers because of "liability purposes, if someone else gets a hold of it and performs it wrong, gets hurt, you know, it – we wouldn't want that happening, …." (Tr. 133-35).

No employees of The Boston Store were either "affected employees"[23] or "authorized employees"[24] with respect to Mr. Nauholz' work repairing the chain on the freight car door . (Tr. 76, 78, 80, 90, 110-12, 139-40). No potential for interaction with any Boston Store employee existed while the work was performed on the elevator car top, and no store employee was expected to be on the car top while the work was being performed. (Tr. 81, 109-10, 170). There was no exposure to the "unexpected release" of "hazardous" energy to any Boston Store employee. (Tr. 92-93, 241-43). It was neither Otis' nor industry's practice to exchange energy control programs with a customer before allowing its mechanics to perform the type of work Mr. Nauholz performed on June 16, 2009.[25] (Tr. 68-69, 70, 91, 156, 177-78). Only in situations where the mechanic was to interact with another contractor's employees, or the customer's

---

moved as a result of "unexpected energy." (Tr. 75-76).

[23] The standard's preamble states that "an 'affected employee' is one who does not perform the servicing or implement the energy control procedure, but whose responsibilities are performed in an area in which the energy control procedure is implemented and servicing operations are performed under that procedure." (Tr. 262-63; Control of Hazardous Energy Sources (Lockout/Tagout): Final Rule, 54 Fed. Reg. 36,644 (Sept. 1, 1989) to be codified at 29 C.F.R. § 1910, at Exh. 14). Affected employee is further defined as "An employee whose job requires him/her to operate or use a machine or equipment on which servicing or maintenance is being performed under lockout or tagout, or whose job requires him/her to work in an area in which such servicing or maintenance is being performed." (Tr. 272; 29 C.F.R. § 1910.147(b)).

[24] The standard's preamble states that "If an employee must utilize the energy control procedure, that employee is considered to be an 'authorized employee.'" (Exh. 14). Authorized employee is further defined as "A person who locks out or tags out machines or equipment in order to perform servicing or maintenance on that machine or equipment. An affected employee becomes an authorized employee when that employee's duties include performing servicing or maintenance covered under this section." 29 C.F.R. § 1910.147(b).

[25] Mr. Nauholz testified that he did not know of any elevator maintenance company that exchanged an energy control program with a customer before it opened a bi-parting elevator gate in order to work on the elevator. He stated that this was the first time he had heard that OSHA indicated that a company should start doing so. (Tr. 126).

- 12 -

employees, would such an exchange of energy control procedures be expected.[26]  (Tr. 178).

Without such circumstances, Otis and other companies in the elevator industry would not share

their proprietary energy control procedures.  (Tr. 70, 179).  Because of the inherently dangerous

nature of elevator work, it is customary in the elevator industry not to share such work

procedures because doing so can increase the risk of injury to untrained, unauthorized and

unlicensed employees of other employers who may try to self-maintain elevators.  (Tr. 179).

Mr. Lou DeLoreto, Senior Manager, Environmental Health and Safety, for Otis, North

and South America, and Chairman of the National Elevator Industry's Safety Committee, testified

that he was familiar with no incidents of injury to any elevator or customer employee because of

an elevator company not exchanging its energy control program with that customer before an

elevator mechanic implemented an energy control procedure.[27]  (Tr. 174-75, 183-84, 196).  Had

such an incident caused an injury, he would have identified it as part of the root cause

investigation performed by Otis.  (Tr. 196-97).  Mr. DeLoreto testified that Otis does not have

specific energy control  procedures for the more than one hundred varieties of equipment that it

services because of the enormity of  the mechanical parts involved.  (Tr. 177).  He stated that it

was his experience that Otis and all other elevator industry companies did not normally share

---

[26] Otis required its mechanics to communicate energy control procedures to employees of other employers when other affected employees were working with, or in proximity to, Otis employees.  (Tr. 193-94)  When controlling hazardous electrical energy while other trades are involved with a power source, Otis calls for its mechanics to "communicate the issue to all concerned/affected workers."  (Otis' Employee Safety Handbook, Chapter 10, Exh. 5, at p. 39).

