RECORD NO. 13-1194

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

𝕴𝖓 𝕿𝖍𝖊

# 𝕮𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

𝕱𝖔𝖗 𝕿𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## OTIS ELEVATOR COMPANY, INC.,

*Petitioner*,

**v.**

## SECRETARY OF LABOR; U.S. DEPARTMENT OF LABOR; OCCUPATIONAL SAFETY & HEALTH REVIEW COMMISSION,

*Respondents.*

ON PETITION FOR REVIEW FROM A DECISION OF THE
U.S. OCCUPATIONAL SAFETY & HEALTH REVIEW COMMISSION

_____

### BRIEF OF PETITIONER

_____

Stephen C. Yohay
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
3800 Howard Hughes Parkway, Suite 1500
Las Vegas, Nevada  89169
(702) 369-6800
stephen.yohay@ogletreedeakins.com

*Counsel for Petitioner*

John A. Shedden
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, North Carolina  28244
(704) 342-2588
john.shedden@ogletreedeakins.com

*Counsel for Petitioner*

Paul J. Waters
WATERS LAW GROUP, LLC
1465 South Fort Harrison Avenue, Suite 205
Clearwater, Florida  33756
(727) 474-4736
pwaters@oshattorney.com

*Counsel for Petitioner*

*Dated: October 17, 2013*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.      Parties and Amici.**   Otis Elevator Company was the party that appeared before the Occupational Safety and Health Review Commission ("OSHRC") as the Respondent, and Otis Elevator Company is the Petitioner in this appeal.  The Secretary of Labor was the Complainant before the OSHRC and is the Respondent in this appeal.   The Occupational Safety and Health Review Commission also is a Respondent in this appeal.   No intervenors or amici participated in the OSHRC proceeding.

**B.      Rulings Under Review.**   At issue in this appeal is the OSHRC's Decision, dated April 8, 2013, OSHRC Docket No. 09-1278.  The Decision was issued by OSHRC Chairman Thomasina V. Rogers and OSHRC Commissioner Cynthia L. Attwood.  The decision was issued by the OSHRC after the Secretary of Labor sought review of a decision by Administrative Law Judge, Dennis L. Phillips, dated January 14, 2011, OSHRC Docket No. 09-1278.

**C.      Related Cases.**  This case has not previously been before this Court or any other court.  Counsel for Otis Elevator Company is not aware of any other related cases currently pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner makes the following disclosures:

Otis Elevator Company, a New Jersey corporation, is a wholly-owned subsidiary of United Technologies Corporation, a publicly traded company on the New York Stock Exchange.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ..........................................................................i

CORPORATE DISCLOSURE STATEMENT ...................................... ii

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES ..................................................................v

GLOSSARY.......................................................................................... viii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................1

STATUTES AND REGULATIONS......................................................3

STATEMENT OF THE CASE................................................................3

STATEMENT OF FACTS ......................................................................4

      A.    The Gate Chain Could Not Move Unexpectedly During the
           Work................................................................................4

      B.    Mr. Nauholz Had Exclusive Control Over His Work Area, the
           Elevator Car Top ..........................................................8

      C.    Otis' Lockout/Tagout Procedures Were Not Applicable to the
           Job at the Boston Store....................................................10

SUMMARY OF ARGUMENT ..............................................................11

STANDING ............................................................................................14

ARGUMENT ..........................................................................................15

iii

I.    THE INTERPRETATION THAT 29 C.F.R. § 1910.147(f)(2)(i) ALLOWS A "PRESUMPTION" OF EMPLOYEE EXPOSURE TO THE CITED HAZARD IS ARBITRARY AND CAPRICIOUS ...................................................................15

      A.    The Standard of Review on Appeal .........................................15

      B.    The Review Commission's Decision Affirming the Citation Item is Based on a Legal Conclusion, Not Record Evidence .......................................................................16

      C.    The Secretary's Interpretation of 29 C.F.R. § 1910.147(f)(2)(i) as Endorsed by the Commission is Unreasonable, and Not Entitled to Deference .........................20

            1.    The Commission's Ruling is "Plainly Erroneous".........20

            2.    The Cited Standard Does Not Establish a "Presumption" of Exposure ............................................25

            3.    The Secretary and the Commission Misinterpreted the Standard and Contradicted the Secretary's Prior Interpretation..........................................................26

            4.    Uncontroverted Evidence of Industry Practice Further Supports that the Secretary's and the Commission's Interpretation is Unreasonable ..............29

      D.    The Commission's Finding that the Standard Applied to the Work Performed by Otis is Arbitrary and Capricious, and Not Supported by Substantial Evidence............................34

CONCLUSION ......................................................................................40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

<u>C</u>ASES

*Astra Pharm. Prod., Inc.*,
    9 BNA OSHC 2126, 1981 WL 18810 (No. 78-6247, 1981)..................21, 34

*Auer v. Robbins*,
    519 U.S. 452 (1997)........................................................................................20

*Bangor Hydro-Electric Co. v. F.E.R.C.,*
    78 F.3d 659 (D.C. Cir. 1996)......................................................................25

*Beaver Plant Operations, Inc. v. Herman*,
    223 F.3d 25 (1st Cir. 2000)........................................................................29

*Bethlehem Steel Corp. v. OSHRC*,
    573 F.2d 157 (3d Cir. 1978) .......................................................................18

*Brock v. L.R. Willson & Sons, Inc.*,
    773 F.2d 1377 (D.C. Cir. 1985)..................................................................21

*Burkes Mechanical*, *Inc.,*
    21 BNA OSHC 2136 (No. 04-475, 2000) ...................................................38

*Century Steel Erectors, Inc. v Dole*,
    888 F.2d 1399 (D.C. Cir. 1989)............................................................21, 29

*Christopher v. SmithKline Beecham Corp*.,
    132 S. Ct. 2156 (2012)................................................................................20

*Dayton Tire*,
    23 BNA OSHC 1247 (No. 94-1374, 2010), *aff'd in part, vacated in part*
    *on other grounds, Dayton Tire v. Sec'y of Labor,* 671 F.3d 1249
    (D.C. Cir. 2012) ..........................................................................................39

\*Authorities upon which we chiefly rely are marked with asterisks.

v

*Dun-Par Eng'rd Form Co.*,
    12 BNA OSHC 1949, 1986 WL 53519 (No. 79-2553, 1986), *rev'd &*
    *remanded on other grounds, Brock v. Dun-Par Eng'rd Form Co.*,
    843 F.2d 1135 (8th Cir. 1988), *decision on remand*,
    13 BNA OSHC 2147 (1989) ........................................................................21

*Fabi Const. Co., Inc. v. Secretary of Labor*,
    508 F.3d 1077 (D.C. Cir. 2007)..............................................................26, 29

**\* Fabricated Metal Prods., Inc.**,
    18 BNA OSHC 1072, 1997 WL 694096 (No. 93-1853, 1997)...12, 21, 22, 23

*General Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976), *superseded by statute on other grounds*,
    42 U.S.C. § 2000e(k) ...............................................................................29

**\* Gen. Motors Corp.**,
    17 BNA OSHC 1217 (No. 91-2973, consolidated, 1995), *aff'd*,
    *Reich v. Gen. Motors Corp.*,
    89 F.3d 313 (6th Cir. 1996) ...............................................................13, 35

*Gilles & Cotting, Inc.*,
    3 BNA OSHC 2002 (No. 504, 1976) ..........................................................22

*Graphic Commc'ns Int'l Union, Local 554 v.*
*Salem-Gravure Div. of World Color Press, Inc.*,
    843 F.2d 1490 (D.C. Cir. 1988)...........................................................21, 24

*IBP, Inc. v. Herman*,
    144 F.3d 861 (D.C. Cir. 1998)..............................................................16, 25

*Int'l Union, UAW v. General Dynamics Land Sys. Div.*,
    815 F.2d 1570 (D.C. Cir. 1987)..................................................................21

*L.R. Willson & Sons v. OSHRC*,
    698 F.2d 507 (D.C. Cir. 1983)................................................................29-30

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007).....................................................................................25

*Martin v. OSHRC (CF&I)*,
    499 U.S. 144 (1991)............................................................23, 26

*N & N Contractors, Inc. v. OSHRC*,
    255 F.3d 122 (4th Cir. 2001) ...............................................21, 23

*Nat'l Indus. Constructors, Inc. v. OSHRC*,
    583 F.2d 1048 (8th Cir. 1978) .....................................................18

*Otis Elevator Company*,
    OSHRC Docket No. 09-1278 ...........................................................1

*Pettiford v. Sec'y of the Navy*,
    858 F. Supp. 2d 86 (D.C. Cir. 2012) ............................................20

*Rockwell Int'l Corp.*,
    17 BNA OSHC 1801, 1996 WL 559889 (No. 93-54, 1996).......................21

*Rockwell Int'l Corp.*,
    9 BNA OSHC 1092 (No. 12470, 1980) ............................................22

## STATUTES

29 U.S.C § 660(a) .........................................................................1, 14

Occupational Safety and Health Act, 29 U.S.C. § 651, *et seq.*.........................1, 3

§ 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2) ...........................15

§ 11(a) of the Occupational Safety and Health Act, 29 U.S.C. § 660(a)..................15

## OTHER AUTHORITIES

29 C.F.R. § 1910.147 .......................................................................31

29 C.F.R. § 1910.147(a)(1)(i) ..............................................................13

29 C.F.R. § 1910.147(f)(2) ........................................................27, 28, 29

29 C.F.R. § 1910.147(f)(2)(i)............................. 1, 3, 12, 15, 16, 19, 20, 25, 32, 34

CPL 02-00-147.........................................................................27, 28

# **GLOSSARY**

| **Term** | **Abbreviation** |
|---|---|
| Occupational Safety and Health Review Commission | OSHRC |
| Administrative Law Judge | ALJ |
| Decision of Commission dated April 8, 2013 | Decision |
| Decision and Order issued by Administrative Law Judge Dennis L. Phillips dated January 14, 2011 | ALJ D&O |
| Transcript of Hearing before Administrative Law Judge Dennis L. Phillips on April 6-7, 2010 | Tr. |
| Complainant's Exhibit entered during Hearing before Administrative Law Judge Dennis L. Phillips on April 6-7, 2010 | Compl't Ex. |
| Respondent's Exhibit entered during Hearing before Administrative Law Judge Dennis L. Phillips on April 6-7, 2010 | Resp't Ex. |
| Control of Hazardous Energy | Lockout/Tagout or LOTO |

## JURISDICTIONAL STATEMENT

This is a Petition for Review from an Order of the U.S. Occupational Safety and Health Review Commission issued on April 8, 2013, in *Otis Elevator Company,* OSHRC Docket No. 09-1278, pursuant to its authority under 29 U.S.C. § 651, *et seq.*, which affirmed a citation item issued by the Secretary of Labor and which assessed a civil penalty against Petitioner.  This Court has jurisdiction to review that Order under 29 U.S.C § 660(a).  The Petition for Review was timely filed on June 3, 2013.

## STATEMENT OF ISSUES

The questions presented by Otis Elevator's Petition are:

1.     Whether the Occupational Safety and Health Review Commission erred in interpreting the cited OSHA standard, 29 C.F.R. § 1910.147(f)(2)(i), to create a legal presumption, in the absence of record evidence, that employees were exposed to the cited hazard.

2.     Whether the Occupational Safety and Health Review Commission erred in excusing the Secretary from his burden of proving employee exposure to the cited hazard as a required element of the alleged OSHA violation.

3.     Whether the Occupational Safety and Health Review Commission erred in declining to refer to extrinsic evidence, such as the standard's Preamble,

national consensus standards and the custom and practice in the Petitioner's industry, to determine whether a reasonable person would have had notice and concluded that the cited standard required the means of compliance demanded by the Secretary.

4.      Whether the Occupational Safety and Health Review Commission erred by ignoring evidence proving that the Secretary's interpretation concerning the compliance requirements of the cited standard was unreasonable and not entitled to deference.

5.      Whether the Occupational Safety and Health Review Commission erred by concluding that the cited OSHA standard applied to the work performed in this case.

## STATUTES AND REGULATIONS

All applicable provisions are contained in the addendum to this Brief.

## STATEMENT OF THE CASE

Otis received a citation under the federal Occupational Safety and Health Act, 29 U.S.C. § 651, *et seq.*, alleging, in pertinent part, that Otis violated 29 C.F.R. § 1910.147(f)(2)(i), a provision in the OSHA standard addressing control of hazardous energy ("lockout/tagout" or "LOTO"). The cited provision of the standard addresses when an "outside employer" and an "on-site" employer must inform each other of their respective LOTO procedures, stating:

> Whenever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures.

29 C.F.R. § 1910.147(f)(2)(i). Otis performed elevator repair work at the Boston Store but did not exchange LOTO procedures with the Store.

