**NO ORAL ARGUMENT HAS BEEN SCHEDULED**

**No. 13-1194**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**OTIS ELEVATOR COMPANY,**

PETITIONER

v.

**SECRETARY OF LABOR, et al.,**

RESPONDENTS

**ON PETITION FOR REVIEW OF A FINAL ORDER OF
THE ADMINISTRATIVE REVIEW BOARD**

**BRIEF FOR THE SECRETARY OF LABOR**

M. PATRICIA SMITH
  SOLICITOR OF LABOR

JOSEPH M. WOODWARD
  ASSOCIATE SOLICITOR FOR
  OCCUPATIONAL SAFETY AND HEALTH

HEATHER R. PHILLIPS
  COUNSEL FOR APPELLATE LITIGATION

SCOTT GLABMAN
  SENIOR APPELLATE ATTORNEY

U.S. DEPARTMENT OF LABOR
OFFICE OF THE SOLICITOR, ROOM S-4004
200 CONSTITUTION AVENUE, N.W.
WASHINGTON, D.C. 20210
(202) 693-5493

DECEMBER 18, 2013

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    *Parties*

The parties before the Occupational Safety and Health Review Commission were the Secretary of Labor (Complainant) and Otis Elevator (Respondent).

Otis and the Secretary of Labor are the only parties before this court. The Commission, an independent tribunal, is a party in name only and, like a district court, has no stake in the outcome of this case.

B.    *Rulings*

The ruling under review is a Commission final order, issued April 8, 2013, in *Otis Elevator Co.*, 24 BNA OSHC 1081 (No. 09-1278, 2013).

C.    *Related Cases*

This case has not previously been before this court or any other court. I am not aware of any related cases pending before this court or any other court.

/s/Scott  Glabman
SCOTT GLABMAN
Attorney for the Secretary of Labor

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
   AND RELATED CASES

TABLE OF AUTHORITIES ....................................................... iii

GLOSSARY ........................................................... vi

JURISDICTIONAL STATEMENT ............................................. 1

STATEMENT OF THE ISSUES ............................................... 2

STATUTES AND REGULATIONS ............................................ 2

STATEMENT OF THE CASE ................................................ 2

STATUTORY AND REGULATORY BACKGROUND ......................... 3

    1.   *The OSH Act* ................................................... 3

    2.   *The Lock-Out/Tag-Out Standard* ............................... 4

STATEMENT OF FACTS .................................................... 5

    1.   *Injury of an Otis Mechanic While Servicing a Boston Store
        Elevator* ..................................................... 5

    2.   *The ALJ's Decision* ................................. 8

    3.   *The Commission's Decision* .................... 9

SUMMARY OF THE ARGUMENT ....................................... 12

ARGUMENT

    I.   *Standard of Review* ................................. 12

II.    *The Commission Properly Concluded That Otis's Unjamming Activity Was Covered Under the Lock-Out/Tag-Out Standard's Scope and Application Provisions, Thus Triggering Otis's Duty To Communicate  Its Lock-Out/Tagout Procedures to the Boston Store* ........................................................................ 13

   A.    *The Commission Properly Found That There Was an Unexpected Energization Here Because Mr. Nauholz Could Not Predict Precisely When the Chain and Gate Would Begin To Move and Had No Opportunity To Get Out Of the Way* ............................................................ 16

   B.    *The Preamble to the Lock-Out/Tag-Out Standard Supports the Commission's Finding That the Unjamming Activity Involved the Potential for Unexpected Energization* ............................................... 19

III.   *The Commission Properly Affirmed the Cited Violation of the Lock-Out/Tag-Out Standard's Exchange of Information Provision, 29 C.F.R.§ 1910.147(f)(2)(i)* .............. 20

**CONCLUSION** .......................................................................... 29

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

ii

# TABLE OF AUTHORITIES

**CASES:**                                                                                            **Page**

*A.E. Staley Mfg. Co. v. Secretary of Labor*,
   295 F.3d 1341 (D.C. Cir. 2002) ....................................................... 13

*Brock v. City Oil Well Serv. Co.*,
   795 F.2d 507 (5th Cir. 1986) .......................................................... 27

*Bunge Corp. v. Secretary of Labor*,
   638 F.2d 831 (5th Cir. Unit A 1981) ................................................ 28

*\*Burkes Mechanical Inc.*,
   21 BNA OSHC 2136 (No. 04-0475, 2007) ........................... 14, 17, 18

*Carlisle Equip. Co. v. United States Secretary of Labor*,
   24 F.3d 790 (6th Cir. 1994) ............................................................. 27

*Chevron U.S.A. v. Natural Resources Defense Council*,
   467 U.S. 837 (1984) ....................................................................... 13

*Cuyahoga Valley Ry. Co. v. United Transp. Union*,
   474 U.S. 3 (1985) ............................................................................. 4

*\*Dayton Tire*,
   23 BNA OSHC 1247 (No. 94-1374, 2010, *aff'd in part, vacated in
   part on other grounds*, 671 F.3d 1249 (D.C. Cir. 2012) ........ 17, 18, 19

*Faultless Div., Bliss & Laughlin Indus., Inc. v. Secretary of Labor*,
   674 F.2d 1177 (7th Cir. 1982) ...................................................... 27-28

*Flintco Inc.*,
   16 BNA OSHC 1404 (No. 92-1396, 1993) ....................................... 25

*Gen'l Motors Corp.*,
   22 BNA OSHC 1019 (No. 91-2834E &
   91-2950, 2007) ............................................................... 10, 14, 17,  19

**\*Authorities on which we chiefly rely are marked with asterisks.**

*Joseph J. Stolar Constr. Co.*,
    9 BNA OSHC 2020 ........................................................................... 24

*Martin v. OSHRC*, (CF&I),
    499 U.S. 144 (1991) ..................................................................... 3, 4

*Martin v. Pav-Saver Mfg. Co.*,
    933 F.2d 528 (7th Cir. 1991) ............................................................ 4

*Montgomery Kone, Inc. v. Secretary of Labor*,
    234 F.3d 720 (D.C. Cir. 2000) ......................................................... 13

*Reich v. Gen. Motors Corp.*,
    89 F.3d 313 (6th Cir. 1996) ............................................................ 18

*Yousuf v. Samantar*,
    451 F.3d 248 (D.C. Cir. 2006) ......................................................... 13

## STATUTES AND REGULATIONS:

Occupational Safety and Health Act of 1970 (OSH Act),
    29 U.S.C. § 651-678.......................................................................... 1