[27] Mr. DeLoreto has served in his current position for two years and has been employed by Otis for ten years.  His major responsibility is to develop and deploy environmental health and safety programs, including hazardous energy control.  (Tr. 174-75).  There is no evidence in the record establishing any nexus between Mr. Nauholz' injury to his finger and the lack of any exchange of lockout/tagout procedures.

- 13 -

control of their hazardous energy programs with their customers.[28]  (Tr. 178-79, 185).  He stated

that he did not expect Mr. Nauholz to interact with The Boston Store employees during his

service call on June 16, 2009.  (Tr. 178-79).  He stated that an initial exchange of energy control

procedures between Otis and its customers provided no increased benefit to Otis or its customer's

employee's health or safety.[29]  (Tr. 184).

    Otis is one of the largest elevator companies in the world.[30]  (Tr. 186).  Otis has

approximately 80,000 customers with more than 200,000 varieties and types of equipment,

excluding escalators, with vintages dating from as early as 1960 to the present to maintain in the

United States.[31]  (Tr. 180, 192, 195).  It also maintains more than 5,000 escalators.  (Tr. 180).

Mr. DeLoreto testified that it would be impractical, "unrealistic and unfeasible" for Otis to

provide all of its energy control programs to each customer before its service mechanics were

actually allowed to implement control procedures at a work site.  (Tr. 180-82).  He also testified

that Otis did not typically inform its customers of its lockout/tagout procedures.  (Tr. 185-86).

    Mr. DeLoreto further testified that it would be "very difficult" for an elevator mechanic to

be able to conclude that a customer had an energy control procedure that was appropriate for the

particular circumstance found at the work site.  (Tr. 181-83).  In many instances when

---

[28] Mr. DeLoreto testified that serious injuries and fatalities have occurred where building engineers have tried to self-maintain their elevators. (Tr. 179).
[29] There was no evidence that indicated that any injury resulted to any other employer's employee because information on hazardous energy control programs was not exchanged between the customer and the elevator service company.


[30] Otis employs about 61,000 employees worldwide, with about 8,000 employees in the United States.  Its annual revenue worldwide in 2008 was about $12.9 billion, with about $2.5 billion generated in the United States  (Tr. 186; Exh. 10).
[31] About 1.6 million elevators and escalators are serviced by Otis worldwide.  (Exh. 10).

performing work on a customer's elevators, even finding an individual employed at the work site to communicate with may not be possible. (Tr. 129-31, 135, 183). Such a requirement could prevent the prompt response to an emergency, such as freeing a trapped passenger in an elevator car. (Tr. 131). Mr. DeLoreto testified that there would be an increased risk to safety extended to both the riding public and the mechanic, as well as the equipment, where an elevator mechanic's repairs are delayed by any need for Otis and its customers to first exchange energy control procedures that may or may not be appropriate to the circumstance subsequently found at the work site. (Tr. 183, 243-45).

Both Messrs. DeLoreto and Karosas testified where there are no affected or authorized employees of the customer, and no expected interaction between Otis employees and the customer's employees, exchanging energy control procedures created no health and safety benefit for Otis or customer employees. (Tr. 184, 239-41, 245). The CSHO was aware of no instances where the failure of an elevator to inform a customer of its energy control procedures resulted in any injury to the customer's employee. (Tr. 91).

The Court found Mr. George V. Karosas qualified to testify and render expert opinions in matters relating to whether or not: 1) there was any potential for the unexpected release of stored energy due to gravity acting on the elevator car door where there was no potential of interaction of Otis and store employees, 2) there was any potential for injury due to the release of stored energy due to gravity acting on the elevator car door to anyone other than Mr. Nauholz, 3) the lockout/tagout standard contained at 29 C.F.R. § 1910.147 is a performance standard allowing flexibility in the specific means by which the objectives of the standard may be achieved, 4) the goals and objectives of the standard as they relate to the interaction of the Otis outside servicing

- 15 -

personnel with the on-site employer were met by the practices employed on June 16, 2009, 5) the

failure to secure the gravity energy of the elevator door and the unexpected release of energy

resulting in injury to Mr. Nauholz was irrelevant to, and not a basis for the citation regarding

noncompliance with 29 C.F.R. § 1910.147(f)(2), 6) disseminating Otis energy control procedures

to employers whose employees are not allowed by law to work on elevator equipment would

increase the risk of injury to any unauthorized and untrained employees attempting to utilize those

procedures or provide any benefit, gain or increase to employee health or safety, and 7) industries

such as the elevator industry do not understand or apply 29 C.F.R. §

1910.147(f)(2)(ii) in a manner that requires the exchange of energy control programs because a

host employer or a servicing contractor may utilize energy control procedures on equipment when

absolutely no interaction of their respective employees can occur when such procedures are

utilized on the equipment in question.   (Tr. 228; Joint Prehearing Submission, at pp. 3-4).