After an evidentiary hearing, Administrative Law Judge ("ALJ") Dennis L. Phillips of the Occupational Safety and Health Review Commission ("Review Commission") vacated the item, concluding that the LOTO standard was not applicable and that, in any event, due primarily to the undisputed absence of any

3

hazard to which Boston Store employees were exposed as a result of Otis' work on the elevator, the standard did not require Otis to inform Boston Store of its LOTO procedures.  On review, the Review Commission reversed the decision, affirmed the citation item, and determined that, in pertinent part, the cited standard applied and that, under the cited standard, employee exposure should be presumed.

Otis contends that, as a matter of well-settled law, the Secretary must prove employee exposure as an element of a violation; that a  "presumption" of exposure is not allowed and is not supported by the record, the standard, its history, or relevant precedent; and that, in any event, the standard is not applicable to the work that Otis was performing.   As a result, the Review Commission decision should be reversed, and the citation vacated in its entirety.

## STATEMENT OF FACTS

### A.    The Gate Chain Could Not Move Unexpectedly During the Work

On June 16, 2009, Otis Elevator Company ("Otis") assigned elevator service mechanic Ken Nauholz to the job of repairing a freight elevator at the Boston Store in the Brookfield Square Mall, Brookfield, Wisconsin.   Mr. Nauholz held an elevator mechanic's license issued by the State of Wisconsin.  Tr. 106-07.  When he received his assignment by phone from Otis' dispatch center, he was told only that the freight car gate was "hung up and not functioning."  Tr. 108.  Mr. Nauholz

4

did not know the specifics of the job and did not have a particular plan to repair the gate prior to his arrival at the Boston Store.  *Id.*  He did not anticipate that he would use any energy control procedures that day.  *Id.*

When he arrived, Mr. Nauholz followed his routine and signed in at the entrance.  Tr. 108-09.  The person at the desk near the entrance door expected him and knew he was "the Otis Elevator guy" there to work on the elevator.  Tr. 109. On his way to the gate, he met a "couple" of Boston Store employees who told him that the gate was "hung up" on the freight car and they were not sure why.  *Id.* Those employees were not working near the freight elevator, but in an area "quite a ways from the car," in another room.  Tr. 111-12, 139.  All employees were aware that the gate was broken.  Tr. 109-10.

Mr. Nauholz testified that when he previously repaired elevators at the Boston Store, he would "check in" with the Store's maintenance man, but the maintenance man was on vacation that week.  Tr. 110-111.  In any event, when Mr. Nauholz previously performed work atop an elevator car at the Store, the maintenance man had never accessed that area to observe the work, and did not assist Mr. Nauholz in any way.  Tr. 111.  The OSHA Compliance Officer who investigated the case admitted that he never asked, and therefore did not determine, whether any Boston Store employee would ever be on top of the elevator car.  Tr. 74.

In point of fact, no Boston Store employees were to be involved in Mr. Nauholz's work that day. He confirmed that during his three years of servicing the Boston Store, no Boston Store employees had ever, and would never, become involved in his work. Tr. 110. In Wisconsin, only licensed elevator mechanics, who maintain their licenses with continuing education and training, can legally perform service on elevator equipment. Resp't Ex. K; Tr. 106-07. Thus, the OSHA Compliance Officer testified that Mr. Nauholz told him that he had not seen any Boston Store employees with whom to share any information about his work. Tr. 57. The Compliance Officer also admitted that, in his investigation, he "never learned of any Boston Store employee who ever performed any kind of energy control at all on the elevator equipment . . . ." Tr. 76.

As he approached the elevator gate, Mr. Nauholz saw that a large "out of order" sign covered the elevator's call buttons (Tr. 117-19; Resp't Ex. T at "E") and the gate's bottom was only about three feet above the floor. Tr. 112-13, 115-16. No one could enter the car without stooping to get under the gate, and, at five feet five inches tall, Mr. Nauholz had to crouch to get under it. Tr. 113-16. The frozen elevator gate could not move when Mr. Nauholz tried to move it, despite pulling on the gate extremely hard. Tr. 112-13, 119. There was "no way" that the gate would move, he said. Tr. 119, 122, 158.

To find the gate door mechanism, Mr. Nauholz accessed the elevator car top with a large red step-ladder inside the elevator car, just inside the partially open gate.  Tr. 113-17; Resp't Ex. T at "C".  The mechanism was located on the top of the elevator car on its right side near the front.  Tr. 120; Resp't Ex. P; Resp't Ex. T at "F".  From that spot, Mr. Nauholz could clearly see the area in front of the gate. Tr. 120-21.  No unauthorized personnel could approach the gate, much less crawl under it to enter the car, without him seeing them.  Tr. 70-71, 113, 121, 125.  When Mr. Nauholz examined the mechanism, he saw that one of the gate's chains had come off of its sprocket and had become tightly wedged.  Tr. 121-22.  This chain was jammed and could not move in any way mechanically.  Tr. 122.  The only way for this chain to move was for it to be repaired or "un-wedged." *Id.*  Therefore, Mr. Nauholz proceeded to pry the chain back onto the sprocket. *Id.*

Importantly, Mr. Nauholz fully expected that once he placed the chain back onto the sprocket, the chain would move. *Id*.  Because he expected the chain to begin to move after prying it back onto the sprocket, he made sure his hand was safely away from the chain before it did.  Tr. 122-23.  When the chain began to move, however, Mr. Nauholz then made the deliberate and intentional decision to grab the chain with his hands.  Tr. 123.  He grabbed the chain because he was worried about its connecting link breaking when the gate closed and the chain dropping down inside of a box containing one of the gate's counterweights.  Tr.

123-24.   Had the chain broken, Mr. Nauholz would have needed to spend significant time trying to "fish" the chain out of the counterweight's box.   *Id.* Again, prior to grabbing the chain, Mr. Nauholz had not been in a position where he could have been injured by the chain, and he would not have been injured if he had not intentionally grabbed the chain.  Tr. 123-25.  There was no possibility that the chain could move unexpectedly prior to being repaired.  Tr. 112-13, 119, 122, 158, 270.

## B.   Mr. Nauholz Had Exclusive Control Over His Work Area, the Elevator Car Top

The elevator car top where Mr. Nauholz repaired the sprocket and chain mechanism was under his exclusive control the entire time he was working.  Tr. 74, 76, 125-26, 180, 241-42, 269, 271-72.  The Compliance Officer conceded that he had no reason to dispute this.  Tr. 76.  The only way to access the elevator car top was to duck under the jammed gate, climb up a large stepladder, go through a hatch in the elevator car roof, and climb on top of the elevator.  Tr. 113.  With the freight car gate jammed open, the elevator car could not possibly move. Nevertheless, consistent with safe industry practice, upon accessing the elevator car top, Mr. Nauholz further ensured that it could not move and was under his exclusive control by placing the car on "inspection mode" at the inspection station located on the elevator car top.  Tr. 113, 148-50.  No Boston Store employee could

be exposed to any injury from any movement of the gate chain and sprocket once Mr. Nauholz repaired it.  Tr. 90, 125-26.

Only the chain and sprocket posed a hazard while the work was performed, and Mr. Nauholz was exposed only because he intentionally grabbed the chain.  Tr. 126, 246, 271-72.  The gate itself was counterweighted on both sides to reduce its weight significantly.  Tr. 120, 158.  There was no evidence that any movement of the elevator gate itself posed any risk of injury to any Boston Store employee.  Tr. 242-43, 270.  The chains and sprockets that controlled the gate were not "electronically moving."  Only "mechanical movement" was involved.  Tr. 161.

The Compliance Officer admitted that he "cannot make any specific determination" as to whether a Boston Store employee could potentially have been under the gate.  Tr. 80.  The reason, he explained, is that he was not present when the work was performed.  He could only make "an assumption," he said – in other words, speculate.  *Id.*

The elevator car top was under Mr. Nauholz's exclusive control during the entire time of his work and no potential for interaction with Boston Store employees existed at any time while he was working.  Tr. 125, 180.  In short, there was no exposure to the "unexpected release" of "hazardous" energy to any Boston Store employee.  Tr. 92-93, 241-43; *see also* ALJ D&O 11-12.

9

**C.    Otis' Lockout/Tagout Procedures Were Not Applicable to the Job at the Boston Store**

Prior to June 16, 2009, Otis had developed and implemented multiple policies and procedures to protect its employees from different kinds of potentially hazardous energy.   Tr. 175.[1]   Otis expected its employees to analyze the circumstances they confront in the field and determine the hazardous energy control procedures necessary to perform their work.    Tr. 177, 214-15. Accordingly, Otis had developed a specific procedure for working on the bi-parting freight door such as the one involved in this case.  Resp't Ex. B.  This procedure applied to the repair performed by Mr. Nauholz on the freight elevator bi-parting gate.  Tr. 48.  Importantly, this procedure called for wedging the gate open with a custom "door-stop" whether or not any potential for "unexpected" gate movement could occur while a repair took place.  Resp't Ex. B at 3.

With respect to communicating electrical energy control lockout/tagout procedures to the other employers' employees, Otis required this when other affected employees were working with or in proximity to Otis employees.  Tr. 193-

---

[1] On June 16, 2009, the Boston Store had no energy control procedures that applied to the freight elevator in any way.  Tr. 81, 213-14.  Although no Boston Store employees legally could work on the freight elevator, because none were licensed to do so, Boston Store eventually adopted a lockout/tagout procedure for the freight elevator to settle a citation that the Secretary had issued to it.  Tr. 213-14; Resp't Ex. F.  This procedure dealt strictly with locking and tagging out the power supply and had no application to the wedged chain and sprocket fixed by Mr. Nauholz – it remains entirely irrelevant to his work that day.  Tr. 217; Resp't Ex. F.

94; Compl't Ex. C-5 at 38-39 (in context of electrical energy, "communicate the issue to all concerned/affected workers").     In    this    instance,    however,    Mr. Nauholz's work did not require the use of these procedures because his work did not involve electrical energy.     Under the circumstances that Mr. Nauholz encountered, it was not Otis' practice to exchange an energy control procedure like the one for the gate with a customer before such work was performed.  Tr. 68-70, 91, 156, 177-178.  Thus they are not involved at all in this citation.  Indeed, the OSHA Compliance Officer admitted that he made no effort to determine whether Otis failed to utilize electrical energy control procedures, or procedures to isolate hydraulic energy.  Tr. 85; *see also* Compl't Ex. C-5 at 38-42.  In sum, this was not a case in which inadvertent activation of an energy source such as an electrical switch would have affected the work, or placed any employee at risk.

## SUMMARY OF ARGUMENT

Straying from the record evidence and the reasoned determination below, the Review Commission and the Secretary created an improper legal presumption of exposure to violative conditions as well as incorrectly held that the cited standard applied to the work performed by Otis.  These determinations are arbitrary and capricious, unreasonable, and not entitled to deference.  Also, given the undisputed

11

record evidence, the Review Commission's decision produced a result that defies common sense.

It is well-settled that an element of proof that the Secretary must satisfy to establish a violation of a standard is employee exposure or access to the hazard created by noncompliance.  To meet this burden, the Secretary is required to show that an employee's entry into the zone of danger is reasonably predictable.  *Fabricated Metal Prods., Inc.*, 18 BNA OSHC 1072, 1997 WL 694096, at *4 (No. 93-1853, 1997).  Such a showing is entirely absent from the Review Commission's determination.  In fact, the Commission recognized that a risk of accident was "exceptionally low."

In short, the Commission's decision adopting the Secretary's interpretation ignores its long-standing precedent and excuses the Secretary from his burden of proof, concluding that the cited standard allows a "presumption" that a Boston Store employee could have possibly interfered with the "restrictions and prohibitions" of Otis's energy control program.  *Nothing* in § 1910.147(f)(2)(i) or its history allows employee exposure to be presumed.  Instead, guidance directs that the standard is a "performance standard" in which such a presumption of exposure is particularly inappropriate.

Moreover, as is self-evident from the record, the interpretation of the standard below fails to make reasonable sense.  The record unmistakably shows

12

that there was no possibility of exposure and no possibility that a Boston Store employee could have interfered with the work performed by Otis' elevator repair technician.  To even be *potentially* exposed, a Boston Store employee would have to ignore an "out of order" sign, duck under a stuck and partially closed elevator gate, enter the "out of order" elevator car, climb the Otis mechanic's ladder, and access the top of the elevator car inside the elevator shaft.  This common-sense challenge to the Commission's reasoning is bolstered by undisputed record evidence of industry practice, which supports that, for multiple reasons, no one in the elevator industry would have presumed exposure and exchanged energy control programs in a situation such as that here.

Finally, in addition to an improper legal presumption, the Commission's finding that the standard applied to the work performed by Otis is arbitrary and capricious, and not supported by substantial evidence.  "[T]he [cited] standard applies only to those machines and pieces of equipment for which energization or start up would be *unexpected* by employees."  *Gen. Motors Corp.*, 17 BNA OSHC 1217, 1218 (No. 91-2973, consolidated, 1995) (emphasis in original), *aff'd*, *Reich v. Gen. Motors Corp.*, 89 F.3d 313 (6th Cir. 1996); 29 C.F.R. § 1910.147(a)(1)(i). Here, the record unequivocally establishes – and the Secretary is unable to counter – that no such unexpected release of energy could have occurred.  Consequently,

13

the finding that the standard applied to the work performed by Otis should be set aside.