    § 2(b), 29 U.S.C. § 651(b)............................................................... 3

    § 9, 29 U.S.C. § 658 ..................................................................... 3

    § 10, 29 U.S.C. § 659 ................................................................. 2, 3

    § 10(a), 29 U.S.C. § 659(a) ............................................................ 4

    § 10(c), 29 U.S.C. § 659(c) ......................................................... 1, 4

    § 11(a), 29 U.S.C. § 660(a) ...................................................... 1, 4, 13

    § 11(b), 29 U.S.C. § 660(b)............................................................ 4

    § 12(j), 29 U.S.C. § 661(j) ............................................................ 4

§ 17, 29 U.S.C. § 666 ............................................................ 3-4

Code of Federal Regulations

29 C.F.R. § 1910.147 ............................................................. 27

29 C.F.R. § 1910.147(a)(1)(i) .............................. 4, 8,  9, 10, 15

29 C.F.R. § 1910.147(a)(2) ........................................ 8, 9, 10, 15

29 C.F.R. § 1910.147(a)(2)(i) ............................................ 10, 15

29 C.F.R. § 1910.147(a)(2)(ii) .................................................. 20

29 C.F.R. § 1910.147(a)(2)(ii)(B)..................................... 11, 15

29 C.F.R. § 1910.147(a)(3)(i) ............................................. 13-14

29 C.F.R. § 1910.147(b)................................................. 5, 15, 20

29 C.F.R. § 1910.147(f)(2)(i)............... 2, 5, 8, 9, 11, 12, 15, 20,
                                        21, 22, 23, 24, 26, 28, 29

**MISCELLANEOUS:**

Federal Register,

OSHA, "Control of Hazardous Energy Sources (Lockout/Tagout.),"
      Final Rule, (Preamble to Lock-out/Tag-out Final Rule)

   *54 Fed. Reg. 36,644 .............................................. 5, 20, 23, 25

   55 Fed. Reg. 38,677, 38,683 (Sept. 20, 1990) ........................ 23

*OSHA's  Lock-Out/Tag-Out  (LOTO)  Compliance Directive,
      CPL 02-00-147 (at 2-31) (Feb. 11, 2008).............. 14, 26, 27, 28

# GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge of the Occupational Safety and Health Review Commission |
| BNA OSHC | Bureau of National Affairs, Inc. Occupational Safety and Health Cases, reporter of Commission cases.  The acronym is used in citations. |
| C-[number] | Complainant's Exhibit.   In Commission proceedings, the complainant is the Secretary of Labor. |
| CF&I | Short form for the case *Martin v. OSHRC (CF&I Steel Corp.)*, 499 U.S. 144 (1991) |
| Commission | Occupational Safety and Health Review Commission |
| CPL-[number] | OSHA Compliance Directive |
| OSHA | Occupational Safety and Health Administration |
| OSH Act | Occupational Safety and Health Act |
| OSHRC | Occupational Safety and Health Review Commission. |
| R-[number] | Respondent's Exhibit.  In Commission proceedings, the respondent is the cited employer.  Otis Elevator was the respondent in the proceeding before the Commission. |
| Secretary | Secretary of Labor |
| Tr. | Transcript |

## JURISDICTIONAL STATEMENT

Petitioner Otis Elevator Company seeks review of a final order of the Occupational Safety and Health Review Commission under the Occupational Safety and Health Act of 1970 (OSH Act or the Act), 29 U.S.C. §§ 651-678.  After Otis's service mechanic Ken Nauholz lacerated his hand unjamming an elevator gate at the Boston Store, a department store, in Brookfield, Wisconsin, the Occupational Safety and Health Administration (OSHA)[1] investigated the accident and issued a serious citation to Otis.  Commission (Comm.) Dec. 1; Administrative Law Judge (ALJ) Dec. 2; Transcript (Tr.) 48.  Otis contested the citation, and the Commission had jurisdiction over the dispute under section 10(c) of the Act.  29 U.S.C. § 659(c).

An ALJ vacated the citation on January 14, 2011.  ALJ Dec. 2, 24.  Subsequently, the Commission reversed the ALJ and affirmed the citation in its April 8, 2013 final order, disposing of all of the parties' claims.  Comm. Dec. 2, 13.  On June 3, 2013, Otis filed a petition for review with this Court.  This Court has jurisdiction because the petition was filed within sixty days of the date of the Commission's final order.  29 U.S.C. § 660(a).

---

[1]  The Secretary of Labor has delegated his responsibilities under the OSH Act to the Assistant Secretary for Occupational Safety and Health, who heads OSHA. The terms "Secretary" and "OSHA" are used interchangeably here.

## STATEMENT OF THE ISSUES

1.  Whether the Commission correctly found that Otis mechanic Nauholz's unjamming activity was covered by OSHA's lock-out/tag-out standard where the activity involved the potential for unexpected energization because Mr. Nauholz could not predict when the jam would yield and had no opportunity to move safely away and there was no mechanism to provide adequate advance notice of machine activitation.

2.  Whether the Commission properly found that Otis violated the lock-out/tag-out standard's exchange of information provision, 29 C.F.R. § 1910.147(f)(2)(i), where Otis failed to provide the Boston Store with information on its lock-out/tag-out procedures and Boston Store employees were present at the worksite and could potentially interfere with or be harmed by the Otis mechanic's unjamming activity.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in Otis's principal brief.

## STATEMENT OF THE CASE

This enforcement action arises under section 10 of the OSH Act, 29 U.S.C. § 659.  After investigating Otis mechanic Nauholz's accident while repairing a freight elevator in the Boston Store in Brookfield, Wisconsin, OSHA issued a citation to Otis, alleging a serious violation of 29 C.F.R. § 1910.147(f)(2)(i), which

required Otis and the Boston Store to inform each other of their lock-out/tag-out procedures.[2]  Comm. Dec.1.  The citation item proposed a penalty of $5000.  ALJ Dec. 2.  Otis contested the citation, and, following a hearing on the merits, the ALJ vacated the citation ALJ Dec. 2, 24.  The Commission reversed the ALJ and affirmed the citation in a final order, assessing a penalty of $500.  Comm. Dec. 2, 13.  The petition for review to this Court followed.