Mr. Karosas testified regarding industry understanding and the requirements of the

industry consensus standard American National Standards Institute (ANSI) Z-244.1 (Control of

Hazardous Energy, Lockout/Tagout and Alternative Methods).[32]   OSHA used the Z-244.1

standard as a principal reference source when it developed and promulgated OSHA's energy

control standard, 29 C.F.R. § 1910.147 (The Control of Hazardous Energy Sources

---

[32] Mr. Karosas is an engineering consultant specializing in product safety analysis and engineering, industrial and workplace safety, machine guarding and safeguarding, lockout/tagout, hazardous energy control procedures, risk assessment, accident analysis and reconstruction, and hazard analysis.  In 1975, he earned a Bachelor of Science degree in industrial and systems engineering from the Illinois Institute of Technology.  He is a licensed professional engineer in the State of Illinois and a certified safety professional.  He has over 37 years of experience in the areas of product safety, employee safety, and safety standards, including identifying situations where energy control programs should be exchanged between employers.  Since 1988, Mr. Karosas has been a member of the ANSI committee that originally developed the American National Standard for Personnel Protection – Lockout/Tagout of Energy Sources – Minimum Safety Requirements Z244.1 (Z244.1) standard in 1982.  (Tr. 202-06, 209-10; Exhs. H, I).

(lockout/tagout)), in 1989. [33]  (Tr. 206-07; Exh. H).

Mr. Karosas testified that he reviewed the Boston Store's energy control procedures and found that there was no machine-specific procedure associated with the elevator that existed when Mr. Nauholz repaired the elevator on June 16, 2009. [34]  (Tr. 213-14, 273).   He also testified that the specific hazard that injured Mr. Nauholz was the sprocket and the chain that passed over the sprocket that was associated with the elevator gate.   Mr. Karosas' expert report also stated that Mr. Nauholz "was injured because of his failure to follow Otis' established energy control procedure, not because of a failure to inform Bon-Ton [The Boston Store], or a failure to obtain Bon-Ton's [The Boston Store's] (non-existent) procedure."[35]   (Tr. 216; Exh. I, at p. 9).

Mr. Karosas testified that the ANSI standard places the responsibility on the host employer, or customer in this case, to determine the degree of coordination of energy control programs necessary, as well as apprising outside contractors of any special unique hazards existing in the host facility operation.  (Tr. 231-33, 235-36; Exh. H).  Mr. Karosas testified that under the circumstances present when Mr. Nauholz performed his work on June 16, 2009, ANSI Z-244.1 would not have required an exchange of energy control programs between Otis and The Boston Store.  (Tr. 238).  This is because Mr. Nauholz was the only authorized employee, with no other affected employees, and Mr. Nauholz had exclusive control over the elevator, with no reasonable expectation that any other employee would be exposed to any safety hazard or

---

[33] Before then, Z-244.1 was the document used by industry for guidance in the control of hazardous energy.  (Tr. 230-31).  Z-244.1 continues to be used by industry as supplemental guidance to help determine how to comply with the standard at 29 C.F.R. § 1910.147.  (Tr. 236-38).

[34] Mr. Karosas testified that only Otis had an energy control procedure that applied to the work performed by Mr. Nauholz on June 16, 2009 at the store.  (Tr. 273).