## STANDING

Otis Elevator has standing because it was adversely affected and aggrieved by an Order of the Commission which affirmed a citation item against Otis Elevator and which assessed a civil penalty against it.  *See* 29 U.S.C. § 660(a) ("Any person adversely affected or aggrieved by an order of the Commission issued under subsection (c) of section 659 . . . may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or where the employer has its principal office, or in the Court of Appeals for the District of Columbia Circuit, by filing in such court within sixty days following the issuance of such order a written petition praying that the order be modified or set aside.").

14

## ARGUMENT

## I. THE INTERPRETATION THAT 29 C.F.R. § 1910.147(f)(2)(i) ALLOWS A "PRESUMPTION" OF EMPLOYEE EXPOSURE TO THE CITED HAZARD IS ARBITRARY AND CAPRICIOUS

### A.  The Standard of Review on Appeal

Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2) provides that a reviewing court shall hold unlawful and set aside an agency decision if it is:

"(a)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(b)    contrary to constitutional right, power, privilege, or immunity;

(c)    in excess of statutory jurisdiction, authority, or limitations; or short of statutory right;

(d)    without observance of procedure required by law;

(e)    unsupported by substantial evidence in a case subject to sections 556 and 557 of [Title 5] or otherwise reviewed on the record of an agency hearing provided by statute; or

(f)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

Section 11(a) of the Occupational Safety and Health Act ("the Act"), 29 U.S.C. § 660(a), specifically provides that on judicial review of a Review Commission decision, factual questions shall be "conclusive" if supported by "substantial evidence on the record considered as a whole."  However, where, as here, the key finding is a *legal* one – plainly not based on the factual Record –

15

"arbitrary and capricious" review of the Commission decision is applicable.  As

this Court stated in *IBP, Inc. v. Herman*:

> Both the Company and the Secretary frame our review of
> this issue as a "substantial evidence" question, surely
> because the Occupational Safety and Health Act's
> judicial review provision provides that "[t]he findings of
> the Commission with respect to questions of fact, if
> supported by substantial evidence on the record
> considered as a whole, shall be conclusive." 29 U.S.C. §
> 660(a) (1994).  **This provision, however, neither
> restricts our review to questions of fact nor precludes
> arbitrary and capricious review of Commission
> decisions.**  While that section governs factfinding,
> Congress did not intend to relieve the Commission of the
> reasoned decisionmaking requirement of the
> Administrative Procedure Act.  *S.G. Loewendick & Sons,
> Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C. Cir. 1995); *see
> also* 5 U.S.C. § 706(2)(A) (1994).

144 F.3d 861, 866 (D.C. Cir. 1998) (emphasis added).  Thus, the "substantial

evidence" standard of judicial review does *not* restrict courts from examining

Commission decisions for arbitrariness and capriciousness.

**B.      The Review Commission's Decision Affirming the Citation Item is
         Based on a Legal Conclusion, <u>Not</u> Record Evidence**

The penultimate basis for the Commission's decision is its legal conclusion

that, under 29 C.F.R. § 1910.147(f)(2)(i), the exposure of Otis' repairman to a

hazard resulting from the actions of Boston Store employees may be "*<u>presumed</u>*"

from the language and history of the standard.[2]  In so deciding, the Commission rejected the ALJ's finding in vacating the citation item; that is, that, based on the evidence, there was "no possibility" of Otis and Boston Store employees "interacting or creating 'misunderstandings'" so as to place Mr. Nauholz in a "zone of danger."  Decision at 6.

Straying from the record evidence and the ALJ's determination, the Commission applied a *legal presumption* and speculated hypothetically that "Boston Store's inability to provide its employees with proper instruction *could have*, in turn, made it more *likely* that a Boston Store employee would interfere with the use of those procedures, exposing the mechanic to serious injury from a release of stored energy."  Decision at 12 (emphasis added).  The Commission applied this hypothetical-based rationale despite that, in a subsequent portion of its Decision, the Commission came very close to agreeing with the ALJ's factual assessment of the record as to the absence of *any* risks facing Mr. Nauholz. Indeed, the Commission agreed that:

> The likelihood of an accident resulting from a Boston Store employee interfering with Otis's LOTO procedures (had they been implemented) was **exceptionally low**: an out-of-order sign had been placed by the elevator before the Otis mechanic arrived at the store; only a limited number of Boston Store employees were present at the

---

[2] The Commission accepted the Secretary's contention that the standard "presumes that in this situation a Boston Store employee may interfere with the 'restrictions and prohibitions' of Otis's energy control program."  Decision at 7.

> time because the servicing activity was being performed before the store opened for business; and the record shows that Boston Store employees, as part of their jobs, were *not* responsible for servicing the freight elevator, at least when the Otis mechanic was assigned to perform the servicing activity.

Decision at 12 (bold emphasis added).[3]

Clearly, even while seemingly acknowledging the ample factual evidence undermining the finding of a standard violation, the Commission ignored this evidence in favor of a legal presumption of exposure to affirm the citation item against Otis. Consequently, the Commission's decision affirming the citation item is based upon a legal conclusion, and not the record evidence.

Indeed, the Secretary's and the Commission's interpretation of the standard as applied to the facts of this case does not make sense. Standards under the Act "should be given a reasonable, commonsense interpretation." *Nat'l Indus. Constructors, Inc. v. OSHRC*, 583 F.2d 1048, 1055 (8th Cir. 1978). Indeed, "[i]n an adjudicatory proceeding, the Commission should not strain the plain and natural meaning of words in a standard to alleviate an unlikely and uncontemplated hazard." *Bethlehem Steel Corp. v. OSHRC*, 573 F.2d 157, 161 (3d Cir. 1978). Here, the Commission ignored these principles in its interpretation of

---

[3] Based on this determination, the Commission reduced the Secretary's proposed $5,000 penalty for the violation to $500. *See* Decision at 12-13.

§ 1910.147(f)(2)(i) and, in overturning the ALJ's decision, achieved a result that simply makes no sense in light of the record evidence.

The record unmistakably shows that there was "no possibility" that the Boston Store employees would seek, let alone achieve, access to the top of the elevator car.  Tr. 74, 76, 90, 110-11, 113, 125-26, 242-43, 246, 270-72.  This was the only "zone of danger."  *Id.*  It can hardly be seriously asserted that any retail employee of the Boston Store would take it upon himself to ignore an "out of order" sign, duck under a partially closed elevator gate, enter the "out of order" elevator car, climb the Otis mechanic's ladder, and access the top of the elevator car inside the elevator shaft.  As the ALJ found, there was no possibility that the Boston Store and Otis employees would "interact" or have a "misunderstanding" so that it was necessary for there to have been "'coordination' of energy control programs" to protect any employee's safety.  ALJ D&O at 23.  Indeed, nowhere have the Secretary or the Commission suggested what additional information should have been given to the Boston Store employees that even could have protected them, or the Otis mechanic.  The Commission's and Secretary's interpretation of § 1910.147(f)(2)(i) is neither "reasonable" nor "common sense," and it represents precisely the sort of interpretation that "strains the plain and natural meaning of words" courts have consistently found improper.

**C.    The Secretary's Interpretation of 29 C.F.R. § 1910.147(f)(2)(i) as Endorsed by the Commission is Unreasonable, and Not Entitled to Deference**

Under the U.S. Supreme Court's decision in *Auer v. Robbins*, courts ordinarily defer to an agency's interpretation of its own ambiguous regulations. 519 U.S. 452, 461 (1997) (citations omitted).  This general rule, however, does not apply in all cases.  Deference is <u>not</u> appropriate, for example, when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation,'" or when there is reason to suspect that the interpretation "does not reflect the agency's fair and considered judgment on the matter in question."  *Id.* at 461-62 (quotation marks and citations omitted); *see also*, *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012); *Pettiford v. Sec'y of the Navy*, 858 F. Supp. 2d 86, 91 (D.C. Cir. 2012).  Here, the Secretary's and Commission's interpretation of the standard fails under these standards, is facially unreasonable, and is not entitled to deference.

1.    **The Commission's Ruling is "Plainly Erroneous"**

The Commission has long held that to prove a violation of a specific standard, the Secretary must demonstrate by a preponderance of the evidence: (1) that the cited standard applies; (2) noncompliance with the terms of the standard; (3) *employee exposure or access to the hazard created by the noncompliance*, and (4) that the employer knew, or with the exercise of reasonable diligence could have

known, of the condition. *Astra Pharm. Prod., Inc*., 9 BNA OSHC 2126, 2129, 1981 WL 18810, at *4 (No. 78-6247, 1981)(emphasis added); *Dun-Par Eng'rd Form Co.*, 12 BNA OSHC 1949, 1986 WL 53519, at *3 (No. 79-2553, 1986), *rev'd & remanded on other grounds*, *Brock v. Dun-Par Eng'rd Form Co.*, 843 F.2d 1135 (8th Cir. 1988), *decision on remand*, 13 BNA OSHC 2147 (1989); *Rockwell Int'l Corp.*, 17 BNA OSHC 1801, 1806, 1996 WL 559889, at *6 (No. 93-54, 1996); *N & N Contractors, Inc. v. OSHRC*, 255 F.3d 122, 125-26 (4th Cir. 2001). This Court has stated that "[t]he Secretary has the burden of proving *all* the elements of the OSHA violation with which an employer is charged." *Century Steel Erectors, Inc. v Dole*, 888 F.2d 1399, 1402 (D.C. Cir. 1989) (emphasis added) (citation omitted); *Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377, 1383 (D.C. Cir. 1985). Agency decisions which depart from such established precedent without a reasoned explanation will be vacated as arbitrary and capricious. *Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C. Cir. 1988); *Int'l Union, UAW v. General Dynamics Land Sys. Div.*, 815 F.2d 1570, 1578-79 (D.C. Cir. 1987); *L.R. Willson & Sons, Inc.*, 773 F.2d at 1381-82. Here, the Commission contradicted its own, unequivocally-stated precedent establishing that "[t]he Secretary *always* bears the burden of proving employee exposure to the violative conditions." *Fabricated*

*Metal Prods., Inc.*, 18 BNA OSHC 1072, 1997 WL 694096, at *2 (emphasis added).

In *Fabricated*, the Secretary cited the employer for failing to guard power presses with point of operation plungers located between 36″ and 50″ above the floor and unguarded camshafts 2-3′ above the floor. 1997 WL 694096, at *1. The Secretary alleged that the employees were exposed to the point of operation and the unguarded camshafts if they slipped or fell based on their proximity to the machines. *Id.* at *2. The evidence also established, however, that employees had no operational reason to contact the points of operation or camshafts. *Id.*

On review, the Commission reviewed the two seminal cases[4] in its jurisprudence addressing the Secretary's burden of proving employee exposure and access to a cited hazard. 18 BNA OSHC at 1072, 1997 WL 694096, at *3. Summarizing the results of this review, the Commission declared:

> Accordingly . . . in order for the Secretary to establish employee exposure to a hazard she must show that it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger. **We emphasize that . . . the inquiry is <u>not</u> simply into whether exposure is theoretically possible. Rather,**

---

[4] *Gilles & Cotting, Inc.*, 3 BNA OSHC 2002 (No. 504, 1976); and *Rockwell Int'l Corp.*, 9 BNA OSHC 1092 (No. 12470, 1980).

> **the question is whether employee entry into the danger zone is reasonably predictable.**

*Id.* at *3 (citations and footnotes omitted) (emphasis added).[5]

Based on this standard, the Commission held that the Secretary *failed* to establish employee exposure and vacated the citations.  *Id.* at *3-4.   The Commission rejected the Secretary's interpretation that employee exposure to unguarded machinery is established whenever it is "physically possible for an employee to put his [or her] hand in the hazardous area, even if by inadvertence or improper performance of the job, except where such contact is 'freakish or suicidal.'"  *Id.* at *3 n.8.  Such an interpretation, said the Commission, "does not . . . carry the Secretary's burden to prove exposure as eliminate it."   *Id.* "Accordingly, her position is not entitled to deference under *CF&I*."  *Id.*; *see also*, *id.* at *3 n.6.[6]   "Our inquiry," said the Commission, "is whether the employees' proximity to the machines makes it *reasonably predictable* that they will enter these zones of danger by slipping or falling."  *Id* at *3 n.7 (emphasis added).

The same analysis applies here and leads to similar results.  Under the Commission's precedent, no violation of the requirement by Otis could be proven

---

[5] This formulation has been endorsed by reviewing courts.  *See*, *e.g.*, *N & N Contractors, Inc.*, 255 F.3d at 127.