## STATUTORY AND REGULATORY BACKGROUND

1.    *The OSH Act*

The goal of the OSH Act is "to assure so far as possible" safe working conditions for "every working man and woman in the Nation."  29 U.S.C. § 651(b).  To achieve this goal, the Act separates rule-making and enforcement powers from adjudicative powers and assigns these respective functions to two different administrative actors:  the Secretary and the Commission.  *Martin v. OSHRC (CF&I)*, 499 U.S. 144, 147, 151 (1991).

The Secretary is charged with promulgating and enforcing workplace health and safety standards, and the Commission is responsible for carrying out the Act's adjudicatory functions.  *CF & I*, 499 U.S. at 147.  The Secretary (through OSHA) prosecutes violations of the Act and its standards by issuing citations requiring abatement of violations and assessing monetary penalties.  29 U.S.C. §§ 658-59,

---

[2]  The citation also included another serious violation, which the Secretary withdrew before the ALJ hearing.  Comm. Dec.1 n.1.

3

666. The Commission is an independent agency that is a "neutral arbiter" for adjudicating disputes between employers and OSHA that arise from those citations. *Cuyahoga Valley Ry. Co. v. United Transp. Union,* 474 U.S. 3, 7 (1985) (per curiam); *CF&I*, 499 U.S. at 147-48, 154-55.

The employer may contest a citation by filing a written notice of contest with OSHA within fifteen working days of receiving the citation. 29 U.S.C. § 659(a); *Martin v. Pav-Saver Mfg. Co.*, 933 F.2d 528 (7th Cir. 1991). If an employer contests the citation, a Commission ALJ provides an opportunity for a hearing and issues a decision on the contest. 29 U.S.C. §§ 659(c), 661(j). The Commission may review and modify the ALJ's decision. §§ 659(c), 661(j). Either the Secretary or an aggrieved party may seek judicial review in a United States court of appeals of a Commission final order. § 660(a)-(b).

1.   *The Lock-Out/Tag-Out Standard*

The purpose of the lock-out/tag-out standard is to require employers to establish an energy control program to prevent the unexpected energization or start-up of machines or equipment, or release of stored energy, that could cause injury to employees. 29 C.F.R. §§ 1910.147(a)(1)(i) & (3)(i). The standard applies to the control of energy only during servicing and/or maintenance of machines and equipment. §§ 1910.147(a)(2)(i) & (ii).

4

The cited provision, 29 C.F.R. § 1910.147(f)(2)(i), requires an on-site employer and an outside employer to inform each other of their lock-out or tag-out procedures whenever outside servicing personnel are to be engaged in servicing and/or maintenance of machines and equipment, such as unjamming activity.  §§ 1910.147(b), 1910.147(f)(2)(i).  As OSHA explained in the preamble to the lock-out/tag-out final rule, this "requirement for coordination between the contractor and the on-site employer is intended to deal with the potential for either one's employees to create or compound the hazards to which the other's employees are exposed."   OSHA, "Control of Hazardous Energy Sources (Lockout/Tag-out.)," Final Rule, 54 Fed. Reg. 36,644, 36,681 (Preamble to the Lock-out/Tag-out Final Rule).  OSHA views the proper use of § 1910.147(f)(2)(i) as a means of preventing misunderstandings about either side's lock-out/tag-out procedures that could be a possible source of injury.  *Id*. at 36,680-81.

## STATEMENT OF FACTS

1.     *Injury of an Otis Mechanic While Servicing a Boston Store Elevator*

Otis is one of the largest elevator companies in the world, employing approximately 7000 workers in the United States alone.  Tr. 186.  Otis services and repairs elevators, including the freight elevator at the Boston Store's Brookfield, Wisconsin work place.  ALJ Dec. 3 (Stips. 4-7).  The store uses this elevator to move merchandise, and sometimes personnel, between the first and second floors

5

of the building.  Tr. 51.  During his inspection of the store, the OSHA compliance officer observed four employees use the elevator in a half hour.  (*Id.*)

The elevator was equipped with outer bi-parting doors and an inner metal grated gate that had to be manually raised or lowered to use the elevator.  Tr. 51, 118; Respondent's Exhibit (R-) T.  The gate was controlled by a mechanism that included two chain assemblies on the roof top of the elevator, one on each side next to the gate.  Comm. Dec. 2.  Each chain assembly included vertical and horizontal chains attached to separate sprockets.  Comm. Dec. 2.  The horizontal chains were powered by one of the motor's pulleys, which raised and lowered the gate.  Comm. Dec. 2.

On June 16, 2009, Otis assigned mechanic Nauholz to repair this Boston Store elevator, whose gate was "hung up and not functioning."  ALJ Dec. 4-6; Comm. Dec. 1-2.  When Mr. Nauholz arrived at the store at about 8:30 a.m., he signed in with a store employee, and walked to the elevator, encountering a couple of other store employees who told him that the elevator gate was broken.  ALJ Dec. 6; Tr. 108-10.  Although the store did not open for business until 10 or 10:30 a.m., there were several employees in the store while Mr. Nauholz was there.  Tr. 139.  Mr. Nauholz admitted that not all employees in the store knew that he was there, and that employees could have come near the elevator gate while he was working on it.  Comm. Dec. 12 n.11; Tr. 142-43, 171.  Mr. Nauholz did not inform

6

any Boston Store employee of Otis's lock-out/tag-out procedures.  Comm. Dec. 3;

ALJ Dec. 6; Tr. 156, 188, 254.

When Mr. Nauholz got to the elevator he noticed that the gate was stuck in a

partially open position about three feet above the floor.  Comm. Dec. 2; ALJ Dec.

7.  After being unable to budge the gate, he ducked under it to enter the elevator

car, and used a step ladder to open the car's escape hatch and climb on top of the

car.  Comm. Dec. 2; ALJ Dec. 7.

Once on top of the car, Mr. Nauholz flipped two switches to prevent the

elevator from being called to another floor, and to ensure that the gate could not be

moved electrically by pressing a button.  Comm. Dec. 2; Tr. 143-44.  He then

determined that the gate could not move because one of its chains, which was

connected to a counterweight, was off its sprocket and jammed.  Comm. Dec. 2;

Tr. 122.  Mr. Nauholz tried to fix the gate by prying the chain back onto the

sprocket.  Comm. Dec. 2; ALJ Dec. 8; Tr. 56, 122-123.  As soon as the chain was

unjammed, it started moving as he anticipated, and he grabbed it to prevent the

gate from slamming and breaking the link between the chain and the

counterweight, a rupture that would have delayed his repair.  Comm. Dec.2-3.  As

a result of grabbing the chain, Mr. Nauholz's hand was dragged through the

sprocket and chain, and lacerated, requiring hospital treatment.  Comm. Dec. 2;

ALJ Dec. 2; Tr. 48, 56; Complainant's Exhibit (C-) 3 at 2.  After his injury, Mr.