[35] Mr. Karosas' expert report stated that Mr. Nauholz "failed to neutralize or block the stored energy due to gravity in the bi-parting door assembly and was injured as a result."  Mr. Karosas' report stated that had Mr. Nauholz

potential injury.[36] (Tr. 76, 238, 246, 272). Where there were no other authorized employees, no affected store employees, and the few store employees at The Boston Store working away from the elevator were aware that the elevator was being serviced, and with a work area under the exclusive control of Mr. Nauholz, there was no potential for interaction with any employees of The Boston Store. (Tr. 241-42, 274). Under the circumstances of June 16, 2009, where Mr. Nauholz had exclusive control of the work area and no expected interaction with others, the elevator industry does not ordinarily understand 29 C.F.R. § 1910.147 to require an exchange of energy control programs. (Tr. 239, 242, 246, 274). Mr. Karosas testified that there was no health or safety benefit by an exchange of energy control procedures between Otis and the store on June 16, 2009. This was because there was no store procedure to exchange, no hazardous energy control store guidance that would benefit Mr. Nauholz, no possibility that a store employee was an employee authorized to work on the elevator, and no possibility that a store employee could be an employee exposed to a hazard related to the mechanic's work. (Tr. 240-41, 245). Mr. Karosas also testified that there was no potential hazard created by Mr. Nauholz not providing a copy of an energy control procedure to the Boston Store on June 16, 2009. (Tr. 242-43). In his opinion, had Mr. Nauholz disclosed guidance to restrict potentially hazardous energy to the Boston Store, there is an increased risk that store employees may, at some point, feel able to perform maintenance on the elevator themselves. (Tr. 243-44; Exh. I, at p. 12). Mr. Karosas also testified that Mr. Nauholz conveyed enough information to comply with the standard by informing the store that he was there to service the elevator. (Tr. 254-55, 257, 263-66, 275-76).

---

"followed his written procedures and training, he would not have been injured."). (Exh. I, at pp. 1, 12).

[36] The Court agrees with Mr. Karosas and finds that there were no affected store employees at the store on June 16,

Mr. Karosas also testified that any propping of the elevator door to prevent gate chain movement on June 16, 2009 would not have triggered a duty to exchange energy control programs under 29 C.F.R. § 1910.147(f)(2)(i). (Tr. 246). He also stated that 29 C.F.R. § 1910.147 was a performance standard that provided Respondent flexibility in how to comply with the standard. (Tr. 263; Exh. I, at p. 4). He testified "that the performance requirements of preventing the injuries due to unexpected energization while servicing and conducting maintenance and servicing operations in the elevator industry are met essentially by the practices in the elevator industry, with respect to the facts in this case." (Tr. 264-65). He stated that Otis actually and exclusively controlled the area where Mr. Nauholz worked on June 16, 2009. (Tr. 269). He testified that there was no unexpected energization or release of energy that the chain could have inflicted upon Mr. Nauholz because Mr. Nauholz "indicated that it was expected. He controlled it. He knew what was going to happen." (Tr. 270). He stated that to fall within the standard, the release of energy "has to be unexpected." (Tr. 270-71).

Discussion

In order to prove the alleged violation, the Secretary must prove that Mr. Nauholz was engaged in activities on June 16, 2009 that were covered by the scope and application of The Control of Hazardous Energy (lockout/tagout) standard at 29 C.F.R. § 1910.147.[37] It has not done so. The Secretary called only the CSHO to testify at the trial. The evidence before the Court does not prove that the standard applies. The Commission has stated that the "lockout/tagout standard begins with a scope provision, the first sentence of which reads as

---

2009.
[37] The regulatory violation at issue is not based upon any failure to implement lockout/tagout procedures. It is based upon Otis and the store not informing each other of their respective lockout or tagout procedures for isolating gravity energy before Mr. Nauholz serviced the store elevator.

follows: 'This standard covers the servicing and maintenance of machines and equipment in

which the *unexpected* energization or start up of the machines or equipment, or release of stored

energy could cause injury to employees.' 29 C.F.R. § 1910.147(a)(1)(i)(emphasis in original)."[38]

*Sec'y of Labor v. Gen. Motors Corp.,* 17 BNA OSHC 1217, 1218 (No. 91-2973, consolidated,

1995)("the standard applies only to those machines and pieces of equipment for which

energization or start up would be *unexpected* by employees")(emphasis in original), *aff'd Reich v.*

*Gen. Motors Corp.*, 89 F.3d 313 (6th Cir. 1996). The term "unexpected" is an unambiguous

limitation on the application of the standards. (*Gen. Motors Corp.,* 17 BNA OSHC at 1220).