[6] "*CF& I*" refers to the U.S. Supreme Court's opinion in *Martin v. OSHRC (CF&I)*, 499 U.S. 144 (1991).

unless the Secretary demonstrated not simply that exposure was theoretically possible but that employee entry into the danger zone was *reasonably predictable*. The Commission did not refer or cite to *any* record evidence showing exactly which "restrictions and prohibitions" of Otis' "program" might have been interfered with, or how such interference was "reasonably likely" to occur in a way that could create a hazard for any employee.  Moreover, it sidestepped its own conclusion that the risk of an accident was "exceptionally low."  In short, the Commission ignored its precedent and excused the Secretary from his burden of proof, concluding that the provision of the cited standard allowed it to "presume" that a Boston Store employee could possibly interfere with the "'restrictions and prohibitions' of Otis' energy control program."  Decision at 7.  In Commission proceedings, however, "conjecture cannot substitute for a reasoned explanation." *Graphic Commc'ns Int'l Union, Local 554*, 843 F.2d at 1494.

The Secretary did not contend that the ALJ's factual finding was incorrect or point to any contrary evidence adduced at the hearing.  Accordingly, the Commission's conclusion was not based on an evidentiary finding that such interference was possible, let alone reasonably predictable.  Rather, it was based purely on the Commission's legal interpretation of the standard, as urged by the Secretary.  As this Court has recognized, such a decision based on a legal conclusion "is more naturally and appropriately tested in terms of reasonableness

24

than in terms of evidentiary weight." *See IBP, Inc.*, 144 F.3d at 866; *see also*, *Bangor Hydro-Electric Co. v. F.E.R.C.*, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996). In light of all the above, the Commission's ruling is unreasonable, plainly erroneous, and should not be upheld.

### 2.  The Cited Standard Does Not Establish a "Presumption" of Exposure

Contrary to the Commission and the Secretary, there is nothing in the cited provision of the standard or its history that may reasonably be construed as allowing a "presumption" of employee exposure to the hazard the standard is aimed at preventing. First, there is no reference in the Commission's decision to *any* prior ruling construing 29 C.F.R. § 1910.147(f)(2)(i) to contain such an exposure presumption. Second, there is *no indication* that, before the citation in this case, the Secretary had ever asserted that the standard allows this presumption. Thus, to defer to this new interpretation would result in precisely the kind of "unfair surprise" against which the U.S. Supreme Court has long warned. *See, e.g., Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170-71 (2007) (Department of Labor's change in interpretation of a regulation need not be disregarded as long as "interpretive changes create no unfair surprise"). Indeed, while the Secretary may announce an interpretation of a standard for the first time in a citation, this method of interpretation diminishes the degree of deference owed to the agency. As the Supreme Court has stated:

> [T]he decision to use a citation as the initial means for
> announcing a particular interpretation may bear on the
> adequacy of notice to regulated parties, *see Bell
> Aerospace*, 416 U. S., at 295, 94 S. Ct., at 1772; *Bowen v.
> Georgetown Univ. Hospital*, 488 U.S., at 220, 109 S. Ct.,
> at 477-78 (SCALIA, J., concurring), on the quality of the
> Secretary's elaboration of pertinent policy
> considerations, *see Motor Vehicle Mfrs. Assn. of United
> States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463
> U.S. 29, 43, 103 S. Ct. 2856, 2866, 77 L. Ed. 2d 443
> (1983), and on other factors relevant to the
> reasonableness of the Secretary's exercise of delegated
> lawmaking powers.

*Martin*, 499 U.S. at 158; *accord*, *Fabi Const. Co., Inc. v. Sec'y of Labor*, 508 F.3d 1077, 1088 (D.C. Cir. 2007) ("Even if the Secretary's interpretation were reasonable, announcing it for the first time in the context of this adjudication deprives Petitioners of fair notice. Where, as here, a party first receives actual notice of a proscribed activity through a citation, it implicates the Due Process Clause of the Fifth Amendment.").

3.     **The Secretary and the Commission Misinterpreted the Standard and Contradicted the Secretary's Prior Interpretation**

The justification provided by the Commission for its "presumption" misses the mark. The Commission characterized the cited provision as a "specification standard" in order to find that Otis' failure to provide information to Boston Store employees would mean that access and exposure to the hazard may be presumed; a rigid and mechanistic application of the standard. The Commission rejected Otis'

assertion that the standard is a far more flexible "performance standard."  Decision at 7 n.7.  The Secretary's historical guidance as to the standard in question undermines the Commission's perfunctory conclusion, however, and shows that Otis' contention below is correct.

For instance, the "Control of Hazardous Energy" Compliance Directive interpreting the Lockout/Tagout Standard makes it unmistakably clear that – contrary to the Commission's decision – the Secretary does *not* regard § 1910.147(f)(2) as a "specification standard" that "'prescribes a means of enhancing employee safety . . . ."  Decision at 7.  In the Compliance Directive, the Secretary clearly identifies § 1910.147(f)(2) as a "*performance oriented standard* [that] allows the employers the *flexibility* on how to meet the LOTO standard requirements."  CPL 02-00-147, Ch. 3, pp. 56-57 (emphases added).[7]

Further, and perhaps even more compelling, the Secretary declares in the Compliance Directive that, under the LOTO standard as applied to the issue of employee exposure on a multi-employer worksite, a compliance officer must undertake a careful review of the particular facts involved to determine whether, under the so-called Multi-Employer Citation Policy, it is appropriate to issue a

---

[7] The Commission referred to the Compliance Directive in its Decision, indicating that it is a legitimate reference source for the Secretary's interpretations of the Standard.  Decision 7 n.7.

citation to the host employer, or the contractor, under § 1910.147(f)(2). As the

Compliance Directive itself states:

> The contractor must take reasonable steps consistent with its authority to protect its employees if the contractor knows, or has reason to know, that the host's energy control procedures are deficient or otherwise insufficient to provide the requisite protection to its employees.
>
> NOTE: The guidance provided in *OSHA Instruction, CPL 02-00-124, Multi-Employer Citation Policy (December 10, 1999)*, must be used to determine host employer and contractor compliance with the LOTO standard. **In <u>all</u> cases, the decision to issue § 1910.147 citations to the host or contractor employer should be based on all of the relevant facts and the established policy for exposing, creating, correcting, and controlling employers.**

CPL 02-00-147, Ch. 2, p. 31 (bold emphases added).

This interpretive guidance shows why the Secretary and the Commission

erred in relying so heavily on the introductory term "whenever" in the cited

provision to support the claim that exchanges of information are *always* required

"whenever outside servicing personnel" are engaged in multi-employer situations.

*See* Decision at 6. Such an interpretation necessarily requires that there could

*never* be an exception to this requirement, no matter the circumstances. However,

the Compliance Directive makes clear that, until this case, the Secretary did not

construe the standard in such a mechanistic fashion. Instead, the Secretary

unambiguously directed that "all of the relevant facts and the established policy for

exposing, creating, correcting, and controlling employers" must be considered before a citation is issued under § 1910.147(f)(2).

No such analysis of "all of the relevant facts" was made here, either by the Secretary or the Commission. Where the Secretary has been inconsistent interpreting a standard, due process concerns are raised because it cannot be said that the Respondent had fair notice of the conduct required. *See*, *e.g.*, *Beaver Plant Operations, Inc. v. Herman*, 223 F.3d 25, 30-31 (1st Cir. 2000). Further, this inconsistency is an additional reason to find the Commission's interpretation unreasonable, and not entitled to deference. *See General Elec. Co. v. Gilbert*, 429 U.S. 125, 143 (1976), *superseded by statute on other grounds*, 42 U.S.C. § 2000e(k). In short, the Commission's Decision affirming the citation item against Otis plainly misinterpreted the standard at issue and contradicted the Secretary's prior interpretation.

### 4. Uncontroverted Evidence of Industry Practice Further Supports that the Secretary's and the Commission's Interpretation is Unreasonable

As this Court discussed in *Fabi Construction*, evidence of industry practice should be considered in determining whether the interpretation of a broadly worded OSHA standard is reasonable, especially where, as here, the interpretation is announced for the first time in a citation. 508 F.3d at 1084; *accord, Century Steel Erectors*, 888 F.2d at 1405; *L.R. Willson & Sons, Inc. v. OSHRC*, 698 F.2d

507, 513-14 (D.C. Cir. 1983).  Here, Otis introduced compelling evidence of industry custom and practice before the ALJ, but the Commission improperly ignored it.

For instance, Mr. Nauholz, a highly experienced mechanic, testified that no one in the elevator industry informs customers of energy control procedures (such as wedging a gate) before working in situations like that presented in this case.  Tr. 156.  Lou DeLoreto, Otis' then Senior Manager of Environment Health and Safety,[8] and Chairman of the National Elevator Industry Safety Committee, concurred.  Tr. 177-78.

Both Mr. Nauholz's and Mr. DeLoreto's testimony was reinforced by uncontroverted expert opinion. George Karosas, an engineering consultant with over thirty-seven (37) years of experience in lockout/tagout hazardous energy control procedures and workplace safety, testified regarding industry understanding and the requirements of the industry consensus standard, ANSI Z-244.1 ("Control of Hazardous Energy, Lockout/Tagout and Alternative Methods").[9]  Mr. Karosas testified that the ANSI standard placed the responsibility

_____

[8] Mr. DeLoreto is now Vice President – Health & Safety at Schindler Elevator Corporation (U.S.).

[9] The ALJ found Mr. Karosas to be a highly qualified expert in the development, implementation and use of hazardous energy control procedures.  ALJ D&O 15-19. In addition to his thirty-seven (37) years of experience, Mr. Karosas is a licensed Professional Engineer in Illinois, a Certified Safety Professional, and a member of

on the *host employer*, or customer in this case, to determine the degree of coordination of energy control programs necessary, as well as apprising outside contractors of any special unique hazards existing in the host facility operation.  Tr. 235-36.  This, of course, is consistent with OSHA's Multi-Employer Citation Policy.  As shown above, under the Secretary's Lockout/Tagout Compliance Directive, the Secretary and the Commission should have analyzed the evidence relating to these factors before determining whether to issue a citation to Otis.

When Mr. Nauholz performed his work on June 16, 2009, ANSI Z-244.1 would *not* have required an exchange of energy control programs between Otis and the Boston Store.  Tr. 238.  This is because, as discussed above, Mr. Nauholz was the only authorized employee, with no other affected employees, and he had exclusive control over the elevator, with no reasonable expectation that any other employee would be exposed to any safety hazard or potential injury.  *Id*.  Under such circumstances, there was *no potential* for interaction between Mr. Nauholz and any Boston Store employees.  Tr. 241-42.

---

the ANSI Z 244.1 committee.  He also is a member of the committee charged with drafting ANSI Z-244.1, the original industry consensus standard upon which OSHA based its hazardous energy control standard, 29 C.F.R. § 1910.147.  Tr. 206-07.  Prior to OSHA's standard, ANSI Z-244.1 was the document used by industry for guidance in the control of hazardous energy.  Tr. 230-31.  Employers continue to use ANSI Z-244.1 to determine how to comply with performance standards like lockout/tagout.  Tr. 236-38.

Mr. Karosas explained that, because those were the routine conditions under which elevator service work is performed, the elevator industry did not ordinarily understand 29 C.F.R. § 1910.147(f)(2)(i) to require an exchange of energy control programs for situations such as wedging open a gate, as here.  Tr. 239, 242, 246. Moreover, he believed that Mr. Nauholz in fact had conveyed enough information to protect Boston Store employees.  Tr. 254-55, 263-66, 275-76.

This opinion makes eminent sense in the context of this case.  Otis has approximately 80,000 customers in the United States using more than 200,000 varieties of equipment, manufactured from as early as 1960 to the present, which potentially need service.  Tr. 195.  Given this, a mechanic cannot know before analyzing a particular problem what type of energy control procedure, if any, will be necessary.  Tr. 129, 131.  Indeed, there are so many variables surrounding the potential work that it is impossible to determine whether a customer has a copy of the appropriate hazardous energy control procedure before implementing it.  Tr. 129-30, 182-83.  Moreover, in many instances, as here, finding an individual with whom to communicate is not possible.  Tr. 129-31, 135.  Such a requirement could prevent the prompt response to an emergency, such as freeing a trapped passenger in an elevator car.  Tr. 131.  This increased risk to safety would extend to the riding public, the mechanic, and the equipment itself.  Tr. 183, 243-45.

32

Even if the cited standard could be satisfied by adding a summary of lockout/tagout procedures (which were not used here) to customer contracts, it would not be possible to add such language to the contracts of 80,000 customers with more than 200,000 varieties of equipment.  Tr. 194-95.  Such a step for all of the potential procedures and equipment could add as many as fifty pages to a simple two page contract, and would provide no benefit to employee safety under the circumstances in which elevator mechanics work.  *Id.*[10]

In addition, where no interaction between Otis employees and the customer's employees is expected,[11] the mechanical gesture of exchanging energy control procedures creates no benefit to the health and safety of either employer. Tr. 184, 239-41, 245.  Here, the Compliance Officer knew of *no instances* where the failure of an elevator company to inform a customer of its energy control procedures resulted in any injury to any customer employee.  Tr. 91.  Similarly, Mr. DeLoreto knew of no injuries to any customer employee because an elevator company failed to provide information about a particular energy control procedure.

---

[10]  At most buildings, the employees who would come into contact with Otis personnel at the worksite would likely never see these procedures because they are not the employees who contract for services.