7

Nauholz drove himself to the hospital, and another Otis employee finished the repair later that day.  C-3 at 2.

    2.    *The ALJ's Decision*

      The ALJ vacated the citation on the grounds that: (1) the lock-out/tag-out standard's scope provision at 29 C.F.R. § 1910.147(a)(1)(i) did not cover the cited activity, Mr. Nauholz's elevator repair activity at the Boston Store on June 16, 2009[3]; and (2) the cited provision, § 1910.147(f)(2)(i), the standard's exchange of information requirement, did not apply to the cited activity.  ALJ Dec. 19-23.

      Holding that "[t]he term 'unexpected' is an unambiguous limitation on the application of the [lock-out/tag-out] standard[]," ALJ Dec. 20, the ALJ found, largely on the basis of Mr. Nauholz's testimony, that the energization of the elevator chain and gate was not unexpected because Mr. Nauholz fully expected them to start moving when he put the chain back on the sprocket.  ALJ Dec. 21-22. Accordingly, the ALJ concluded that Mr. Nauholz's repair activity was not covered by § 1910.147(a)(1)(i) because the energization that resulted from his work was not unexpected as required by the provision.  ALJ Dec. 20-21.

---

[3]  Although the ALJ stated that Mr. Nauholz's repair activity also was not covered by the application provision of the lock-out/tag-out standard, 29 C.F.R. § 1910.147(a)(2), he discussed only the scope provision, § 1910.147(a)(1)(i).  ALJ Dec. 19.  Section 1910.147(a)(2) limits the application of the standard to the control of energy during servicing and/or maintenance of machines and equipment. Section 1910.147(a)(1)(i) covers only servicing and maintenance in which unexpected energization could cause injury to employees.

The ALJ also found that the cited provision, 29 C.F.R. § 1910.147(f)(2)(i),

requiring an on-site employer and an outside employer to inform each other of

their lock-out or tag-out procedures, did not apply to Mr. Nauholz's repair activity

because there was no possibility of an interaction between Mr. Nauholz and Boston

Store employees in the elevator servicing area.  ALJ Dec. 22-23.  The ALJ

determined that no such interaction was possible because "[t]he only employee

who would ever be on the elevator car top, where the work was performed, would

be an Otis employee [i.e., Mr. Nauholz]."  ALJ Dec. 21-22.)  The ALJ further

found that Boston Store employees were not exposed to the zone of danger because

it was not "reasonably predictable" that they would go onto the car top.  ALJ Dec.

22-23.  The ALJ also noted that there was insufficient evidence to show that the

elevator gate was a zone of danger or that store employees were in the area of the

gate while Mr. Nauholz serviced the elevator.  Dec. 22 n.43, 23.

3.    *The Commission's Decision*

The Commission reversed the ALJ and affirmed the citation on the grounds

that: (1) the lock-out/tag-out standard's scope and application provisions, 29

C.F.R. §§ 1910.147(a)(1)(i) and 1910.147(a)(2), covered the cited activity, Comm.

Dec. 3-6; and (2) the cited provision, § 1910.147(f)(2)(i), applied to the cited

activity, Comm. Dec. 6-10.

9

Contrary to the ALJ's conclusion, the Commission found that coverage of the cited activity under the lock-out/tag-out standard scope provision, 29 C.F.R. § 1910.147(a)(1)(i), did not depend on whether Mr. Nauholz expected the elevator chain and gate to be energized when he unjammed the chain. Comm. Dec. 4. Instead, the Commission linked coverage under the standard to whether there was a potential for an unexpected release of stored energy that could cause injury to Mr. Nauholz, i.e., the absence of a mechanism to provide adequate advance notice of machine activation. Comm. Dec. 4 (citing *Gen'l Motors Corp.*, 22 BNA OSHC 1019, 1023 (No. 91-2834E & 91-2950, 2007)). The Commission found there was such a potential here because, absent such a mechanism, Mr. Nauholz could not predict when the jam would yield, and was, in fact, surprised by the release of energy. Comm. Dec. 4.

The Commission further found that if the cited activity was not done during normal production operations, the standard's application provision, 29 C.F.R. § 1910.147(a)(2)(i), covered the cited activity because Mr. Nauholz's unjamming activity constituted servicing and/or maintenance that potentially exposed him to the unexpected energization of the elevator gate and chain. Comm. Dec. 4-6. Alternatively, the Commission found that even if Mr. Nauholz's work was done during normal production operations, it would still be covered under the standard's exception for servicing and/or maintenance where an employee has to place part of

10

his body in a machine's point of operation or where an associated danger zone

exists during a machine operating cycle.  Comm. Dec. 5 n.4 (citing § 1910.147

(a)(2)(ii)(B)).

Again rejecting the ALJ's conclusion, the Commission also found that the

cited provision, § 1910.147(f)(2)(i), the exchange of information requirement,

applied to the cited unjamming activity.  Comm. Dec. 6-10.  The Commission

found that, by its terms, the cited provision applies "*whenever* outside servicing

personnel are to be engaged in activities covered by the scope and application of

[the lock-out/tag-out] standard.'"  Comm. Dec. 6 (quoting § 1910.147(f)(2)(i))

(emphasis added by the Commission).  Since the Commission determined that Mr.

Nauholz was engaged in such activities and that Otis did not inform the Boston

Store of its lock-out/tag-out procedures, the Commission concluded that the plain

language of the cited provision presumed the hazard that a Boston Store employee

might interfere with the restrictions and prohibitions of Otis's lock-out/tag-out

procedures.  Comm. Dec. 6-7, 10.  Accordingly, the Commission affirmed the

violation.[4]  Comm. Dec. 10.

---

[4]  The Commission also rejected Otis's infeasibility affirmative defense on the
grounds that determining what energy control procedure to use was
straightforward, and that Mr. Nauholz could have provided the applicable
procedure to Boston Store personnel before he started work.  Comm. Dec. 11.  The
Commission also affirmed the violation as serious on the basis that an accident was
possible and that if it occurred, it was likely that serious injury could result from it.
Comm. Dec. 12.  Finally, the Commission reduced the proposed penalty from

## SUMMARY OF THE ARGUMENT

The Commission properly found that Otis mechanic Nauholz's unjamming activity at the Boston Store elevator was covered by the lock-out/tag-out standard. The standard covers "servicing and maintenance" of machines and equipment, including "unjamming" where the unexpected release of hazardous energy could cause injury to employees. Mr. Nauholz's unjamming activity involved the potential for unexpected energization because he could not predict when the jam would yield and had no opportunity to move away. Nor was the elevator equipped with a mechanism to provide advance notice of machine activation.