The standard applies where a service employee is endangered by a release of energy without the

employee's foreknowledge.[39] *Gen. Motors Corp.,* 89 F.3d at 315.

  The Secretary must establish that the hazard of unexpected energizing, start up, or release

of stored energy could occur and cause injury. (*Gen. Motors Corp.,* 17 BNA OSHC at 1218).

As shown by the convincing testimony of Messrs. Nauholz, DeLoreto and Karosas, there was no

hazard of unexpected energization on the elevator car top.[40] The Secretary's view that Otis and

its customers are required to inform each other of their respective lockout/tag out procedures

where there is no possibility of "unexpected" energization fails to give effect to the term

"unexpected" as a limitation on the application of the standard. (*Id.* at 1219-20). In this case,

the evidence proved that there was no potential for an unexpected release of stored gravity energy

---

[38] The Court finds the standard to be plain on its face and not vague. *Tex. E. Prods. Pipeline Co. v. Occupational Safety & Health Review Comm'n*, 827 F.2d 46, 50 (7th Cir. 1987)(standards that are "not models of clarity" and not "incomprehensively vague" may still satisfy due process considerations); *Price Chopper Supermarkets*, 15 BNA OSHC 1518, 1519, n.2 (No. 90-0552, 1992)(when the meaning of the cited regulation is plain on its face, no further inquiry is necessary).

[39] *See Dayton Tire, Bridgestone/Firestone*, 23 BNA OSHC 1247, 1251 (No. 94-1374, 2010)(use of the word "unexpected" in the lockout/tagout context "connotes an element of surprise")(internal citation omitted).

[40] The Court finds that these three witnesses have knowledge and experience with the activities engaged in by Mr. Nauholz at the store on June 16, 2009 that are superior to that of the CSHO and are entitled to greater weight with

- 20 -

while Mr. Nauholz performed his work on the gate chain and sprocket atop of the elevator car. Mr. Nauholz testified that there was no way to manually move the gate in its broken condition before he placed the gate chain back onto its sprocket. (Tr. 119, 122, 158).

The only time that the chain, and the gate, could move was after Mr. Nauholz had completed his repair by placing the chain back onto the sprocket. Mr. Nauholz expected and fully anticipated that the gate and chain would begin moving at that point. (Tr. 122). Mr. Nauholz testified:

> Q.  What expectation did you have for that chain moving once you put the chain back on the sprocket?
> A.  Well, I expected it to move, because there was only one counterweight holding it. The counterweight was – hung up, too.

(Tr. 122).

No part of Mr. Nauholz' body, including his hand, was in a zone of danger when he put the chain back on the sprocket. (Tr. 123-24). The only reason that Mr. Nauholz injured his hand was because he intentionally grabbed it as it started moving. (Tr. 123, 125).   He testified as follows:

> Q. Q. Okay. Was your hand in any danger when you put the chain back on the sprocket?
> A.  No.
> Q. Why not?  Why wasn't your hand in any danger?
> A.  It wasn't in any danger unless I grabbed the chain, so that was my own –
> Q.  Ok.
> A.  – my own doing.

(Tr. 123).

The Court finds Mr. Nauholz' testimony that he expected the chain to move once he put it back

—

---

regard to such activities.

on the sprocket and that he intentionally grabbed the chain to be entirely credible.[41]

The standard at 29 C.F.R. § 1910.147(f)(2)(i) applies when employers have employees who potentially can interact in the common work area while the elevator servicing work is being performed, so that coordination is necessary. [42] (Tr. 215-16; Exh. I, at pp. 6-9). Here, there was only one employer, Otis, allowed to perform servicing work on the elevator in question. (Tr. 106-07; Exh. K). The only employee who would ever be on the elevator car top, where the work was performed, would be an Otis employee. No Boston Store employee could service the elevator equipment in question. The store had no lockout or tagout procedure that applied to the freight elevator or to work performed by Mr. Nauholz. No "authorized employee" existed at the work site other than the Otis employee, Mr. Nauholz. No "affected employees" existed at The Boston Store.[43] No non-Otis employee was exposed to an actual potential hazard, the chain and sprocket on the elevator car top.[44]

The only "zone of danger" was the area on the elevator car top which contained the chain and sprocket that caused Mr. Nauholz' injury. As the Commission has stated, "… the inquiry is not simply

---

[41] *See Vandervoort's Diary Foods Co.*, 20 BNA OSHC 1605, 1608 (No. 02-2175, 2003)("The safeguards required by the cited standard [29 C.F.R. § 1910.147(c)(7(i)] are intended to protect employees *only* from the unexpected reactivation of equipment attributable to inadvertence. No lockout/tagout procedures can protect employees from the deliberate and malicious actions of another.")(emphasis in the original).