[11]  Again, because elevator mechanics work in the elevator machine room, on elevator car tops, or in elevator hoistways, where access is typically restricted to licensed elevator technicians, there is virtually no interaction with customer employees while maintenance and repair work is being performed.

Tr. 183-84.  Mr. DeLoreto knew of *no incidents* of an elevator employee being injured for that reason.  *Id.*[12]

All of this evidence weighs heavily upon the proper interpretation of the cited standard and should have been considered by the Commission in its Decision. The Commission's failure to do so is another reason why its decision is unreasonable, and should not be upheld.

### D.    The Commission's Finding that the Standard Applied to the Work Performed by Otis is Arbitrary and Capricious, and Not Supported by Substantial Evidence

29 C.F.R. § 1910.147(f)(2)(i), the cited standard, provides:

> Whenever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures.

To establish a violation of the standard, the Secretary must prove that Otis' activities were covered by the scope and application of the standard.  Indeed, as set forth above, the Secretary always must prove that the cited standard applies to the cited conditions.  *See, e.g., Astra Pharm. Prod., Inc.*, 9 BNA OSHC at 2129, 1981 WL 18810, at *4.

As the ALJ correctly noted, the cited lockout/tagout standard begins by addressing its scope, stating: "'[t]his standard covers the servicing and

---

[12]  Had such an incident caused an injury, Mr. DeLoreto testified that he would have identified it as part of Otis' root cause investigation.  Tr. 196-197.

maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy could cause injury to employees.'" ALJ D&O 19-20 (emphasis in original) (quoting 29 C.F.R. § 1910.147(a)(1)(i)). Thus, "the standard applies only to those machines and pieces of equipment for which energization or start up would be *unexpected* by employees." *Gen. Motors Corp.*, 17 BNA OSHC at 1218 (emphasis in original).

The ALJ correctly stated that, under Commission precedent, "[t]he term 'unexpected' is an unambiguous limitation on the application of the [entire standard]." ALJ D&O 20 (citation omitted); *see Gen. Motors Corp.*, 17 BNA OSHC at 1220. An employer's mere determination that an employee could be injured if stored energy is released at some point during a servicing operation is insufficient to bring the activity within the lockout/tagout standard, because such an interpretation of the standard would expressly omit the word "unexpected." *Id.*

Here, as the ALJ found, the Secretary did not prove that any hazard of unexpected release of energy could occur when the Otis mechanic replaced the gate chain on its sprocket. ALJ D&O 20-21. As discussed above, Mr. Nauholz testified, without contradiction, that there was *no way* for the gate to move in its broken condition before he placed the gate chain back onto its sprocket. Tr. 119, 122, 158. Mr. Nauholz further testified during cross-examination that "[y]ou could have hung on [the gate] with all your weight, and it wasn't moving." Tr. 158.

Because the chain was off of the sprocket and wedged, he stated "there was no way for it to possibly move, mechanically."  Tr. 122.  Mr. Nauholz testified, again without contradiction, that he expected and fully anticipated that the chain would move after he placed it on the sprocket.  Tr. 122.  The ALJ noted key testimony as follows:

> Q.    What expectation did you have for that chain moving once you put the chain back on the sprocket?
>
> A:    Well, I expected it to move, because there was only one counterweight holding it.   The counterweight was – hung up too.

ALJ D&O 20-21 (quoting Tr. 122).

Because Mr. Nauholz was fully aware that the chain would move, and *expected* it to move, he was safely away from the chain after he placed it on the sprocket.   Tr. 123-24.   The *only* reason he injured his hand was because he *intentionally* grabbed the chain as it started moving.  Tr. 123, 125.  Again, the ALJ quoted Mr. Nauholz's critical testimony:

> Q.    Okay. Was your hand in any danger when you put the chain back on the sprocket?
>
> A.    No.
>
> Q.    Why not? Why wasn't your hand in any danger?
>
> A.    It wasn't in any danger unless I grabbed the chain, so that was my own –

Q.    Ok.

A.     - my own doing.

ALJ D&O 21 (quoting Tr. 123).  The ALJ found "Mr. Nauholz's testimony that he expected the chain to move once he put it back on the sprocket and that he intentionally grabbed the chain to be entirely credible."  ALJ D&O 21-22.

Mr. Karosas confirmed Mr. Nauholz's testimony.  ALJ D&O 17-18, n.35. After reviewing the pertinent documents and observing the trial testimony, Mr. Karosas testified that he saw no evidence that any unexpected release of energy could occur while Mr. Nauholz was working on the gate chain.  As Mr. Karosas stated, Mr. Nauholz "indicated it was expected.  He controlled it.  He knew what was going to happen."  Tr. 270.  The ALJ found this testimony to be highly credible.  ALJ D&O 20.

The Secretary meets the above abundance of evidence with silence, adducing no contrary facts.  As discussed above, the Compliance Officer made no determination about any movement of the elevator when the work was performed. Tr. 67.  He made no findings regarding any potential for movement of the gate, its chain or the sprocket, because he was not there the day of the incident.  Tr. 79-80, 96.  He admitted he did not know when or whether Mr. Nauholz expected the gate chain to move during the repair.  Tr. 87.  What the Compliance Officer did know, however, undermined any argument that the gate chain could move unexpectedly -

the gate could not move because it was "knotted up" worse than the Otis mechanic had seen before.  Tr. 73.  In short, the ALJ correctly concluded that the Secretary had *no evidence* to counter the fact that there was no possibility of unexpected gate chain movement.  ALJ D&O 23 n.45; *see also* ALJ D&O 7-8, n.11 ("There was no possibility that the chain would move unexpectedly prior to being repaired.") (Tr. 112-13, 119, 122, 158, 270)).

Nonetheless, the Commission found that the potential release of stored energy created by the unjamming of the chain assembly created the potential for unexpected energization, thus triggering the application of the standard.  ALJ D&O 4.  This finding is simply not supported by the record evidence, and it reflects a misreading of the standard.

The Commission relied upon its decision in *Burkes Mechanical*, *Inc.*, 21 BNA OSHC 2136, 2139 (No. 04-475, 2005).  There, however, the employees were actually working in cramped positions under an operating conveyor belt, which exposed them to "an associated danger zone . . . during a machine operating cycle."  *Id.*  Obviously, the possibility of inadvertent contact with the moving conveyor existed there.  In this case, there was no such possibility of inadvertent exposure to a hazard.  Moreover, here, there was no operating cycle or operation of any machine to create a "danger zone" – in short, the Commission assumed an analogous hazard without any supporting evidence.

Similarly, in *Dayton Tire*, the Commission noted in interpreting the lockout-tagout standard that the "use of the word 'unexpected' connotes an element of surprise . . . ." 23 BNA OSHC 1247 (No. 94-1374, 2010) (quoting *Gen. Motors Corp., Delco Chassis Div.*, 17 BNA OSHC 1217, 1219-20 (No. 91-2973, 1995), *aff'd*, 89 F.3d 313, 315 (6th Cir. 1996)), *aff'd in part, vacated in part on other grounds*, *Dayton Tire v. Sec'y of Labor*, 671 F.3d 1249 (D.C. Cir. 2012). The Commission further reiterated that the "Secretary must show that there is some way in which the particular machine could energize, start up, or release stored energy without sufficient advance warning to the employee." *Id.* (citing *Gen. Motors Corp.*, 17 BNA OSHC at 1219-20). Here, it was only Mr. Nauholz who could reactivate the chain, and it was his plan to do so. It is undisputed that, without his action, no activation would occur. This can hardly be regarded as "unexpected."[13] Once again, the Commission reached for a strained interpretation of the standard that makes no common sense in the circumstances of this case. The finding that the standard applied to the work performed by Otis should be set aside.

---

[13] Again reflecting the "performance" quality of the standard, the Commission also observed in *Dayton Tire* that "an employer could make this determination based on facts within its knowledge, including the circumstances under which machines could become energized and, after energization, the length and quality of any warning prior to movement or start up of the equipment." *Id.*

## **CONCLUSION**

For the foregoing reasons, Petitioner Otis Elevator Company respectfully requests the Court enter a judgment affirming Petitioner's Petition for Review, vacating the April 8, 2013 Decision and Order issued by the Occupational Safety and Health Review Commission, and vacating Citation 1, item 2 in its entirety.

Dated this the 17th day of October, 2013.

Respectfully submitted,

/s/ Stephen C. Yohay
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
3800 Howard Hughes Parkway, #1500
Las Vegas, Nevada 89169
Telephone: (702) 369-6800
Facsimile: (702) 369-6888
E-mail: stephen.yohay@ogletreedeakins.com

Paul J. Waters
Waters Law Group, LLC
1465 South Fort Harrison Avenue, Suite 205
Clearwater, Florida 33756
Telephone: (727) 474-4736
E-mail: pwaters@oshattorney.com

John A. Shedden
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, North Carolina 28244
Telephone: (704) 342-2588
Facsimile: (704) 342-4379
E-mail: john.shedden@ogletreedeakins.com

*Attorneys for Petitioner Otis Elevator Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*9,028*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated:  <u>October 17, 2013</u>          <u>/s/ Stephen C. Yohay          </u>
                                        *Counsel for Petitioner*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 17th day of October, 2013, I caused this Brief of

Petitioner to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

> Scott Glabman
> Heather R. Phillips
> U.S. DEPARTMENT OF LABOR
> (LABR) Office of the Solicitor
> Room S-4004
> 200 Constitution Avenue, NW
> Washington, DC 20210
> (202) 693-5493
> glabman.scott@dol.gov
> phillips.heather@dol.gov
>
> *Counsel for Respondents*

I further certify that on this 17th day of October, 2013, I caused the required

copies of the Brief of Petitioner to be hand filed with the Clerk of the Court.

/s/ Stephen C. Yohay
*Counsel for Petitioner*

# **ADDENDUM**

                                                                          **Page**

29 C.F.R. § 1910.147                                                        A-1

Cited Portions of CPL 02-00-147                                            A-13

Code of Federal Regulations
  Title 29. Labor
    Subtitle B. Regulations Relating to Labor
      Chapter XVII. Occupational Safety and Health Administration, Department of Labor
        Part 1910. Occupational Safety and Health Standards (Refs & Annos)
          Subpart J. General Environmental Controls (Refs & Annos)

29 C.F.R. § 1910.147

§ 1910.147 The control of hazardous energy (lockout/tagout).

Effective: August 1, 2011

Currentness

(a) Scope, application and purpose--

(1) Scope.

(i) This standard covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees. This standard establishes minimum performance requirements for the control of such hazardous energy.

(ii) This standard does not cover the following:

(A) Construction and agriculture employment;

(B) Employment covered by parts 1915, 1917, and 1918 of this title;

(C) Installations under the exclusive control of electric utilities for the purpose of power generation, transmission and distribution, including related equipment for communication or metering;

(D) Exposure to electrical hazards from work on, near, or with conductors or equipment in electric-utilization installations, which is covered by subpart S of this part; and

(E) Oil and gas well drilling and servicing.

(2) Application.

(i) This standard applies to the control of energy during servicing and/or maintenance of machines and equipment.

**A-1**

(ii) Normal production operations are not covered by this standard (See subpart 0 of this part). Servicing and/or maintenance which takes place during normal production operations is covered by this standard only if;:

    (A) An employee is required to remove or bypass a guard or other safety device; or

    (B) An employee is required to place any part of his or her body into an area on a machine or piece of equipment where work is actually performed upon the material being processed (point of operation) or where an associated danger zone exists during a machine operating cycle.

Note: Exception to paragraph (a)(2)(ii): Minor tool changes and adjustments, and other minor servicing activities, which take place during normal production operations, are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production, provided that the work is performed using alternative measures which provide effective protection (See subpart 0 of this part).

    (iii) This standard does not apply to the following.

    (A) Work on cord and plug connected electric equipment for which exposure to the hazards of unexpected energization or start up of the equipment is controlled by the unplugging of the equipment from the energy source and by the plug being under the exclusive control of the employee performing the servicing or maintenance.

    (B) Hot tap operations involving transmission and distribution systems for substances such as gas, steam, water or petroleum products when they are performed on pressurized pipelines, provided that the employer demonstrates that (1) continuity of service is essential; (2) shutdown of the system is impractical; and (3) documented procedures are followed, and special equipment is used which will provide proven effective protection for employees.

    (3) Purpose.

    (i) This section requires employers to establish a program and utilize procedures for affixing appropriate lockout devices or tagout devices to energy isolating devices, and to otherwise disable machines or equipment to prevent unexpected energization, start-up or release of stored energy in order to prevent injury to employees.

    (ii) When other standards in this part require the use of lockout or tagout, they shall be used and supplemented by the procedural and training requirements of this section.

(b) Definitions applicable to this section.

Affected employee. An employee whose job requires him/her to operate or use a machine or equipment on which servicing or maintenance is being performed under lockout or tagout, or whose job requires him/her to work in an area in which such servicing or maintenance is being performed.

**A-2**

Authorized employee. A person who locks out or tags out machines or equipment in order to perform servicing or maintenance on that machine or equipment. An affected employee becomes an authorized employee when that employee's duties include performing servicing or maintenance covered under this section.