The Commission also properly held that Otis violated the lock-out/tag-out standard's exchange of information provision, 29 C.F.R. § 1910.147(f)(2)(i), because Otis failed to inform the Boston Store of its lock-out/tag-out procedures. The Commission correctly found that the provision presumes the hazard and applied where Boston Store employees were present and potentially had access to the worksite.

## ARGUMENT

I.    *Standard of Review*

The issues presented in this case concern the interpretation of provisions of the OSHA lock-out/tag-out standard. Questions of textual interpretation are issues

---

$5000 to $500 on the ground that the likelihood of an accident was exceptionally low. Comm. Dec. 12-13.

of law and are decided *de novo*. *Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006). If the meaning of the provision, considering its text and legislative history, is plain, it must be given effect. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984). If, however, the provision is ambiguous, OSHA's interpretation must be upheld so long as it is reasonable, i.e., sensibly conforms to the standard's wording and purpose. *Martin v. OSHRC ("CF & I ")*, 499 U.S. 144, 150-51 (1991).

To the extent that there are nontextual issues here, this Court reviews Commission decisions under a "highly deferential standard." *Montgomery Kone, Inc. v. Secretary of Labor*, 234 F.3d 720, 722 (D.C. Cir. 2000). The court must uphold the Commission's factual findings if they are "supported by substantial evidence on the record considered as a whole," and must uphold the Commission's other conclusions if they are not arbitrary, capricious, an abuse of discretion or otherwise contrary to law. 29 U.S.C. § 660(a); *A.E. Staley Mfg. Co. v. Secretary of Labor*, 295 F.3d 1341, 1345 (D.C. Cir. 2002).

II.   *The Commission Properly Concluded That Otis's Unjamming Activity Was Covered Under the Lock-Out/Tag-Out Standard's Scope and Application Provisions, Thus Triggering Otis's Duty To Communicate Its Lock-out/Tag-out Procedures to the Boston Store.*

The purpose of the lock-out/tag-out standard is to require employers to establish and use an energy control program "to prevent unexpected energization, start-up or release of stored energy in order to prevent injury to employees." 29

13

C.F.R. § 1910.147(a)(3)(i).  As the Secretary's compliance directive on the

standard explains:

> Although some have contended that the standard does
> not apply when an employee is aware of the continuing
> presence of hazardous energy, this assertion is
> completely at odds with the language, purpose, and
> spirit of the standard.  Quite simply, the LOTO [lock-
> out/tag-out] standard is violated when an employee is, or
> may be, exposed to hazardous energy that has not been
> isolated, even if the employee knows that the energy has
> not been controlled and continues to constitute a hazard.

Lock-out/Tag-out Compliance Directive, CPL 02-00-147 at 2-31 (Feb. 11, 2008).

The directive elaborates that reliance on the employee's recognition of

hazardous energy provides inadequate protection, and that there are no

circumstances under which any part of an employee's body is ever permitted to be

exposed within a hazardous area, during servicing and/or maintenance activities

while the machine is still running or energized.  *Id.* (citing *Gen. Motors Corp.*, 22

BNA OSHC 1019 (Nos. 91-2834E & 91-2950, 2007); *Burkes Mechanical Inc.*, 21

BNA OSHC 2136, 2139 n.4 (No. 04-0475, 2007).  The goal of the standard, then,

is total de-energization of any machine or equipment that could potentially release

hazardous energy.  In keeping with this broad protective purpose, "unexpected"

energization means any hazardous energization that could potentially occur where

a machine has not been properly locked and tagged out.

Otis was cited for violating 29 C.F.R. § 1910.147(f)(2)(i).  That provision

requires an on-site employer and an outside employer to inform each other of their

lock-out/tag-out procedures whenever outside servicing personnel perform

"activities covered by the scope and application" of the lock-out/ tag-out standard.

The lock-out/tag-out standard's scope and application provisions cover "servicing

and maintenance" of machines and equipment, including "unjamming" where the

unexpected energization or start up of the machines or equipment, or the release of

hazardous energy could cause injury to employees."   29 C.F.R. § 1910.147(a)(i),

(a)(2), (b) (definition of "servicing and/or maintenance").  The Commission found

that Mr. Nauholz's activity of unjamming the elevator gate chain fell within the

scope and application of the standard because there was a potential for an

unexpected release of stored energy that could cause injury.[5]  Comm. Dec. 4.  The

Commission's finding is supported both by case law establishing that energization

is "unexpected" if it could occur without sufficient notice or warning to ensure the

employee's safety, and by language in the standard's preamble indicating that the

---

[5] The Commission also correctly noted "[w]e need not reach the issue of whether
the Otis mechanic's work was done during 'normal production operations,'
because the record establishes the LOTO standard's applicability in either case."
Comm. Dec. 5 n.4.  This is because if the work was not done during "normal
production operations," the lock-out/tag-out standard applied pursuant to §
1910.147(a)(2)(i).  If the work was done during normal production operations, the
lock-out/tag-out standard applied because the record establishes that the
requirements for applicability pursuant to § 1910.147(a)(2)(ii)(B) have been met.

15

servicing employee's awareness that energization could or would occur does not mean that such energization is outside the scope of the standard's coverage.

A.   *The Commission Properly Found That There Was an Unexpected Energization Here Because Mr. Nauholz Could Not Predict Precisely When the Chain and Gate Would Begin To Move and Had No Opportunity To Get Out Of the Way.*

The Commission properly found that Mr. Nauholz's unjamming activity involved the potential for unexpected energization because, although he expected the chain to begin to move once it was unjammed from the sprocket, Mr. Nauholz "could not predict when the jam would yield" and therefore had no opportunity to move safely away.  Comm. Dec. 4.  Otis argues that Mr. Nauholz was in no danger until he intentionally grabbed the chain as it started moving.  Otis Brf. 36.  But this merely proves that Mr. Nauholz was close enough to the moving chain to be injured by it; whether contact was deliberate, or reflexive as the Commission found, is irrelevant.[6]  Comm. Dec. 4.  More importantly, Otis ignores the central point that Mr. Nauholz had no advance warning or notice of when the chain would begin to move and thus no opportunity to move safely away.  Insofar as the record shows, Mr. Nauholz was unaware of the chain's energization until it actually began to move.  By then it was obviously too late to avoid the hazard.