[42] *See Equipment Depot Ltd.*, 20 BNA OSHC at 1198 (purpose of exchanging lockout/tagout programs under 29 C.F.R. § 1910.147(f)(2)(i) "is to ensure that the customer will not attempt to activate a machine while the outside party is working on it").

[43] The Court finds that there is insufficient evidence to show that store employees were in the area of the gate while Mr. Nauholz serviced the elevator.

[44] Should the elevator gate routinely be considered a hazard under these circumstances, every employee in a fifty-story building who passed the hoistway door of an elevator being serviced atop the car, on which some sort of energy control procedure might potentially be used, may be exposed to injury and become an "affected employee." Under this rationale, the elevator company would be required to initially exchange its potentially, innumerable energy control procedures (whether mechanical, hydraulic, electrical, gravity or otherwise) with employers of every potential "affected employee" in the building, including on-site management, security, and janitorial employees, as well as employers of every employee leasing space in the building. The Secretary's rationale "presumes" that an outside employer's failure to inform on-site employers in these circumstances "will create hazardous conditions for both the outside employee and the on-site employee." (Secretary's post-hearing brief, at p. 10, n. 2).

into whether exposure is theoretically possible. Rather the question is whether employee entry into the danger zone is reasonably predictable." *Fabricated Metal Prods., Inc.*, 18 BNA OSHC 1072, 1074 (No. 93-1853, 1997)(footnote and internal citations omitted). The evidence showed that the only "zone of danger" was on the elevator car top near the chain and sprocket on which Mr. Nauholz worked. There was insufficient evidence that another "zone of danger" was created by the gate. Within the "zone of danger" (the elevator car top) there was no possibility for employees of The Boston Store and Otis to "interact," or create "misunderstandings," so that "coordination" of energy control programs was necessary to protect employee safety. (Exh. G; *see also Carpenter Contracting Corp.*, 11 BNA OSHC 2027, 2030-31 (No. 81-838, 1984) (failure to establish that employee activity would bring employee into "zone of danger" created by alleged violation with "reasonable predictability" justified vacation of citation.

Mr. Nauholz' activities atop the elevator car were not covered by the scope and application of the standard. Under these unique circumstances, the standard does not apply.[45] The foregoing is sufficient to dispose of the alleged violation in that the Secretary has failed to meet one of the four essential elements of her prima facie case. *See, e.g., Kokosing Constr. Co.*, 17 BNA OSHC 1869 (No. 92-2596, 1996), citing to *Waldon Healthcare Center*, 16 BNA OSHC 1052 (No. 89-2804, 1993).

<u>Findings of Fact and Conclusions of Law</u>

---

[45] No evidence was presented to contradict these dispositive facts. The CSHO made no determination regarding any movement of the elevator at the time the work was being performed. (Tr. 67). He made no determinations regarding any potential for movement of the chain, sprocket, or gate. The CSHO admitted that he did not know when or whether Mr. Nauholz expected the gate chain to move during the repair. (Tr. 87). *See Vandervoort's Diary Foods Co.,* 20 BNA OSHC at 1608 (Because evidence does not establish 29 C.F.R. § 1910.147 applicable to operation, alleged violation must be vacated).

- 23 -

All findings of fact and conclusions of law relevant and necessary to a determination of the contested issues have been found and appear in the decision above.  Fed. R. Civ. P. 52(a).  All proposed findings of fact and conclusions of law inconsistent with this decision are denied.

**ORDER**

Based upon the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that Citation 1, Item 2, alleging a violation of 29 C.F.R. § 1910.147(f)(2)(i) is VACATED in its entirety.

/s/
HONORABLE DENNIS L. PHILLIPS
U.S. OSHRC Judge

Date:  January 14, 2011
        Washington, D.C.

- 24 -