Capable of being locked out. An energy isolating device is capable of being locked out if it has a hasp or other means of attachment to which, or through which, a lock can be affixed, or it has a locking mechanism built into it. Other energy isolating devices are capable of being locked out, if lockout can be achieved without the need to dismantle, rebuild, or replace the energy isolating device or permanently alter its energy control capability.

Energized. Connected to an energy source or containing residual or stored energy.

Energy isolating device. A mechanical device that physically prevents the transmission or release of energy, including but not limited to the following: A manually operated electrical circuit breaker; a disconnect switch; a manually operated switch by which the conductors of a circuit can be disconnected from all ungrounded supply conductors, and, in addition, no pole can be operated independently; a line valve; a block; and any similar device used to block or isolate energy. Push buttons, selector switches and other control circuit type devices are not energy isolating devices.

Energy source. Any source of electrical, mechanical, hydraulic, pneumatic, chemical, thermal, or other energy.

Hot tap. A procedure used in the repair, maintenance and services activities which involves welding on a piece of equipment (pipelines, vessels or tanks) under pressure, in order to install connections or appurtenances. It is commonly used to replace or add sections of pipeline without the interruption of service for air, gas, water, steam, and petrochemical distribution systems.

Lockout. The placement of a lockout device on an energy isolating device, in accordance with an established procedure, ensuring that the energy isolating device and the equipment being controlled cannot be operated until the lockout device is removed.

Lockout device. A device that utilizes a positive means such as a lock, either key or combination type, to hold an energy isolating device in a safe position and prevent the energizing of a machine or equipment. Included are blank flanges and bolted slip blinds.

Normal production operations. The utilization of a machine or equipment to perform its intended production function.

Servicing and/or maintenance. Workplace activities such as constructing, installing, setting up, adjusting, inspecting, modifying, and maintaining and/or servicing machines or equipment. These activities include lubrication, cleaning or unjamming of machines or equipment and making adjustments or tool changes, where the employee may be exposed to the unexpected energization or startup of the equipment or release of hazardous energy.

Setting up. Any work performed to prepare a machine or equipment to perform its normal production operation.

Tagout. The placement of a tagout device on an energy isolating device, in accordance with an established procedure, to indicate that the energy isolating device and the equipment being controlled may not be operated until the tagout device is removed.

Tagout device. A prominent warning device, such as a tag and a means of attachment, which can be securely fastened to an energy isolating device in accordance with an established procedure, to indicate that the energy isolating device and the equipment being controlled may not be operated until the tagout device is removed.

(c) General--

**A-3**

(1) Energy control program. The employer shall establish a program consisting of energy control procedures, employee training and periodic inspections to ensure that before any employee performs any servicing or maintenance on a machine or equipment where the unexpected energizing, start up or release of stored energy could occur and cause injury, the machine or equipment shall be isolated from the energy source, and rendered inoperative.

(2) Lockout/tagout.

(i) If an energy isolating device is not capable of being locked out, the employer's energy control program under paragraph (c)(1) of this section shall utilize a tagout system.

(ii) If an energy isolating device is capable of being locked out, the employer's energy control program under paragraph (c)(1) of this section shall utilize lockout, unless the employer can demonstrate that the utilization of a tagout system will provide full employee protection as set forth in paragraph (c)(3) of this section.

(iii) After January 2, 1990, whenever replacement or major repair, renovation or modification of a machine or equipment is performed, and whenever new machines or equipment are installed, energy isolating devices for such machine or equipment shall be designed to accept a lockout device.

(3) Full employee protection.

(i) When a tagout device is used on an energy isolating device which is capable of being locked out, the tagout device shall be attached at the same location that the lockout device would have been attached, and the employer shall demonstrate that the tagout program will provide a level of safety equivalent to that obtained by using a lockout program.

(ii) In demonstrating that a level of safety is achieved in the tagout program which is equivalent to the level of safety obtained by using a lockout program, the employer shall demonstrate full compliance with all tagout-related provisions of this standard together with such additional elements as are necessary to provide the equivalent safety available from the use of a lockout device. Additional means to be considered as part of the demonstration of full employee protection shall include the implementation of additional safety measures such as the removal of an isolating circuit element, blocking of a controlling switch, opening of an extra disconnecting device, or the removal of a valve handle to reduce the likelihood of inadvertent energization.

(4) Energy control procedure.

(i) Procedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section.

Note: Exception: The employer need not document the required procedure for a particular machine or equipment, when all of the following elements exist: (1) The machine or equipment has no potential for stored or residual energy or reaccumulation of stored energy after shut down which could endanger employees; (2) the machine or equipment has a single energy source which can be readily identified and isolated; (3) the isolation and locking out of that energy source will completely deenergize and deactivate the machine or equipment; (4) the machine or equipment is isolated from that energy source and locked out during

A-4

servicing or maintenance; (5) a single lockout device will achieve a locked-out condition; (6) the lockout device is under the exclusive control of the authorized employee performing the servicing or maintenance; (7) the servicing or maintenance does not create hazards for other employees; and (8) the employer, in utilizing this exception, has had no accidents involving the unexpected activation or reenergization of the machine or equipment during servicing or maintenance.

(ii) The procedures shall clearly and specifically outline the scope, purpose, authorization, rules, and techniques to be utilized for the control of hazardous energy, and the means to enforce compliance including, but not limited to, the following:

(A) A specific statement of the intended use of the procedure;

(B) Specific procedural steps for shutting down, isolating, blocking and securing machines or equipment to control hazardous energy;

(C) Specific procedural steps for the placement, removal and transfer of lockout devices or tagout devices and the responsibility for them; and

(D) Specific requirements for testing a machine or equipment to determine and verify the effectiveness of lockout devices, tagout devices, and other energy control measures.

(5) Protective materials and hardware.

(i) Locks, tags, chains, wedges, key blocks, adapter pins, self-locking fasteners, or other hardware shall be provided by the employer for isolating, securing or blocking of machines or equipment from energy sources.

(ii) Lockout devices and tagout devices shall be singularly identified; shall be the only devices(s) used for controlling energy; shall not be used for other purposes; and shall meet the following requirements:

(A) Durable.

(1) Lockout and tagout devices shall be capable of withstanding the environment to which they are exposed for the maximum period of time that exposure is expected.

(2) Tagout devices shall be constructed and printed so that exposure to weather conditions or wet and damp locations will not cause the tag to deteriorate or the message on the tag to become illegible.

(3) Tags shall not deteriorate when used in corrosive environments such as areas where acid and alkali chemicals are handled and stored.

**A-5**

(B) Standardized. Lockout and tagout devices shall be standardized within the facility in at least one of the following criteria: Color; shape; or size; and additionally, in the case of tagout devices, print and format shall be standardized.

(C) Substantial--

(1) Lockout devices. Lockout devices shall be substantial enough to prevent removal without the use of excessive force or unusual techniques, such as with the use of bolt cutters or other metal cutting tools.

(2) Tagout devices. Tagout devices, including and their means of attachment, shall be substantial enough to prevent inadvertent or accidental removal. Tagout device attachment means shall be of a non-reusable type, attachable by hand, self-locking, and non-releasable with a minimum unlocking strength of no less than 50 pounds and having the general design and basic characteristics of being at least equivalent to a one-piece, all-environment-tolerant nylon cable tie.

(D) Identifiable. Lockout devices and tagout devices shall indicate the identity of the employee applying the device(s).

(iii) Tagout devices shall warn against hazardous conditions if the machine or equipment is energized and shall include a legend such as the following: Do Not Start, Do Not Open, Do Not Close, Do Not Energize, Do Not Operate.

(6) Periodic inspection.

(i) The employer shall conduct a periodic inspection of the energy control procedure at least annually to ensure that the procedure and the requirements of this standard are being followed.

(A) The periodic inspection shall be performed by an authorized employee other than the ones(s) utilizing the energy control procedure being inspected.

(B) The periodic inspection shall be conducted to correct any deviations or inadequacies identified.

(C) Where lockout is used for energy control, the periodic inspection shall include a review, between the inspector and each authorized employee, of that employee's responsibilities under the energy control procedure being inspected.

(D) Where tagout is used for energy control, the periodic inspection shall include a review, between the inspector and each authorized and affected employee, of that employee's responsibilities under the energy control procedure being inspected, and the elements set forth in paragraph (c)(7)(ii) of this section.

(ii) The employer shall certify that the periodic inspections have been performed. The certification shall identify the machine or equipment on which the energy control procedure was being utilized, the date of the inspection, the employees included in the inspection, and the person performing the inspection.

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

(7) Training and communication.

(i) The employer shall provide training to ensure that the purpose and function of the energy control program are understood by employees and that the knowledge and skills required for the safe application, usage, and removal of the energy controls are acquired by employees. The training shall include the following:

   (A) Each authorized employee shall receive training in the recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control.

   (B) Each affected employee shall be instructed in the purpose and use of the energy control procedure.

   (C) All other employees whose work operations are or may be in an area where energy control procedures may be utilized, shall be instructed about the procedure, and about the prohibition relating to attempts to restart or reenergize machines or equipment which are locked out or tagged out.

(ii) When tagout systems are used, employees shall also be trained in the following limitations of tags:

   (A) Tags are essentially warning devices affixed to energy isolating devices, and do not provide the physical restraint on those devices that is provided by a lock.

   (B) When a tag is attached to an energy isolating means, it is not to be removed without authorization of the authorized person responsible for it, and it is never to be bypassed, ignored, or otherwise defeated.

   (C) Tags must be legible and understandable by all authorized employees, affected employees, and all other employees whose work operations are or may be in the area, in order to be effective.

   (D) Tags and their means of attachment must be made of materials which will withstand the environmental conditions encountered in the workplace.

   (E) Tags may evoke a false sense of security, and their meaning needs to be understood as part of the overall energy control program.

   (F) Tags must be securely attached to energy isolating devices so that they cannot be inadvertently or accidentally detached during use.

(iii) Employee retraining.

**A-7**

USCA Case #13-1194      Document #1461691      Filed: 10/17/2013      Page 60 of 73

(A) Retraining shall be provided for all authorized and affected employees whenever there is a change in their job assignments, a change in machines, equipment or processes that present a new hazard, or when there is a change in the energy control procedures.

(B) Additional retraining shall also be conducted whenever a periodic inspection under paragraph (c)(6) of this section reveals, or whenever the employer has reason to believe, that there are deviations from or inadequacies in the employee's knowledge or use of the energy control procedures.

(C) The retraining shall reestablish employee proficiency and introduce new or revised control methods and procedures, as necessary.

(iv) The employer shall certify that employee training has been accomplished and is being kept up to date. The certification shall contain each employee's name and dates of training.

(8) Energy isolation. Lockout or tagout shall be performed only by the authorized employees who are performing the servicing or maintenance.

(9) Notification of employees. Affected employees shall be notified by the employer or authorized employee of the application and removal of lockout devices or tagout devices. Notification shall be given before the controls are applied, and after they are removed from the machine or equipment.

(d) Application of control. The established procedures for the application of energy control (the lockout or tagout procedures) shall cover the following elements and actions and shall be done in the following sequence:

(1) Preparation for shutdown. Before an authorized or affected employee turns off a machine or equipment, the authorized employee shall have knowledge of the type and magnitude of the energy, the hazards of the energy to be controlled, and the method or means to control the energy.

(2) Machine or equipment shutdown. The machine or equipment shall be turned off or shut down using the procedures established for the machine or equipment. An orderly shutdown must be utilized to avoid any additional or increased hazard(s) to employees as a result of the equipment stoppage.

(3) Machine or equipment isolation. All energy isolating devices that are needed to control the energy to the machine or equipment shall be physically located and operated in such a manner as to isolate the machine or equipment from the energy source(s).

(4) Lockout or tagout device application.

(i) Lockout or tagout devices shall be affixed to each energy isolating device by authorized employees.

**A-8**

(ii) Lockout devices, where used, shall be affixed in a manner to that will hold the energy isolating devices in a "safe" or "off" position.

(iii) Tagout devices, where used, shall be affixed in such a manner as will clearly indicate that the operation or movement of energy isolating devices from the "safe" or "off" position is prohibited.

(A) Where tagout devices are used with energy isolating devices designed with the capability of being locked, the tag attachment shall be fastened at the same point at which the lock would have been attached.

(B) Where a tag cannot be affixed directly to the energy isolating device, the tag shall be located as close as safely possible to the device, in a position that will be immediately obvious to anyone attempting to operate the device.

(5) Stored energy.

(i) Following the application of lockout or tagout devices to energy isolating devices, all potentially hazardous stored or residual energy shall be relieved, disconnected, restrained, and otherwise rendered safe.

(ii) If there is a possibility of reaccumulation of stored energy to a hazardous level, verification of isolation shall be continued until the servicing or maintenance is completed, or until the possibility of such accumulation no longer exists.

(6) Verification of isolation. Prior to starting work on machines or equipment that have been locked out or tagged out, the authorized employee shall verify that isolation and deenergization of the machine or equipment have been accomplished.