---

[6]  Mr. Nauholz could have been injured by the moving chain even if he had not physically grabbed it.  As the Commission found, Mr. Nauholz's unjamming activity placed him in close enough proximity to the chain that his clothing could have been caught in the chain or sprocket when the stored energy was released.  Comm. Dec. 4-5.

16

Commission precedent directly supports the conclusion that the unjamming activity at issue here involved the potential for unexpected energization.  The Commission has held  that "[e]nergization is 'unexpected'  in the absence of some mechanism to provide adequate advance notice of machine activation." *Dayton Tire*, 23 BNA OSHC 1247, 1250 (No. 94-1374, 2010, *aff'd in part, vacated in part on other grounds*, 671 F.3d 1249 (D.C. Cir. 2012); *Gen. Motors*, 22 BNA OSHC at 1023 (Nos. 91-2834E & 91-2950, 2007); *Burkes Mechanical Inc.*, 21 BNA OSHC at 2139 n.4 (No. 04-0475, 2007) (citing *Gen. Motors*, 89 F.3d at 315).  In these cases, the Commission has made clear that the employee's expectation that energization could or would occur is not sufficient to remove a servicing or maintenance activity from coverage under the standard.  In *Burkes Mechanical*, 21 BNA OSHC 2136, the Commission affirmed a citation issued under the lock-out/tag-out standard because employees cleaned near and under a conveyer belt while the belt was running rather than following lock-out/tag-out procedures.  *Id.* at 2139.  The Commission expressly rejected the employer's argument that the fact that the belt was moving removed the servicing activity from coverage under the standard.  *Id.*  Instead, the Commission held that the employees were engaged in a covered servicing activity because the cleaning work exposed them to danger from the moving conveyor.  *Id.* at 2140.

The Commission recently reaffirmed this conclusion in *Dayton Tire*, 23

BNA OSHC 1247 (No. 94-1374, 2010), *aff'd in part, vacated in part on other*

*grounds*, 671 F.3d 1249 (D.C. Cir. 2012). In that case, the Secretary cited a tire

manufacturer for over a hundred alleged willful violations of the lock-out/tag-out

standard. *Dayton Tire*, 23 BNA OSHC at 1248. The Commission rejected the

employer's argument that the energization of machines was not unexpected when

the equipment was in an automatic mode during servicing, holding that it had

"already considered and rejected [this] argument in *Burkes Mechanical, Inc.*" *Id.*

at 1253. Here, as in these two prior Commission cases, Mr. Nauholz was not

afforded adequate notice that energization could occur and cause injury. That Mr.

Nauholz may have known that the chain would move normally once it was

unjammed, just as the employees knew that the machines were operating in *Burkes*

*Mechanical* and *Dayton Tire*, does not release Otis from the requirements of the

lock-out/tag-out standard.[7]

---

[7]  The Secretary does not believe that the presence of a device warning of
impending start up or energization of a machine is a sufficient basis to find that the
machine has no potential for unexpected energization. *Reich v. General Motors
Corp.*, 89 F.3d 313, 315 (6th Cir. 1996) (affirming Commission decision that lock-
out/tag-out standard did not apply to servicing of machines designed and
constructed so that they could not start up without giving a servicing employee
notice of what was about to happen). In the Secretary's view, the clear intent of
the standard is to require lock-out/tag-out procedures  whenever there is a
possibility that energization could occur and cause injury. This Court need not
reach this issue here, however, because the absence of advance notice or warning

In short, since it is undisputed that the Boston Store elevator had no mechanism to provide adequate advance notice of the activation of the elevator, the energization that resulted from the cited jamming activity was unexpected under Commission precedent.  *Dayton Tire*, 23 BNA OSHC at 1250; *Gen. Motors Corp.*, 22 BNA OSHC at 1023.

Mr. Nauholz's expectation that the chain would move when he unjammed it did not exempt his unjamming activity from the coverage of the lock-out/tag-out standard.  Whatever the level of Mr. Nauholz's subjective expectations, the energization of the chain and gate was "unexpected" in that he could not predict when it would occur and thus had no opportunity to avoid it.  Comm. Dec. 4-5.

B.     *The Preamble to the Lock-Out/Tag-Out Standard Supports the Commission's Finding That the Unjamming Activity Involved the Potential for Unexpected Energization.*

The preamble to the lock-out/tag-out final rule further buttresses the Commission's finding here by clarifying that energization can be considered unexpected within the scope of the standard when machine components are known to be moving.  The preamble includes, in a list of hazards the standard was designed to counter, the following accidents involving energized equipment:  (1) an employee who was cleaning "an operating granite saw" and got caught in its

---

to employees that a machine is about to start up or energize is sufficient under Commission case law to establish the potential for unexpected energization.

moving parts; (2) an employee who climbed into a shut-down waste hogger and fell onto a moving conveyor belt; and (3) employees who were repairing a turned-off press brake, and lost control of a metal bar while trying to use it to turn a still-moving flywheel.  Preamble, 54 Fed. Reg. at 36,646.   The fact that unjamming of equipment during normal production operations is covered where employees may be exposed to unexpected energization is a further indication that coverage does not turn on the employee's subjective expectation that energization could occur. 29 C.F.R. 1910.147(a)(2)(ii) and (b) (definition of "servicing and/or maintenance").  As a  practical matter, whenever an employee attempts to unjam a machine during normal production operations while the machine is still energized, he or she will naturally "expect" that unjamming will result in the resumption of machine operations.  Accordingly, the servicing employee's subjective expectation that unjamming will result in the movement of the jammed parts cannot logically have been intended by the Secretary to limit coverage of servicing performed during production operations.

III.    *The Commission Properly Affirmed the Cited Violation of the Lock-Out/Tag-Out Standard's Exchange of Information Provision, 29 C.F.R. § 1910.147(f)(2)(i).*

The Commission correctly found that Otis violated the lock-out/tag-out standard's exchange of information provision, 29 C.F.R. § 1910.147(f)(2)(i). Comm. Dec. 6-7.  As shown above, mechanic Nauholz's unjamming activity was

20

covered by the lock-out/tag-out standard's scope and application provisions.  *Supra* pp. 15-16.  And, the cited provision of the lock-out/tag-out standard plainly requires that "*[w]henever* outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures."  § 1910.147(f)(2)(i) (emphasis added).  It is undisputed that the Boston Store was an on-site employer, Otis was an outside employer, Boston Store employees were present at the worksite with Otis mechanic Nauholz, and Otis did not inform the Boston Store of its lock-out/tag-out procedures.  Comm. Dec. 3; ALJ Dec. 6; Tr. 156, 188, 254.  Accordingly, the provision applied, and Otis violated it.