(e) Release from lockout or tagout. Before lockout or tagout devices are removed and energy is restored to the machine or equipment, procedures shall be followed and actions taken by the authorized employee(s) to ensure the following:

(1) The machine or equipment. The work area shall be inspected to ensure that nonessential items have been removed and to ensure that machine or equipment components are operationally intact.

(2) Employees.

(i) The work area shall be checked to ensure that all employees have been safely positioned or removed.

(ii) After lockout or tagout devices have been removed and before a machine or equipment is started, affected employees shall be notified that the lockout or tagout device(s) have been removed.

(3) Lockout or tagout devices removal. Each lockout or tagout device shall be removed from each energy isolating device by the employee who applied the device. Exception to paragraph (e)(3): When the authorized employee who applied the lockout or tagout device is not available to remove it, that device may be removed under the direction of the employer,

**A-9**

provided that specific procedures and training for such removal have been developed, documented and incorporated into the employer's energy control program. The employer shall demonstrate that the specific procedure provides equivalent safety to the removal of the device by the authorized employee who applied it. The specific procedure shall include at least the following elements:

(i) Verification by the employer that the authorized employee who applied the device is not at the facility;

(ii) Making all reasonable efforts to contact the authorized employee to inform him/her that his/her lockout or tagout device has been removed; and

(iii) Ensuring that the authorized employee has this knowledge before he/she resumes work at that facility.

(f) Additional requirements--

(1) Testing or positioning of machines, equipment or components thereof. In situations in which lockout or tagout devices must be temporarily removed from the energy isolating device and the machine or equipment energized to test or position the machine, equipment or component thereof, the following sequence of actions shall be followed:

(i) Clear the machine or equipment of tools and materials in accordance with paragraph (e)(1) of this section;

(ii) Remove employees from the machine or equipment area in accordance with paragraph (e)(2) of this section;

(iii) Remove the lockout or tagout devices as specified in paragraph (e)(3) of this section;

(iv) Energize and proceed with testing or positioning;

(v) Deenergize all systems and reapply energy control measures in accordance with paragraph (d) of this section to continue the servicing and/or maintenance.

(2) Outside personnel (contractors, etc.).

(i) Whenever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures.

(ii) The on-site employer shall ensure that his/her employees understand and comply with the restrictions and prohibitions of the outside employer's energy control program.

(3) Group lockout or tagout.

**A-10**

(i) When servicing and/or maintenance is performed by a crew, craft, department or other group, they shall utilize a procedure which affords the employees a level of protection equivalent to that provided by the implementation of a personal lockout or tagout device.

(ii) Group lockout or tagout devices shall be used in accordance with the procedures required by paragraph (c)(4) of this section including, but not necessarily limited to, the following specific requirements:

(A) Primary responsibility is vested in an authorized employee for a set number of employees working under the protection of a group lockout or tagout device (such as an operations lock);

(B) Provision for the authorized employee to ascertain the exposure status of individual group members with regard to the lockout or tagout of the machine or equipment and

(C) When more than one crew, craft, department, etc. is involved, assignment of overall job-associated lockout or tagout control responsibility to an authorized employee designated to coordinate affected work forces and ensure continuity of protection; and

(D) Each authorized employee shall affix a personal lockout or tagout device to the group lockout device, group lockbox, or comparable mechanism when he or she begins work, and shall remove those devices when he or she stops working on the machine or equipment being serviced or maintained.

(4) Shift or personnel changes. Specific procedures shall be utilized during shift or personnel changes to ensure the continuity of lockout or tagout protection, including provision for the orderly transfer of lockout or tagout device protection between off-going and oncoming employees, to minimize exposure to hazards from the unexpected energization or start-up of the machine or equipment, or the release of stored energy.

Note: The following appendix to § 1910.147 services as a non-mandatory guideline to assist employers and employees in complying with the requirements of this section, as well as to provide other helpful information. Nothing in the appendix adds to or detracts from any of the requirements of this section.

**Credits**

[54 FR 36687, Sept. 1, 1989; 54 FR 42498, Oct. 17, 1989; 54 FR 46610, Nov. 6, 1989; 55 FR 38685, Sept. 20, 1990; 61 FR 5508, Feb. 13, 1996; 76 FR 24698, May 2, 2011; 76 FR 44265, July 25, 2011]

SOURCE: 76 FR 24698, May 2; 39 FR 23502, June 27, 1974; 51 FR 24526, 24527, July 7, 1986; 51 FR 33260, Sept. 19, 1986; 54 FR 36687, Sept. 1, 1989; 58 FR 4549, Jan. 14, 1993; 63 FR 33466, June 18, 1998; 63 FR 66038, Dec. 1, 1998; 64 FR 204, Jan. 4, 1999; 69 FR 68717, Nov. 24, 2004; 70 FR 1140, Jan. 5, 2005; 70 FR 8291, Feb. 18, 2005; 70 FR 53929, Sept. 13, 2005; 72 FR 71069, Dec. 14, 2007; 73 FR 13754, March 14, 2008; 76 FR 33607, June 8, 2011; 76 FR 80739, Dec. 27, 2011; 78 FR 35566, June 13, 2013, unless otherwise noted.

AUTHORITY: 29 U.S.C. 653, 655, 657; Secretary of Labor's Order No. 12–71 (36 FR 8754), 8–76 (41 FR 25059), 9–83 (48 FR 35736), 1–90 (55 FR 9033), 6–96 (62 FR 111), 3–2000 (65 FR 50017), 5–2007 (72 FR 31159), 4–2010 (75 FR 55355),

**A-11**

or 1–2012 (77 FR 3912), as applicable.; Sections 1910.141, 1910.142, 1910.145, 1910.146, and 1910.147 also issued under 29 CFR part 1911.

Notes of Decisions (28)

Current through October 3, 2013; 78 FR 61761

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**A-12**

WestlawNext® © 2013 Thomson Reuters. No claim to original U.S. Government Works.      12



# OSHA INSTRUCTION

**U.S. DEPARTMENT OF LABOR**     **Occupational Safety and Health Administration**

| **DIRECTIVE NUMBER:** CPL 02-00-147 | **EFFECTIVE DATE: 2/11/08** |

**SUBJECT:** The Control of Hazardous Energy – Enforcement Policy and Inspection Procedures

## ABSTRACT

**Purpose:**   This directive (manual) establishes OSHA's enforcement policy for its standards addressing the control of hazardous energy.  It instructs OSHA enforcement personnel on both the agency's interpretations of those standards, and on the procedures for enforcing them.  The application of this instruction will further OSHA's goal of uniform enforcement of these standards.  However, OSHA personnel should exercise professional judgment consistent with their authority as appropriate when particular circumstances necessitate a deviation from the guidance provided in the instruction in order to effectuate the purposes of the Occupational Safety and Health Act (OSH Act), to utilize resources to effectively administer the OSH Act, or to ensure CSHO safety.

This instruction is not a standard, regulation or any other type of substantive rule.  No statement in this instruction should be construed to require the regulated community to adopt any practices, means, methods, operations, or processes beyond those which are already required by the OSH Act or standards and regulations promulgated under the OSH Act.

**Scope:**   This instruction applies OSHA-wide.

**References:**   1.   General Industry Standards, 29 CFR Part 1910.

2.   Federal Register, Vol. 54, No. 169, September 1, 1989, pages 36644-36696, *Control of Hazardous Energy Sources (Lockout/Tagout), Final Rule, 29 CFR 1910.147.*

3.   Federal Register, Vol. 55, No. 183, September 20, 1990, pages 38677-38687, *Control of Hazardous Energy Sources (Lockout/Tagout), Final Rule, Corrections and Technical Amendments, 29 CFR 1910.147.*

4. Federal Register, Vol. 58, No. 59, March 30, 1993, pages 16612-16623, *Control of Hazardous Energy Sources (Lockout/Tagout), Final Rule, Supplemental Statement of Reasons, 29 CFR 1910.147.*

5. Federal Register, Vol. 65, No. 119, June 20, 2000, pages 38302-38304, *Control of Hazardous Energy Sources (Lockout/Tagout), Notice of the Availability of a Lookback Review Pursuant to the Regulatory Flexibility Act and Executive Order 12866.*

**Cancellations:**     OSHA Instruction, STD 01-05-019 [STD 1-7.3], 29 CFR 1910.147, *The Control of Hazardous Energy (Lockout/Tagout) -- Inspection Procedures and Interpretive Guidance*, September 11, 1990.

As part of the directive revision process, OSHA has removed and archived interpretations from its public web-site that no longer reflect current policy and/or are superseded by this OSHA Instruction.

**State Impact:**     This instruction describes a Federal Program change for which State adoption is not required, but is recommended.  (See Chapter 1.VII.) [State Adoption Summary]

**Action Offices:**     National, Regional, Area, and State Consultation Offices.

**Originating Office:**     Directorate of Enforcement Programs, Office of General Industry Enforcement

**Contact:**     Directorate of Enforcement Programs (202-693-1850)
Office of General Industry Enforcement
200 Constitution Avenue, N.W., N-3119
Washington, DC  20210

By and Under the Authority of

Edwin G. Foulke, Jr.
Assistant Secretary

Abstract-2

**A-14**

## Executive Summary

This directive (manual) provides guidance to OSHA personnel concerning the Occupational Safety and Health Administration's (OSHA's) policy, procedures, and technical interpretations regarding the enforcement of the *Control of hazardous energy (lockout/tagout)* standard, 29 CFR §1910.147, and other related standards.  OSHA completed a look-back review of its *Control of hazardous energy (lockout/tagout)* standard, 29 CFR §1910.147, pursuant to Section 610 of the Regulatory Flexibility Act and Section 5 of Executive Order 12866.  In response to the look-back review's suggestions, OSHA Instruction STD 01-05-019 [STD 1-7.3], *29 CFR 1910.147, The Control of Hazardous Energy (Lockout/Tagout) – Inspection Procedures and Interpretative Guidance* (dated September 11, 1990) has been cancelled and superseded by this instruction. However, due to the magnitude of this review, a phased approach is planned for the revision of this instruction.  Many of the changes contained in this revision are described below, and the second phase will include the incorporation of existing letters of interpretation, including frequently asked questions, into the manual.

## Significant Changes

This instruction cancels the September 11, 1990 OSHA Instruction, STD 1-7.3.  This manual provides enforcement policy and guidance for OSHA personnel performing inspection activity related to the control of hazardous energy.  Significant modifications in this instruction include:

- Changes in the instruction format necessitated by the *OSHA Directive System* (ADM 03-00-003);
- Addition of *Compliance Officer Safety* guidelines;
- Inclusion of *Citation Examples* and additional guidance regarding *Affirmative Defenses;*
- Incorporation of compliance assistance flowcharts;
- Inclusion of additional guidance on the minor servicing exception, specific energy control procedures, periodic inspections, and unexpected energization;
- Inclusion of additional information and guidance on *Alternative Methods to Lockout/Tagout (LOTO)*;
- Inclusion of general reference material for information pertinent to hazardous energy control, including governmental, industry and national consensus standards; and
- Addition of vehicle repair and maintenance standards and practices, including relevant Internet links, to assist employers engaged in these activities with hazardous energy control.