Otis disputes this conclusion, asserting that the Commission:

(1) improperly substituted a legal conclusion for record evidence in finding that the exchange of information provision presumed the hazard of potential exposure to an unexpected energization, Otis Brf. 16-19;

(2) undermined its finding of a violation of the cited provision by finding that the likelihood of an accident resulting from a Boston Store employee's interference with Otis's lock-out/tag-out procedures was extremely low, Otis Brf. 17-18;

(3) improperly adopted a new interpretation of the lock-out/tag-out exchange of information provision without fair notice that contradicted the Secretary's previous interpretation of the provision, Otis Brf. 25-29; and

(4) improperly ignored the evidence of contrary industry practice in interpreting the provision, Otis Brf. 29-34.

Otis's first contention is mistaken. There is nothing improper about the Commission's inference of a presumption of hazard from the language of the exchange of information provision instead of relying on the record.[8] Nor does this inference amount, as Otis contends, to an "exposure presumption." Otis Brf. 25.

The exchange of information provision is a specification standard that expressly states that "[w]henever" an outside employee is performing covered activities, the provision takes effect. 29 C.F.R. § 1910.147(f)(2)(i). The standard does not require a showing of on-site employee interaction with the outside employees or a zone of danger created by servicing or maintenance operations performed by outside employees. Rather, the hazard is presumed by the standard. As OSHA explained in the preamble to the lock-out/tag-out final rule, this "requirement for coordination between the contractor and the on-site employer is intended to deal with the potential for either one's employees to create or compound the hazards to which the other's employees are exposed." Preamble to

---

[8] Apart from this legal presumption, the Commission did find, in determining that the lock-out/tag-out application provision was met, that mechanic Nauholz's unjamming activity on top of the elevator car put parts of his body in a danger zone, where the release of stored energy could result in a caught-in hazard. Comm. Dec. 5-6. Based on Mr. Nauholz's testimony, the Commission also found, in characterizing the violation as serious, that Boston Store employees could have come near the elevator and removed a wedge, or pulled on the gate when Mr. Nauholz was unjamming the gate, thus giving them access to the worksite as well. Comm. Dec. & n.11; Tr. 142-43, 171.

the Lock-out/Tag-out Final Rule, 54 Fed. Reg. at 36,881.  As such, §

1910.147(f)(2)(i) serves to prevent misunderstandings about either side's lock-

out/tag-out procedures that could be a possible source of injury.  *Id.* at 36,680-81.

Thus, Otis was obligated to inform the Boston Store of its lock-out/tag-out

procedure so store employees could be instructed to stay away from the jammed

elevator gate while an Otis employee was present to service it.  Whether any store

employees actually approached the elevator during this particular repair is not

relevant to the question of whether § 1910.147(f)(2)(i) applied and was violated.

This is because the provision "presumes that in this situation a Boston Store

employee may interfere with 'the restrictions and prohibitions' of Otis's energy

control program."[9]  Comm. Dec. 7 (citing 55 Fed. Reg. 38,677, 38,683 (Sept. 20,

1990) (final rule) (stating that § 1910.147(f)(2)(i)  is "a way to prevent

misunderstandings by either plant employees or outside service personnel

regarding [in part] . . . the restrictions and prohibitions imposed upon each group of

employees by the other employer's energy control program")).  Thus, regardless of

---

[9] Contrary to Otis's assertion, Otis Brf. 24, this statement by the Commission does
not mean that the Commission "excused the Secretary from his burden of proof
and allowed it to "presume" employee exposure.  Instead, and as the Commission
correctly found, the record establishes that Boston Store employees were present at
the store and had access to the elevator gate while the Otis mechanic was servicing
the elevator.  Comm. Dec. 7 n.8.  Otis's assertion that the Commission applied a
"legal presumption of exposure," Otis Brf. 11, 18, is therefore wholly incorrect.

the height at which the gate was stuck[10] or whether the gate could fall before being repaired, a store employee who approached the elevator while Mr. Nauholz was working would not have expected the gate to fall.  That no store employee happened to be in the vicinity of the gate during the repair hardly makes it impossible, or even unlikely, that one could have walked over; the record includes testimony that Boston Store employees regularly used the elevator.  Tr. 51.

In sum, the exchange of information provision presumes the hazard of potential exposure to the unexpected energization of equipment or release of hazardous energy once the provision is violated.  Contrary to Otis's contentions, Otis Brf. 12, no showing of a hazard or employee exposure to a zone of danger was necessary to establish the violation.  *Joseph J. Stolar Constr. Co.*, 9 BNA OSHC 2020, 2024 n.2 ("The Commission has held that, when a standard prescribes specific means of enhancing employee safety, [a] hazard is presumed to exist if the terms of the standard are violated.").

---

[10] Contrary to Otis's suggestion, this point does not rely on the possibility that a store employee would "duck under a stuck and partially closed elevator gate."  Otis Brf. 13.  An employee who walked up to the gate could be injured by its movement if she, for example, placed her hand on it or her foot under it.  It would hardly be extraordinary for an employee to try and see what was happening inside the elevator or speak to Mr. Nauholz during the repair or stand in close proximity to the gate.  This is why it is critical that employers exchange their lock-out/tag-out information and why § 1910.147(f)(2)(i) presumes a hazard where such information exchange has not occurred (and where employees are present at the worksite).

24

Otis's second contention – that the Commission's factual finding that the likelihood of an accident was low undermined its finding of a violation -- confuses the exchange of information provision's presumption of the hazard with the evaluation of the gravity factor of a penalty.  As explained above, the provision presumes the hazard and anticipates possible exposure where employees are present at the worksite.  The extremely low possibility of an accident is relevant only to determining the gravity of the associated penalty, *Flintco Inc.*, 16 BNA OSHC 1404, 1405-06 (No. 92-1396, 1993), and not to whether the standard presumes a hazard.