Abstract-3

**A-15**

**Table of Contents**

Chapter 1     BACKGROUND ......................................................................................... 1-1

I.     Purpose ...................................................................................................... 1-1
II.    Scope ......................................................................................................... 1-1
III.   Significant Changes ................................................................................... 1-1
IV.    Cancellations ............................................................................................. 1-1
V.     References ................................................................................................. 1-1
VI.    Action ........................................................................................................ 1-3
VII.   Federal Program Change ........................................................................... 1-3
VIII.  Standard Overview ..................................................................................... 1-3
IX.    Definitions .................................................................................................. 1-4
       A.    *Affected Employee* ........................................................................... 1-4
       B.    *Authorized Employee* ...................................................................... 1-4
       C.    *Capable of Being Locked Out* ........................................................ 1-5
       D.    Control Reliability .......................................................................... 1-5
       E.    Controller ...................................................................................... 1-5
       F.    Disconnecting Means ....................................................................... 1-5
       G.    *Energized* ...................................................................................... 1-5
       H.    *Energy Isolating Device* ................................................................. 1-5
       I.    Exclusive Control ............................................................................ 1-6
       J.    Group Lockout/Tagout ..................................................................... 1-6
       K.    Group Lockout/Tagout Mechanism ................................................. 1-6
       L.    Hazardous Energy .......................................................................... 1-6
       M.    *Hot Tap* ......................................................................................... 1-7
       N.    Isolating Switch ............................................................................. 1-7
       O.    Job Lock ("Operations or Production Lock"). ................................ 1-7
       P.    Job-Tag with a Tab. ......................................................................... 1-7
       Q.    *Lockout* ......................................................................................... 1-7
       R.    *Lockout Device* ............................................................................. 1-8
       S.    Lockbox (Master) ............................................................................ 1-8
       T.    Lockbox (Satellite) .......................................................................... 1-8
       U.    Machinery and Machine Guarding (29 CFR Part 1910, Subpart O) ................. 1-8
       V.    Master Tag ...................................................................................... 1-8
       W.    *Normal Production Operations* ..................................................... 1-8
       X.    Personal Tagout (Accountability) Device ....................................... 1-8
       Y.    Primary Authorized Employee ........................................................ 1-9
       Z.    Principal Authorized Employee ...................................................... 1-9
       AA.  Safeguarding ................................................................................. 1-9
       BB.  *Servicing and/or maintenance* ..................................................... 1-10
       CC.  *Setting up* ..................................................................................... 1-10
       DD.  *Tagout* .......................................................................................... 1-11
       EE.  *Tagout device* .............................................................................. 1-11
       FF.  Work Authorization Permit ............................................................ 1-11
X.     Terminology ............................................................................................. 1-11

i

Chapter 2      ENFORCEMENT POLICIES AND PROCEDURES ........................................... 2-1

   I.     Compliance Officer Safety ................................................................... 2-1
   II.    Inspection Guidelines ........................................................................... 2-3
       A.   Performance of Servicing or Maintenance Operations ................... 2-3
       B.   Employer Responsibility ................................................................. 2-3
       C.   Evaluations of Compliance ............................................................ 2-3
       D.   Documentation and Screening Guidance ....................................... 2-4
       E.   Outside Personnel ........................................................................... 2-7
       F.   Compliance Assistance Flowcharts ................................................ 2-7
   III.   Citation Guidance ................................................................................ 2-7
       A.   General ............................................................................................ 2-7
       B.   Classification of Violations ........................................................... 2-11
       C.   Citations in the Alternative ............................................................ 2-11
       D.   Citation Examples .......................................................................... 2-11
   IV.   Alternative Methods and Consensus Standards ................................... 2-15
       A.   General ............................................................................................ 2-15
       B.   Minor Servicing Exception to the Lockout/Tagout Standard ......... 2-16
       C.   29 CFR 1910, Subpart O, *Machinery and Machine Guarding.* ....... 2-16
       D.   Consensus Standards ...................................................................... 2-22
       E.   Energy Isolating Device Equivalency ............................................ 2-27
       F.   Other Abatement Methods .............................................................. 2-30
   V.    Multi-employer Scenario ...................................................................... 2-31
   VI.   Affirmative Defenses ............................................................................ 2-32
       A.   Greater Hazard ............................................................................... 2-32
       B.   Impossibility ................................................................................... 2-32
       C.   Unpreventable Employee Misconduct and Isolated Instance .......... 2-33

Chapter 3      INSPECTION GUIDANCE .................................................................. 3-1

   I.     Purpose of the Standard ....................................................................... 3-1
   II.    Scope and Application of the Standard ................................................ 3-2
       A.   Unexpected Energization, Unexpected Start-up, and Release of Stored Energy 3-2
       B.   Normal Production Operations ....................................................... 3-6
       C.   Lockout/Tagout's Relationship to Other OSHA Standards ........... 3-8
       D.   Standard Exemptions ..................................................................... 3-16
       E.   Compliance Assistance Flowcharts ................................................ 3-17
   III.   Vehicle Hazardous Energy Control ...................................................... 3-22
       A.   Background ..................................................................................... 3-22
       B.   Hazardous Energy .......................................................................... 3-22
       C.   Energy Control Program ................................................................ 3-23
       D.   Manufacturers' Servicing and Maintenance Guidelines ................ 3-24
       E.   "Troubleshooting," Testing, and Component Positioning .............. 3-24
       F.   References ....................................................................................... 3-25
   IV.   Minor Servicing Exception to the Lockout/Tagout Standard ............... 3-25
   V.    Protective Materials and Hardware ...................................................... 3-32
       A.   Durable .......................................................................................... 3-32
       B.   Standardized. ................................................................................. 3-32

C.   Substantial ....................................................................... 3-33
D.   Labeling ........................................................................... 3-33
VI.     Energy Isolating Devices ........................................................... 3-33
A.   Capable of Being Locked Out ............................................ 3-34
B.   Not Capable of Being Locked Out ....................................... 3-35
VII.    Lockout vs. Tagout .................................................................. 3-35
A.   Tagout .............................................................................. 3-35
B.   Lockout and *Full Employee Protection* [*Tags Plus*] ......................... 3-37
VIII.   Notification of Affected Employees ............................................. 3-38
IX.     Energy Control Procedures ........................................................ 3-39
X.      Application of Control Measures ................................................ 3-48
XI.     Removal of Lockout/Tagout Devices ........................................... 3-53
XII.    Machine or Equipment Testing or Repositioning ............................. 3-55
XIII.   Outside Personnel ................................................................... 3-56
XIV.    Group Lockout/Tagout ............................................................. 3-57
XV.     Shift or Personnel Changes ........................................................ 3-58
XVI.    Employee Training .................................................................. 3-60
XVII.   Periodic Inspection ................................................................. 3-65

Chapter 4      GROUP LOCKOUT/TAGOUT ...................................................... 4-1

I.      Definitions ........................................................................... 4-1
II.     Background ........................................................................... 4-1
III.    Group Lockout/Tagout: Organizational Structure ............................ 4-2
A.   Primary Authorized Employee Designation ............................ 4-2
B.   Primary Authorized Employee Coordination ........................... 4-2
C.   Principal Authorized Employee Designation ........................... 4-2
D.   Verification System ............................................................ 4-2
E.   Authorized Employees ....................................................... 4-3
IV.     Group Lockout/Tagout Overview ................................................ 4-3
A.   Shutdown Preparation ........................................................ 4-4
B.   Shutdown .......................................................................... 4-4
C.   Affected Employee Notification .......................................... 4-4
D.   Isolation ........................................................................... 4-4
E.   Application of Lockout/Tagout Devices ................................ 4-4
F.   Stored Energy .................................................................... 4-5
G.   Verification of Isolation ..................................................... 4-5
H.   Servicing/Maintenance ....................................................... 4-6
I.   Release from Lockout/Tagout. .............................................. 4-6
J.   Re-energization.  Energy may be restored to the machine or equipment .......... 4-6
V.      Conventional Group Lockout/Tagout Procedures. ........................... 4-7
VI.     Alternative Group Lockout/Tagout (Control and Accountability) Procedures. ...... 4-10

Chapter 5      REFERENCES ...................................................................... 5-1

since the employees no longer could be exposed to hazardous energy.  Obviously, if the employees are required to bypass the standard guardrail system or otherwise expose themselves to the hazardous energy (in this case the revolving cutting blade), then the LOTO standard requirements must to be implemented.

In another example, dry-cleaning employees disassembled machines that contained steam-heated components, which posed serious thermal energy (burn) hazards.  The LOTO standard applies because the thermal energy may injure employees.

V.     Multi-employer Scenario.  A contractor employer performing maintenance work on a boiler pipeline fails to verify that all of the residual energy in the line has been safely relieved because she believes the host employer effectively de-energized the unit.  The contractor employees are injured as a result of opening the flange, and the contractor blames the host employer for its failure to adequately control the hazardous energy.

The CSHO needs to thoroughly document the facts, in the case file, to determine whether the §1910.147(f)(2) outside personnel provisions were met and to determine whether the agreed upon energy control responsibilities (e.g., contractual responsibilities) of each party were met.  Both the host and contractor employers have independent obligations to provide protection under this performance-oriented standard for their respective employees.  In this scenario, the CSHO should determine which employer(s) had the responsibility to verify energy isolation based upon each employer's respective energy control procedure.

The host employer often will have greater familiarity with the energy control procedures used at the host facility; however, at 29 CFR §1910.147(f)(2)(i), the standard requires the host and contract employers to inform each other about their respective energy control procedures.  Such coordination is necessary to ensure that both sets of employees will be protected from the hazardous energy.  The contractor must take reasonable steps consistent with its authority to protect its employees if the contractor knows, or has reason to know, that the host's energy control procedures are deficient or otherwise insufficient to provide the requisite protection to its employees.

NOTE:     The guidance provided in *OSHA Instruction, CPL 02-00-124, Multi-Employer Citation Policy (December 10, 1999)*, must be used to determine host employer and contractor compliance with the LOTO standard.  In all cases, the decision to issue §1910.147 citations to the host or contractor employer should be based on all of the relevant facts and the established policy for exposing, creating, correcting, and controlling employers.

In *IBP, Inc. v. Herman*, 144 F.3d 861 (D.C. 1998), the Court of Appeals for the District of Columbia Circuit ruled that a host employer was not liable for the lockout/tagout violations of an independent contractor because, apart from pointing out the violations to the contractor, the host's control over those violations was limited to the cancellation of the contract.  Proposed multi-

2-31

**A-19**

component testing or positioning. OSHA allows temporary removal of LOTO devices and the re-energization of the machine only when necessary to perform particular tasks that require energization – i.e., when power must be restored to test or position machines, equipment, or their components. However, employers must provide employee protection (e.g., via machine guarding techniques when it is not possible to remove an employee(s) from the danger area) that eliminates exposure to hazardous energy during all phases of the testing or repositioning operation.

NOTE:    Area Directors shall cite the §1910.147(f)(1) sequence of step requirements, and not the paragraph (c)(4) provisions, when an employer fails to develop or utilize procedures to safely test or position machines/equipment in conjunction with servicing and maintenance activities.

When testing or positioning is necessary, the relevant procedure must establish a sequence of actions to be undertaken, in accordance with §1910.147(f)(1), since employees may be exposed to significant risks during these transition periods. These actions are required to maintain the integrity and continuity of employee protection. These prescribed steps must be implemented in sequence prior to re-energization:

A.    Clear machines of tools and materials – See §1910.147(e)(1);

B.    Remove employees from the hazardous areas around the machine – See §1910.147(e)(2);

C.    Remove the lockout or tagout devices as specified in the standard – See §1910.147(e)(3);

D.    Energize the machine and employ effective employee protection while testing or positioning machinery; and

E.    Turn off all systems, isolate the machine from the energy source, and reapply lockout or tagout devices as specified, if additional servicing or maintenance is required – See §1910.147(d).

This temporary exception applies only for the limited time required for testing or repositioning the machine/equipment or its components. When an energized state is no longer required, the authorized employees must again de-energize the machine/equipment and resume the energy control measures. Paragraph (f)(1) of the standard does not allow the employer to disregard the requirement for locking out or tagging out during other portions of the servicing or maintenance operation.

XIII.    <u>Outside Personnel</u>. Outside servicing and maintenance personnel, such as contractors, service representatives, or employees from a temporary employment agency engaged in general industry activities are subject to the requirements of this standard. These requirements are necessary when outside personnel work on machines or equipment because their activities have the same or greater potential for exposing employees to servicing or maintenance hazards as would exist if the on-site employer's own employees were performing the work.

If outside contractors service or maintain machinery, the on-site employer and the contractor must inform each other of their respective lockout or tagout procedures. The performance-oriented nature of the standard permits the outside (contractor) employer to use either: the host employer's energy control procedure, which some companies will require; its own procedures; or a combination of the two procedures, provided the resulting procedure meets the requirements of the LOTO standard. In some instances, for example, the host employer will prohibit the contractor from shutting down and isolating the host's equipment and the host will implement many of the equipment-specific energy control measures contained in the LOTO standard's energy control procedural requirements. See §1910.147 (c)(4)(ii). The contractor employees would then apply their own personal LOTO devices to a group LOTO mechanism, such as a lockbox, before they verify that the energy sources have been adequately isolated and de-energized. In summary, each employer has an employee protection obligation to control hazardous energy, and this performance oriented standard allows the employers the flexibility on how to meet the LOTO standard requirements.

NOTE:    Refer to the *Citation Guidance* policy contained in Chapter 2, Section III.A for additional information regarding host employer and outside contractors and OSHA's *Multi-Employer Citation Policy, CPL 02-00-124*.

On-site employers and outside employers must inform each other of their respective LOTO procedures. OSHA expects that, in most cases, the on-site and outside contractors will exchange copies of their respective energy control procedures and may, when appropriate, have a discussion regarding relevant provisions (e.g., control measures for all hazardous energy sources potentially to be encountered) of the respective procedures. This provision is intended to ensure that both the host employer and outside personnel are aware that their interaction can be a possible source of injury to employees and are effectively coordinating energy control procedure interaction to protect all employees from hazardous energy. [See paragraph 1910.147(f)(2)(i).]

The onsite employer and the contractor also must each ensure that its respective employees understand and comply with all requirements of the contractor's energy control procedure(s). [See paragraph 1910.147(f)(2)(ii).] The facility owner must evaluate the various aspects of the contractor's energy control procedure(s) to ensure that its own employees are not placed at risk by the implementation of the contractor's procedure because each employer has an independent obligation under the OSH Act to provide employee protection. This knowledge prevents any misunderstanding by either the plant employees or the outside personnel regarding the application of the energy control procedures.

XIV.    Group Lockout/Tagout. Group LOTO applies to the performance of servicing or maintenance activities when more than one employee is engaged in the servicing operation. When servicing and maintenance is performed by a crew, craft, department or other group, a procedure must be utilized that affords each employee a level of protection equivalent to that provided by the implementation of a personal lockout or tagout device.