Otis's third contention asserting that the Secretary improperly adopted a new interpretation of the exchange of information provision rests on two erroneous premises: (1) that the Secretary and the Commission's interpretation of the lock-out/tag-out exchange of information provision is new; and (2) that the current interpretation contradicts the Secretary's previous interpretation.  As shown above, *supra* pp. 22-23, the Secretary's interpretation is not new but reflects the plain meaning of the provision and is consistent with the regulatory intent expressed in the preamble to the final rule.  Preamble to the Lock-out/Tag-out Final Rule, 54 Fed. Reg. at 36,881 ("[the] requirement for coordination between the contractor and the on-site employer is intended to deal with the potential for either one's

employees to create or compound the hazards to which the other's employees are exposed").

Furthermore, the "previous interpretation" that Otis cites, Otis Brf. 28, does not contradict the Secretary's current interpretation which has remained the same since the lock-out/tag-out standard was issued. Otis cites OSHA's lock-out/tag-out compliance directive, CPL 02-00-147 at 2-31, in support of its position. Otis Brf. 28. The directive's interpretation of the provision, however, is actually consistent with the Secretary's constant position that the exchange of information provision presumes the hazard of potential exposure to hazardous energy. The sentence just before the beginning of Otis's quotation expresses this interpretation in saying of the provision's requirement that on-site and outside employers exchange information about their energy control procedures: "Such coordination is necessary to ensure that both sets of employees will be protected from the hazardous energy." CPL 02-00-147 at 2-31.

The directive also elsewhere notes the provision's presumption of this hazard: "This provision [29 C.F.R. § 1910.147(f)(2)(i)] is intended to ensure that both the host employer and outside personnel are aware that their interaction can be a possible source of injury to employees and are effectively coordinating energy control procedure interaction to protect all employees from hazardous energy." CPL 02-00-147 at 3-57. The passage that Otis quotes ("[i]n all cases, the decision

26

to issue § 1910.147 citations . . . should be based on all of the relevant facts," *id*. at

2-31), is not to the contrary since the Secretary would consider all the relevant

facts whether the cited provision presumed the hazard or not.[11]

Finally, Otis's fourth contention, that the Commission improperly ignored

contrary industry practice in interpreting the exchange of information provision, is

wrong as a matter of law.  Legally, industry practice has no application to

violations of specific standards, where the means of compliance are specified.

*Carlisle Equip. Co. v. United States Secretary of Labor*, 24 F.3d 790, 793-94 (6th

Cir. 1994); *Brock v. City Oil Well Serv. Co.*, 795 F.2d 507, 511 (5th Cir. 1986).

Industry practice is relevant under certain generally worded standards where the

employer's compliance duties are not spelled out in specific terms.  *Carlisle*, 24

F.3d at 793-94.  Where, however, the cited standard prescribes the required

conduct in specific terms, industry practice is inapplicable and should not be

considered.  *Id.; City Oil Well*, 795 F.2d at 511; *Faultless Div., Bliss & Laughlin*

---

[11]  Otis also implies that the cited provision does not presume the cited hazard
because the compliance directive shows that the provision is a "performance-
oriented standard."  Otis Brf. 26-27 (quoting CPL 02-00-147 at 3-56 – 57).  But the
directive explains that the performance-oriented aspect of the provision simply
permits the contractor to use the host employer's energy control procedures, its
own procedures, or a combination of the two.  CPL 02-00-147 at 3-57.  This
flexibility in choosing procedures in no way negates the provision's presumption
of potential exposure to hazardous energy, which the directive acknowledges in the
same discussion by saying that each covered employer "has an employee
protection obligation to control hazardous energy."  *Id*.

*Indus., Inc. v. Secretary of Labor*, 674 F.2d 1177, 1187 (7th Cir. 1982); *Bunge*

*Corp. v. Secretary of Labor*, 638 F.2d 831, 836 (5th Cir. Unit A 1981).

Here, the exchange of information provision provided the means of

compliance for the on-site and outside employers in specific terms: "inform each

other of . . . [your] respective lockout or tagout procedures."  29 C.F.R.

§ 1910.147(f)(2)(i).  Moreover, the lock-out/tag-out compliance directive provided

the additional guidance that, in most cases, this requirement would be met when

the on-site and outside employers exchange copies of their energy control

procedures.  CPL 02-00-147 at 3-57.  Thus, the conduct that the exchange of

information provision required was sufficiently specific that industry practice was

properly not considered.  *Faultless*, 674 F.2d at 1187 ("reliance on industry

practice would permit employers to avoid compliance with specific safety

mandates by relying on the (perhaps equally objectionable) practice of their

peers").

28

## CONCLUSION

For the preceding reasons, the Court should affirm the Commission's April 8, 2013 final order affirming the serious violation of 29 C.F.R. § 1910.147(f)(2)(i) and assessing a penalty of $500.

                    M. PATRICIA SMITH
                    Solicitor

                    JOSEPH M. WOODWARD
                    Associate Solicitor for
                     Occupational Safety
                      and Health

                    HEATHER R. PHILLIPS
                    Counsel for Appellate Litigation

                    /s/Scott Glabman
                    SCOTT GLABMAN
                    Senior Appellate Attorney
                    U.S. Department of Labor
                    Frances Perkins Bldg., Room S-4004
                    200 Constitution Avenue, N.W.
                    Washington, D.C. 20210
                    (202) 693-5493
                    Glabman.Scott@DOL.GOV
                    Attorney for the Secretary of Labor

December 18, 2013

29

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> X     this brief contains  6,814  total words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

> O     this brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> X     this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14 point Times New Roman, *or*

> O     this brief has been prepared in a monospaced typeface using _____ with _____.

/s/Scott Glabman
SCOTT GLABMAN
Attorney for the Secretary of Labor
Dated:  December 18, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2013, I served a copy of the preceding

Brief for the Secretary of Labor through the court's CM/ECF system, on the

following:

Mark J. Langer, Clerk
United States Court of Appeals
for the District of Columbia Circuit
Attention:  Ken R. Meadows, Deputy Clerk

Paul J. Waters, Esq.
pwaters@oshattorney.com

Stephen Charles Yohay, Esq.
Stephen.Yohay@odnss.com; tressi.cordarao@odnss.com;
amy.kim@odnss.com; jc.bryant@odnss.com

John Andrew Shedden, Esq.
John.shedden@ogletreedeakins.com; beth.stevens@ogletreedeakins.com;
Emily.pacheco@ogletreedeakins.com

In addition, I filed five paper copies of the brief on the Court today by hand.

/s/Scott Glabman_____
SCOTT GLABMAN
Attorney for the Secretary of Labor